1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 1

# GEM FUNDING LLC

## FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated 01/27/2021, between Gem Funding LLC ("GF") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

Business Legal Name: California Scuba Center

D/B/A: California Scuba Center

Form of Business Entity: Limited Liability Company    EIN #: 84-2623424

Physical Address: 510 Shaw Avenue, Clovis, CA 93612

Mailing Address: 510 Shaw Avenue, clovis, ca 93612

| Purchase Price | Purchased Amount | Specified Percentage | Initial Daily Installment |
|---|---|---|---|
| $40,000.00 | $54,000.00 | 15% | $1,589.00 |

**FOR SELLER #1**

By: _Michael Fitzgerald_

Name: Michael Scott Fitzgerald

Title: owner

Email: mike@cascubacenter.com

Business Phone: 5599081444

**FOR SELLER #2**

By: _____

Name:

Title:

Email:

Business Phone:

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the Personal Guarantee of Performance in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to GF by the following Owner(s)/Guarantor(s) of Seller.

**OWNER/GUARANTOR #1**

By: _Michael Fitzgerald_

Name: Michael Scott Fitzgerald

SSN: 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

Phone: 5599081444

**OWNER/GUARANTOR #2**

By: _____

Name:

SSN:

Phone:

Address: 2904 E Fremont Ave, FRESNO, CA 93710          Address:

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign the Addendum to this Agreement in the form attached hereto as Exhibit B (the "Addendum").

WHEREAS, Seller is desirous to sell to GF, and GF is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

Initial _MF_          Initial

NOW, THEREFORE, for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, GF and Seller hereby agree to the foregoing and as follows:

1. <u>Basic Terms and Definitions</u>.

a. "<u>Effective Date</u>" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when GF paid the Purchase Price to Seller.

b. "<u>Specified Percentage</u>" shall mean the percentage set forth in the preamble to this Agreement of each and every sum from sale made by Seller of Future Receipts.

c. "<u>Future Receipts</u>" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller. "<u>Daily Receipts</u>" shall mean the amount of Future Receipts received by Seller on a daily basis.

d. "<u>Purchased Amount</u>" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to GF pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.

e. "<u>Purchase Price</u>" shall mean the total amount that GF agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from GF pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs i. and j. below. The Purchase Price is set forth in the Preamble to this Agreement.

f. "<u>Initial Daily Installment</u>" shall mean the fixed amount that Seller and GF agree to be a good faith approximation of the Specified Percentage of Seller's Daily Future Receipts. Seller and GF further agree that the Initial Daily Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to GF concerning Seller's most recent accounts receivables, including representations by the Seller to GF regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

g. "<u>Workday</u>" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

h. "<u>Applicable Fees</u>" shall mean, collectively, all initial costs and fees that Seller agrees to pay to GF as consideration for agreeing to enter into this Agreement and that are described in Sections 17-19 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

i. "<u>Prior Balance</u>" shall mean the sum of all amounts that Seller may owe to GF and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

j. "<u>Origination Fee</u>" shall mean the fee that GF charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

k. In the event "<u>Seller</u>" is comprised of more than one entity, then:

i. The term "Seller" shall mean, individually and collectively, all such entities; and

ii. Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in

Initial  *MF*      Initial

question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

      iii.    The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

      iv.    The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

      v.    The terms "Specified Percentage", "Future Receipts", "Daily Receipts", "Initial Daily Installment" shall mean the Specified Percentage, the Future Receipts and the Daily Receipts of each Seller individually; and

      vi.    GF may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

    l.    In the event "Guarantor" is comprised of more than one individual, then:

      i.    The term "Guarantor" shall mean, individually and collectively, all such individuals; and

      ii.    Each Guarantor is an Affiliate of all other Guarantor(s); and

      iii.    The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

      iv.    The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

      v.    GF may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

2.    The Term. This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to GF pursuant to this Agreement are received by GF in full.

3.    Sale of Purchased Future Receipts. Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto GF all of Seller's right, title and interest in the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to GF (hereinafter, the portion of the Future Receipts sold by Seller to GF pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto GF, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to GF of collectability of the Purchased Future Receipts by GF and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to GF full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

4.    Payment of Purchase Price. In consideration of the sale by Seller to GF of the Purchased Future Receipts pursuant to this Agreement, GF agrees to pay to Seller the Purchase Price; the amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

5.    Use of Purchase Price. Seller hereby acknowledges that it fully understands that: (i) GF's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to GF in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business GF's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the forgoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

Initial    *MF*    Initial

6.   <u>Initial Daily Installments of Purchased Amount</u>. The Purchased Amount shall be delivered by Seller to GF daily in the amount of the Initial Daily Installment on each and every Workday commencing on the Effective Date and ending on the Expiration Date.

7.   <u>Approved Bank Account and Credit Card Processor</u>. During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by GF (the <u>"Approved Bank Account"</u>), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by GF (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

8.   <u>Authorization to Debit Approved Bank Account</u>. Seller hereby authorizes GF to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the Initial Daily Installment on each Workday commencing on the Effective Date until GF receives the full Purchased Amount;

*Seller shall provide GF with all access code(s) for the Approved Bank Account.

The Initial Daily Installment is to be drawn via ACH payment, from the following bank account:

| | |
|---|---|
| Account Number: | 325129779489 |
| Routing Number: | 121000358 |
| Account Name: | California Scuba Center |
| Bank Name: | BANK OF AMERICA, N.A. |

   *NOTE that this authorization is to remain in full force and effect until GF receives written notification from Seller of its termination in such time and in such manner to afford GF a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

9.   <u>Fees Associated with Debiting Approved Bank Account</u>. It shall be Seller's exclusive responsibility to pay to its banking institution and/or GF's banking institution directly (or to compensate GF, in case it is charged) all fees, charges and expenses incurred by either Seller or GF due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $50.00 charge per bounced or rejected ACH debit.

10.  <u>Seller's Right for Reconciliation.</u> Seller and GF each acknowledges and agrees that:

   a.   If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Daily Installments for one (1) full calendar month immediately preceding the day when such request for reconciliation is received by GF (each such calendar month, a "Reconciliation Month").

   b.   Such reconciliation (the "Reconciliation") of the Seller's Initial Daily Installment for a Reconciliation Month shall be performed by GF within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by GF from the Approved Bank Account during the Reconciliation Month at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month at issue.

   c.   One or more Reconciliation procedures performed by GF may reduce or increase the effective Initial Daily Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which GF will be debiting the Approved Bank Account may get shortened or extended indefinitely.

11.  <u>Request for Reconciliation Procedure.</u>

   a.   It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Daily

Initial    *M̶F̶*    Initial

Installments during any Reconciliation Month by sending a request for Reconciliation to GF.

b. Any such request for Reconciliation of the Seller's Initial Daily Installments for a specific Reconciliation Month shall be in writing, shall include a copy of Seller's bank statement, credit card processing statements, and pertinent aging report(s) for the Reconciliation Month at issue, and shall be received by GF via email to info@gemfunding.com , with the subject line "REQUEST FOR RECONCILIATION," within five (5) Workdays after the last day of the Reconciliation Month at issue (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by GF).

c. GF's receipt of Seller's request for Reconciliation after the expiration of the five (5) Workday period following the last day of the Reconciliation Month for which such Reconciliation is requested nullifies and makes obsolete Seller's request for Reconciliation for that specific Reconciliation Month.

d. Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and GF shall comply with each such request, provided that:

    i. Each such request is made in accordance with the terms of this Section 11; and

    ii. If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by GF from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

e. Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with GF's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by GF in full, or (ii) modify the amount of the Initial Daily Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month (s) as the result of the Reconciliation.

12. <u>Adjustment of the Initial Daily Installment</u>. Seller and GF each acknowledge and agree that:

a. If at any time during the term of this Agreement Seller experiences a steady decrease in its Daily Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Daily Installment that Seller is obligated to deliver daily to GF in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Daily Installment (the <u>"Adjusted Daily Installment"</u>) shall replace and supersede the amount of the Initial Daily Installment set forth in Section 1 above.

b. The Adjustment of the Initial Daily Installment shall be performed by GF within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Daily Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

c. One or more Adjustments performed by GF may substantially extend the term of this Agreement.

13. <u>Request for Adjustment Procedure.</u>

a. It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to GF.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account, credit card processing statements and any aging reports immediately preceding the date of GF's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to GF based upon which statements the amount of the Initial Daily Installment set forth in Section 1 above (or the then current Adjusted Daily Installment, as the case may be) was determined, and shall be received by GF by email at info@gemfunding.com, with the subject line "REQUEST FOR ADJUSTMENT," within five (5) Workdays after the date that is the later of (i) the last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during

Initial    *MF*    Initial

which an Adjustment Request shall be received by GF).

c. GF's receipt of a Seller's Adjustment Request after the expiration of the above referenced five (5) Workday period nullifies and makes obsolete such Adjustment Request.

d. Seller shall have the right to request Adjustment of the Initial Daily Installment, or the Adjusted Daily Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and GF shall comply in good faith with such request, provided that:

i. Each such request for Adjustment is made in accordance with the terms of this Section 13; and

ii. A request for Adjustment shall not be made after the Expiration Date.

e. Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with GF's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by GF in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

14. Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").

a. Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from GF of the Purchase Price, and upon obtaining GF's prior written consent, to accelerate delivery to GF of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "Outstanding PAFR"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

b. The Outstanding PAFR can only be delivered in full and not partially.

c. Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying GF to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

d. GF shall respond to Seller's request within three (3) Workdays from the date of its receipt by GF.

e. In its response to Seller's request, GF shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

f. As of the date agreed upon as between GF and Seller, Seller shall deliver to GF the full amount of the Outstanding PAFR (such date, the "Accelerated Delivery Date").

g. Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to GF of the Initial Daily Installments prior to the delivery of the Outstanding PAFR to GF.

h. Upon delivery of the Outstanding PAFR to GF in compliance with the provisions of this Section 14, Seller's obligations to GF pursuant to this Agreement shall be deemed completed and fulfilled.

15. Rights and Obligations of GF Upon Receipt of the Outstanding PAFR. Upon receipt of the full amount of the Outstanding PAFR:

a. GF shall notify the Approved Bank Account and request from it to stop transferring Initial Daily Installments to GF's bank account.

b. If GF shall have received one or more Initial Daily Installment (or Adjusted Daily Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing GF's request described in subparagraph (a) above or for any other reason), GF shall immediately do one of the two following things (but not both):

i. Return to Seller the total sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by GF after the date of delivery of the Outstanding PAFR to GF; or

ii. Apply the total sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be)

Initial    *M F*    Initial

received by GF after the Accelerated Delivery Date toward Seller's outstanding financial obligations to GF existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

A. By way of example, if as of the Accelerated Delivery Date, Seller and GF would be parties to another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "Unrelated Future Agreement"), then and in such event GF may, in its sole and absolute discretion, apply the sum of the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) received by GF after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to GF pursuant to the Unrelated Future Agreement.

c. Seller acknowledges and agrees that GF shall have the right to apply the total sum of the Initial Daily Installments (or Adjusted Daily Installments, as the case may be) received by GF after the Accelerated Delivery Date toward Seller's outstanding financial obligations to GF existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, GF granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

16. <u>Risk Sharing Acknowledgments and Arrangements</u>.

a. Seller and GF each hereby acknowledges and agrees that:

i. The Purchased Future Receipts represent a portion of Seller's Future Receipts.

ii. This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from GF does not charge Seller and will not collect from Seller any interest on the monies used by GF for the purchase of the Purchased Future Receipts. The period of time that it will take GF to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after GF's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, GF may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

iii. The amount of the Initial Daily Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Daily Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to GF.

iv. The amounts of Seller's future Daily Receipts may increase or decrease over time.

v. If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual daily amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Daily Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and GF may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

b. **GF's Risk Acknowledgments** . GF agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and GF assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give GF a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, GF hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "Valid Excuses"):_____

i. adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

ii. loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

iii. bankruptcy of Seller; and/or

Initial *MF*          Initial

iv.    natural disasters or similar occurrences beyond Seller's control.

c.    <u>Application of Amounts Received by GF</u>. GF reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GF from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

d.    <u>Not a Loan</u>. Seller and GF agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by GF is not intended to be, nor shall it be construed as, a loan from GF to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, GF's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to GF in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that GF has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by GF shall automatically be reduced to the maximum rate permitted by applicable law and GF shall promptly refund to Seller any interest received by GF in excess of the maximum lawful rate.

17.    <u>Applicable Fees</u>. Seller acknowledges that the Applicable Fees were agreed upon between Seller and GF prior to Seller entering into this Agreement, were subject to arm-length negotiation between GF and Seller, and a list of any of the Applicable Fees is set forth in the Riders to this Agreement, which is attached hereto and made a part hereof.

18.    <u>Prior Balance</u>. Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless GF for any and all damages and losses (including without limitation legal fees and expenses) incurred by GF as the result of such representation being untrue, incorrect or incomplete.

19.    <u>Origination Fee</u>. Seller hereby agrees for GF to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

20.    <u>No Reduction of Purchase Price</u>. Seller hereby: (i) agrees to pay the Applicable Fee, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes GF to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

21.    Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

a.    <u>Financial Condition and Financial Information</u>. Seller's bank and financial statements, copies of which have been furnished to GF, and future statements which may be furnished hereafter pursuant to this Agreement or upon GF's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise GF of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. GF may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to GF within two (2) Workdays. Seller's failure to do so, and/or cutting off GF's online access to the Approved Bank Account, is a material breach of this Agreement.

b.    <u>Governmental Approvals</u>. Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

c.    <u>Good Standing</u>. Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

d.    <u>Authorization</u>. Seller has all requisite power to execute, deliver and perform this Agreement and consummate the

Initial    *MF*    Initial

transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

     e.    <u>Accounting Records and Tax Returns</u>. Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that GF is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

     f.    <u>Taxes; Workers Compensation Insurance.</u> Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

     g.    <u>Business Insurance</u>. Seller maintains and will maintain general liability and business-interruption insurance naming GF as loss payee and additional insured in the amounts and against risks as are satisfactory to GF and shall provide GF proof of such insurance upon request.

     h.    <u>Electronic Check Processing Agreement</u>. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede GF's rights under this Agreement, without GF's prior written consent.

     i.    <u>No Diversion of Future Receipts</u>. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without GF's written permission.

     j.    <u>Change of Name or Location</u>. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and GF, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining GF's written consent.

     k.    <u>Prohibited Business Transactions.</u> Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining GF's consent; or (ii) make or send notice of its intended bulk sale or transfer.

     l.    <u>No Closing of Business</u>. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of GF, and (ii) providing GF with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to GF. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until GF shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide GF ten (10) business days advance notice.

     m.    <u>No Pending Bankruptcy</u>. As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

     n.    <u>Estoppel Certificate</u>. Seller will at any time, and from time to time, upon at least one (1) day's prior notice from GF to Seller, execute, acknowledge and deliver to GF and/or to any other person or entity specified by GF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

Initial    *MF*      Initial

o. <u>Unencumbered Future Receipts</u>. Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

p. <u>No Stacking</u>. Seller shall not further encumber the Future Receipts, without first obtaining written consent of GF.

q. <u>Business Purpose</u>. Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

r. <u>No Default Under Contracts with Third Parties</u>. Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

s. <u>Right of Access</u>. In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants GF the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants GF and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide GF, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow GF to interview any of those parties.

t. <u>Phone Recordings and Contact</u>. Seller agrees that any call between Seller and GFand its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with GF, its managers, employees and agents (collectively, the "<u>GF Parties</u>") and that Seller may be contacted by any of the GF Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the GF Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

u. <u>Knowledge and Experience of Decision Makers</u>. The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

v. <u>Seller's Due Diligence</u>. The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by GF.

w. <u>Consultation with Counsel</u>. The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

x. <u>GF's Consent.</u> Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining GF's consent, such consent may be withheld, granted or conditioned at GF's sole and absolute discretion.

y. <u>No Reliance on Oral Representations</u>. This Agreement contains the entire agreement between Seller and GF with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by GF or any of the GF Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the GF Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

z. No Additional Fees Charged: No Additional Fees Charged. Seller hereby acknowledges and agrees that: (i) other

Initial *MF* Initial

than the Closing Costs, if any, set forth in Sections 17-19 herein, GF is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Sections 17-19 hereof, such fee is not charged by GF. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

PLEDGE OF SECURITY

22. <u>Pledge</u>. As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the <u>"Obligations"</u>), Seller hereby pledges, assigns and hypothecates to GF (collectively, <u>"Pledge"</u>) and grants to GF a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the <u>"Collateral"</u>), whether now existing or hereafter from time to time acquired:

    a.    all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    b.    all Seller's proceeds, as such term is defined by Article 9 of the UCC.

23. <u>Termination of Pledge</u>. Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, GF will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

24. <u>Representations with Respect to Collateral</u>. Seller hereby represents and warrants to GF that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC -1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

25. <u>Further Assurances</u>. Upon the request of GF Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as GF may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

26. <u>Attorney-in-Fact</u>. Seller hereby authorizes GF at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints GF as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in GF's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse and collect all instruments made payable to Seller.

EVENTS OF DEFAULT AND REMEDIES

27. <u>Events of Default.</u> The occurrence of any of the following events shall constitute an "<u>Event of Default</u>" by Seller:

    a.    Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) to GF, and timely and in full payment to GF of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

    b.    Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

Initial _MF_      Initial

c.    Seller shall default under any of the terms, covenants and conditions of any other agreement with GF (if any) which is related to the instant Agreement.

d.    Seller uses multiple depository accounts without obtaining prior written consent of GF in each instance.

e.    Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

f.    Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of GF in each instance.

g.    Seller interferes with GF collection of Initial Daily Installments (or Adjusted Daily Installments, as the case may be), or if there are two (2) or more ACH transactions attempted by GF that are rejected by Seller's bank for any reason.

h.    The Guaranty shall for any reason cease to be in full force and effect.

28.    <u>Default under the Agreement</u>. In case any Event of Default occurs and is not waived by GF in writing, GF may declare Seller in default under this Agreement without notice.

29.    <u>Seller's Obligations Upon Default</u>. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to GF the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to GF, as additional damages, any reasonable expenses incurred by GF in connection with recovering the monies due to GF from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that GF shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as thirty-three percent (33%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or five thousand dollars ($5,000.00), whichever is greater. The entire sum due to GF pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 9.00% per annum (and such interest shall accrue daily).

30.    <u>Remedies Upon Default</u>. Upon Seller's default, GF may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

a.    Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of GF's security interest;

b.    Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

c.    Filing the affidavit of confession of judgment (the "<u>Affidavit</u>"), if any, executed by the Guarantor(s), individually and on Seller's behalf, jointly and severally, in connection with this Agreement in the amount of the unpaid portion of the Purchased Amount, plus the Reasonable Damages, entering judgment with the Clerk of the Court, without notice, and executing thereon (NOTE THAT THIS CONFESSION OF JUDGMENT PROVISION CONSTITUTES A WAIVER OF IMPORTANT RIGHTS THAT SELLER AND/GUARANTOR MAY HAVE AS PARTIES IN DEFAULT UNDER THE TERMS OF THIS AGREEMENT AND/OR GUARANTY, AND ALLOWS **GF** TO OBTAIN A JUDGMENT AGAINST EITHER SELLER AND/OR GUARANTOR WITHOUT NOTICE);

d.    Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to GF of all or any portion of the amounts received by such credit card processor on behalf of Seller.

e.    Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation GF's rights of a secured party under the UCC.

31.    <u>Remedies are not Exclusive</u>. All rights, powers and remedies of GF in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to GF by law or equity.

32.    <u>Power of Attorney</u>. Seller irrevocably appoints GF and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to GF from

any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code (" Account Debtors"), to make payment directly to GF (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which GF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount.

## ADDITIONAL TERMS

33.　Seller Deposit Agreement. Seller shall execute an agreement with GF that shall authorize GF to arrange for electronic fund transfer services and/or "ACH" payments of Initial Daily Installments (or Adjusted Daily Installments, as the case may be) from the Approved Bank Account. Seller shall provide GF and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) GF and/or it's agent to deduct daily the amounts of the Initial Daily Installment (or the Adjusted Daily Installment, as the case may be) to GF from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to GF by permitting GF to withdraw the Initial Daily Installments (or the Adjusted Daily Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

34.　Financial Condition. Seller and its Guarantor(s) authorize GF and its agents to investigate their financial status and history, and will provide to GF any bank or financial statements, tax returns, etc., as GF deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. GF Seller hereby authorizes GF to receive from time to time updates on such information and financial status.

35.　Transactional History. Seller shall execute written authorization(s) to their bank(s) to provide GF with Seller's banking and/or credit-card processing history.

36.　Indemnification. Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by GF for monies owed to GF from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by GF.

37.　No Liability. In no event shall GF be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

38.　Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

39.　Assignment. GF may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining GF's written consent.

40.　Notices. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

41.　Waiver Remedies. No failure on the part of GF to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

　　　　　Initial _MF_　　　　　Initial

42. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

43. <u>Governing Law, Venue and Jurisdiction.</u> This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to GF in New York, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this transaction.

44. <u>Survival of Representation, etc.</u> All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

45. <u>Severability</u>. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

46. <u>Entire Agreement</u>. This Agreement embodies the entire agreement between Seller and GF and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

47. <u>JURY TRIAL WAIVER</u>. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

48. <u>CLASS ACTION WAIVER</u>. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

49. <u>ARBITRATION</u>. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH GF, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND GF SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

Initial     *MF*     Initial

50.     Counterparts and Facsimile Signatures. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Initial     *MF*          Initial

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

FOR SELLER #1

By: *Michael Fitzgerald*

Title: Michael Scott Fitzgerald

EIN:      84-2623424

FOR SELLER #2

By: _____

Title:

EIN:

AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.

OWNER/GUARANTOR #1

By: *Michael Fitzgerald*

Name: Michael Scott Fitzgerald

SSN: 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

OWNER/GUARANTOR #1

By: _____

Name:

SSN:

**GEM Funding, LLC**

By:- *Henry Gross*
_____

Name: **Henry Gross**
Title: **Managing Member**

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of 01/27/2021, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit ofGEM FUNDING, LLC ("Buyer").

WHEREAS:

A.      Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of 01/27/2021, between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

SELLER #1:

Legal Business Name: California Scuba Center
D/B/A: California Scuba Center

SELLER #2:

Legal Business Name:
D/B/A:

B.      Each Guarantor is an owner, officer, or manager of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

C.      Buyer is not willing to enter into the Agreement unless  Guarantor  irrevocably,  absolutely  and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such

Initial  *MF*          Initial

obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

NOW, THEREFORE, as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

1. Defined Terms. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

2. Guaranty of Obligations. Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

3. Guarantor's Additional Covenants. The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    a. any amendment, modification or extension of the Agreement or any Obligation;

    b. any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    c. any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    d. any other guaranty now or hereafter executed by Guarantor or anyone else;

    e. any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    f. any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    g. the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    h. the failure to give Guarantor any notice whatsoever;

    i. any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

4. Guarantor's Other Agreements. Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty.

5. Waiver; Remedies. No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

Initial *MF*        Initial

6. Acknowledgment of Purchase. Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

7. Governing Law and Jurisdiction. This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law. Except as provided in Section 10 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in New York State or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions. Guarantor acknowledges and agrees that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in this Guaranty was negotiated, and is being carried out, in New York. Guarantor acknowledges and agrees that it is guaranteeing a New York agreement and transaction. Guarantor acknowledges and agrees that New York has a reasonable relationship to this transaction.

8. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

9. CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

10. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

11. Severability. If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

12. Opportunity for Attorney Review. The Guarantor represents that he/she has carefully read this Guaranty and has had had a

Initial  *MF*  Initial

reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

13. **Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

AGREED AND ACCEPTED:

OWNER/GUARANTOR #1:

By: _Michael Fitzgerald_____
Name: Michael Scott Fitzgerald
SSN: 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

OWNER/GUARANTOR #2:

By: _____
Name:
SSN:

**GEM FUNDING LLC**
By: _Henry Gross_____
Name: **Henry Gross**
Title: **Managing Partner**

Initial  _MF_  Initial

**RIDER 1**

**TO THE 01/27/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")
Between GEM FUNDING LLC ("GF")
and California Scuba Center ("Seller")**

## ORIGINATION FEE

**1. Possible Conflicts.** If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.** All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Origination Fees.** The parties agree that the Origination Fee that Seller shall pay to GF pursuant to Section 19 of the Agreement shall be the higher of $600 or 5.0% of funded amount for ACH taken of the funded amount.

**4. Authorization.** Seller Hearby Authorizes GF to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 19 of the Agreement by deducting the amount of the Origination Fee from the Purcvhas Price prior to delivering it to Seller.

**5. No Reduction of Purchase Amount.** Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchase Amount.

**6. NSF Fee (Standard).** $50.00 per NSF.

**7. Rejected ACH Fee.** When the merchant directs the bank to Reject our Debit ACH a fee will be assesed depending on the following program:

| Daily ACH Program: | | Weekly ACH Program: | |
|---|---|---|---|
| **Amount Funded** | **Reject Fee** | **Amount Funded** | **Reject Fee** |
| Up to $100,000.00 | $100.00 | Up to $100,000.00 | $200.00 |
| $100,001.00-$250,000.00 | $150.00 | $100,001.00-$250,000.00 | $250.00 |
| Over $250,000.00 | $175.00 | $100,001.00-$250,000.00 | $375.00 |
| | | Over $250,000.00 | $495.00 |

**8. Bank Change Fee.** $75.00 fee when Merchant requires a change of account to be Debited requiring us to adjust our system.

**9. Blocked Account Fee.** $2,500.00 fee when Merchant BLOCKS account from our deibit ACH which places them in default (per contract)

**10. Default Fee.** $5,000.00 fee when Merchant changes bank account cutting GF off from our Collections

**11. UCC Termination Fee.** $150.00 when Merchant is closing out their contract

**12. Miscellaneous Service Fees-** The fee for origination is paid from the first money in. The fee amount will be in accordance with the schedule on this page. Merchant shall pay Gem Funding certain fees when funding is done electronically to their designated bank account and charged a fee of $35.00 for a Fed Wire or $15.00 for an ACH.(All fees are subject to change)

**13. Stacking Fee-** If Business sells any of Business's Future Receivables without Purchaser's prior written concent, in addition to any Collections Administration Fee, Business will be charged 10% of the original Amount Sold.

Seller and GF agree that this Rider shall be attached to the Agreement and shall be made a part thereof.

**AGREED AND ACCEPTED:**

OWNER/GUARANTOR #1

By: *Michael Fitzgerald*

Name: Michael Scott Fitzgerald

OWNER/GUARANTOR #2

By: _____

Name:

**GEM FUNDING**
By: *Henry Gross*
**Name: Henry Gross**
**Title: Managing Partner**

**RIDER 2**

Initial *MF*          Initial

FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT
("Agreement")

Between **GEM** FUNDING, LLC ("**GF**")

and <u>California Scuba Center</u> ("Seller")

## PRIOR BALANCE

1. <u>Possible Conflicts</u>. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. <u>Definitions</u>. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

3. <u>Prior Balance</u>. Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

TOTAL PRIOR BALANCE: <u>$6,019.04</u>

4. <u>Authorization</u>. Seller hereby authorizes GF to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to GF and/or the creditors listed in this Rider.

5. <u>No Reduction of Purchase Price</u>. Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

6. <u>Indemnification.</u> Seller hereby indemnifies and holds harmless GF for any and all damages and losses (including without limitation legal fees and expenses) incurred by GF as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

Seller and **GF** agree that this Rider shall be attached to the Agreement and shall be made a part thereof.

**AGREED AND ACCEPTED:**
OWNER/GUARANTOR #1                    OWNER/GUARANTOR #2

By: *Michael Fitzgerald*                    By: _____
Name: Michael Scott Fitzgerald               Name:

**GEM FUNDING**
**By:** *Henry Gross*
**Name: Henry Gross**
Title: Managing Partner

Initial *MF*        Initial

Dear Seller,

Thank you for your interest to work with GEM FUNDING LLC. We look forward to working with you for as long as you need.

As part of the underwriting process, GEM FUNDING LLC will require viewing access to your bank account prior to and during the Future Receivables Sale and Purchase Agreement.. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Please fill out the form below with the information necessary to access your account.
* Be sure to indicate capital or lower-case letters.

Name of bank: _____Chase_____

Bank portal website: ____www.chase.com_____

Username: ____cascuba2019_____

Password: _____510@ShawAve_____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Any other information necessary to access your account: _____

Initial _MF_                    Initial



### GENERAL AUTHORIZATION

Michael Scott Fitzgerald
_____
Business Owner(s)/Principal(s):

California Scuba Center                    California Scuba Center
_____
Legal Name of Business/DBA:

As identified above: I/we Michael Scott Fitzgerald hereby authorize the release of any and all information pertaining to my/our business California Scuba Center as requested by Gem Funding, LLC. or any of their affiliates, agents, assigns, representatives, in connection with my/our application.

This General Authorization also serves as instruction to any person to release the requested information, including but not limited to: deposit accounts, merchant accounts, payment cards processing accounts, credit references/verifications, payments history, balance, status, etc.

The undersigned hereby consents to Gem Funding, LLC. to obtain and use non-business consumer credit reports on the undersigned in order to further evaluate the undersigned as principals, members, partners, proprietors, and/or guarantors and to obtain and use business information from, but not limited to, credit report bureaus, Dun & Bradstreet or its equivalent, public records, UCC or PPSA Holders, banks, financial institutions, landlords, vendors, suppliers, etc.

I/we attest to the information submitted in the application is correct to the best of my/our knowledge and has been submitted voluntarily.

A photocopy of facsimile of this authorization shall be deemed to be the equivalent of an original.

_Michael Fitzgerald_                    Michael Scott Fitzgerald          Jan 27 2021
_____      _____    _____
Owner/Principal Signature               Owner Printed                    Date


_____      _____    _____
Owner/Principal Signature               Owner Printed                    Date


Business Name: **California Scuba Center**
Physical Address: 510 Shaw Avenue, Clovis, CA 93612
Business Phone: 559-512-8727



**Gem Funding**
Tomorrows Money Today

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep this important legal document for Seller's records.

**DISBURSMENT OF ADVANCE PROCEEDS.** By signing below, Seller authorizes Buyer to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Seller later identifies and is acceptable to Buyer) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until Buyer has received written notification from Seller of its termination in such time and in such manner as to afford Buyer and Seller's depository bank a reasonable opportunity to act on it.

**BUSINESS PURPOSE ACCOUNT.** By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**MISCELLANEOUS.** Buyer is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Seller's account must comply with the provisions of U.S. law.

I, (We) California Scuba Center        Hereby Authorize, **Gem Funding, LLC** to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

Bank Name: BANK OF AMERICA, N.A.        Branch:_____ Tax ID: 84-2623424

ABA: Routing: 121000358 ___ DDA: Account: 325129779489 _____ For the

Amount of $ 1,589.00 _____ (Or) Percentage of each Banking Deposit: % N/A _____

On the Following Days: Monday - Friday _____

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

Signer :(Print Name) Michael Scott Fitzgerald        Date: 01/27/2021

X *Michael Fitzgerald*





## AUTHORIZATION FOR FILING FINANCING STATEMENT
### CONSENT TO FILING FORM UCC-1

In accordance with the Agreement between the parties, Merchant hereby recognizes the need for Gem Funding, LLC. and/or its affiliates to amend and/or file new and/or updated financing statements as it deems necessary to maintain the security interest granted by Merchant in accordance with the terms and conditions of the Agreement.

By signing below, this document shall serve as Merchant's acknowledged written authorization for Gem Funding, LLC. and/or its affiliates to file a new and/or amended financing statement with the office of the Secretary of State. The following description of collateral will be included in such filing:

**Collateral – All present and future assets of the Debtor**

**Notice – Pursuant to an agreement between Debtor and Secured Party, debtor has agreed not to grant a security interest in the above collateral to any other entity. Accordingly, the acceptance of any security interest by anyone other than the Secured Party is likely to constitute the tortious interference with the Secured Party's rights.**

**In the event that any entity is granted a security interest in Debtor's accounts, chattel paper or general intangibles contrary to the above, the Secured Party asserts a claim to any proceeds thereof received by such entity.**

California Scuba Center

Merchant: _____*Michael Fitzgerald*_____
(Signature)

Merchant: Michael Scott Fitzgerald, owner
(Printed Name, Title)

Date: 01/27/2021

Address: 510 Shaw Avenue

Clovis        CA     93612

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 2

# West Coast Business Capital, LLC

116 Nassau Street, Suite 804, New York, NY 10038

**FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT**      CFL License Number
603-K239

This agreement (this "Agreement"), dated 5/6/2021, between West Coast Business Capital, LLC ("WCB") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

**Business Legal Name:** CALIFORNIA SCUBA CENTER LLC
**D/B/A:** CALIFORNIA SCUBA CENTER
**Form of Business Entity:** LLC                     EIN #: 84-2623424
**Physical Address:** 510 SHAW AVE, CLOVIS, CA 93612
**Mailing Address:** 510 SHAW AVE, CLOVIS, CA 93612

| PURCHASE PRICE: | PURCHASED AMOUNT: | SPECIFIED PERCENTAGE: | INITIAL WEEKLY INSTALLMENT: |
|---|---|---|---|
| $ 30,000.00 | $ 43,770.00 | 25 % | $ 1,850.00 |

**FOR THE SELLER #1**                     **FOR THE SELLER #2**

By: *Michael Fitzgerald*                  By: _____

**Name:** MICHAEL S FITZGERALD           **Name:** N/A
**Title:** Owner/Agent/Manager           **Title:** N/A
**Email:** MIKE@CASCUBACENTER.COM        **Email:** N/A
**Business Phone:** (559) 908-1444       **Business Phone:** N/A

*Accurate contact information is required to provide the Seller with important information regarding the Agreement.

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as "Exhibit A" (the "Guaranty") to be signed and delivered to WCB by the following Owner(s)/Guarantor(s) of Seller.

**OWNER/GUARANTOR #1**                   **OWNER/GUARANTOR #2**

By: *Michael Fitzgerald*                 By: _____

**Name:** MICHAEL S FITZGERALD           **Name:** N/A
**SSN:** 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                     **SSN:** N/A
**Phone:** (559) 908-1444                **Phone:** N/A
**Address:** 2904 EAST FREMONT AVE, FRESNO, CA   **Address:** N/A
93710

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign the Addendum to this Agreement in the form attached hereto as Exhibit B (the "Addendum").

**WHEREAS,** Seller is desirous to sell to WCB, and WCB is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, WCB and Seller hereby agree to the foregoing and as follows:

## 1. Basic Terms and Definitions.

**a.** "<u>Effective Date</u>" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when WCB paid the Purchase Price to Seller.

**b.** "<u>Specified Percentage</u>" shall mean TWENTY FIVE PERCENT (25%) of each and every sum from sale made by Seller of Future Receipts.

**c.** "<u>Future Receipts</u>" shall mean, collectively, all of Seller's receipts of any and all monies that shall be received by Seller from any source after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller.

**d.** "<u>Weekly Receipts</u>" shall mean the amount of Future Receipts received by Seller on a weekly basis.

**e.** "<u>Purchased Amount</u>" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to WCB pursuant to this Agreement. The parties agree that the Purchased Amount shall be $43,770.00.

**f.** "<u>Purchase Price</u>" shall mean the total amount that WCB agrees to pay for the Purchased Amount. Note that the amount that Seller will actually receive from WCB pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs i., j. and k. below. The parties agree that the Purchase Price shall be $30,000.00.

**g.** "<u>Initial Weekly Installment</u>" shall mean the fixed amount that Seller and WCB agree to be a good faith approximation of the Specified Percentage of Seller's Weekly Future Receipts. Seller and WCB further agree that, based upon the information provided by Seller to WCB concerning Seller's most recent accounts receivables, including representations by the Seller to WCB regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement, as of the Effective Date the Initial Weekly Installment shall be $1,850.00.

**h.** "<u>Workday</u>" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

**i.** "<u>Applicable Fees</u>" shall mean, collectively, all initial costs and fees that Seller agrees to pay to WCB as consideration for agreeing to enter into this Agreement and that are described in Section 17 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 1 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**j.** "<u>Prior Balance</u>" shall mean the sum of all amounts that Seller may owe to WCB and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**k.** "<u>Origination Fee</u>" shall mean the fee that Seller and a Broker have agreed to in conjunction with brokering this Agreement, which amount Seller authorizes WCB to withhold from the Purchase Price and pay to said Broker. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 3 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price.

**l.** In the event "<u>Seller</u>" is comprised of more than one entity, then:

**i.** The term "Seller" shall mean, individually and collectively, all such entities; and

**ii.** Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

**iii.** The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement; and

**iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

**v.** The terms "Specified Percentage", "Future Receipts", "Weekly Receipts", "Initial Weekly Installment" shall mean the Specified Percentage, the Future Receipts and the Weekly Receipts of each Seller individually; and

**vi.** WCB may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

**m.** In the event "Guarantor" is comprised of more than one individual, then:

    **i.** The term "Guarantor" shall mean, individually and collectively, all such individuals; and

    **ii.** Each Guarantor is an Affiliate of all other Guarantor(s); and

    **iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty; and

    **iv.** The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

    **v.** WCB may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2. The Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, which is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "Expiration Date") when the Purchased Amount and all other sums due to WCB pursuant to this Agreement are received by WCB in full.

**3. Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") unto WCB all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to WCB (hereinafter, the portion of the Future Receipts sold by Seller to WCB pursuant to this Agreement, the "Purchased Future Receipts"); to have and hold the same unto WCB, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to WCB of collectability of the Purchased Future Receipts by WCB and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to WCB full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4. Payment of Purchase Price.** In consideration of the sale by Seller to WCB of the Purchased Future Receipts pursuant to this Agreement, WCB agrees to pay to Seller the Purchase Price; the amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5. Use of Purchase Price.** Seller hereby acknowledges that it fully understands that: (i) WCB's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to WCB in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business WCB's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the forgoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6. Initial Weekly Installments of Purchased Amount.** The Purchased Amount shall be delivered by Seller to WCB weekly in the amount of the Initial Weekly Installment on each and every week commencing on the Effective Date and ending on the Expiration Date.

**7. Approved Bank Account and Credit Card Processor.** During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by WCB (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by WCB (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8. Authorization to Debit Approved Bank Account.** Seller hereby authorizes WCB to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed on Appendix A hereto) in the amount of the Initial Weekly Installment on each week commencing on the Effective Date until WCB receives the full Purchased Amount. Seller shall provide WCB with all access code(s) for the Approved Bank Account.

**9. Fees Associated with Debiting Approved Bank Account.** It shall be Seller's exclusive responsibility to pay to its banking institution and/or WCB's banking institution directly (or to compensate WCB, in case it is charged) all fees, charges and expenses incurred by either Seller or WCB due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

**10. Seller's Right for Reconciliation.** Seller and WCB each acknowledges and agrees that:

    **a.** If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Weekly Receipts, for as long as Seller is not in default under the terms of this Agreement, Seller shall have the right, at its sole and

Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Weekly Installments for one (1) or more full calendar month(s) immediately preceding the day when such request for reconciliation is received by WCB (each such calendar month for which a reconciliation is requested, a "Reconciliation Month").

    **b.** Such reconciliation (the "Reconciliation") of the Seller's Initial Weekly Installment for one or more Reconciliation Month(s) shall be performed by WCB within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by WCB from the Approved Bank Account during the Reconciliation Month(s) at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during the Reconciliation Month(s) at issue.

    **c.** One or more Reconciliation procedures performed by WCB may reduce or increase the effective Initial Weekly Installment amount during the Reconciliation Month in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which WCB will be debiting the Approved Bank Account may get shortened or extended indefinitely.

**11. Request for Reconciliation Procedure.**

    **a.** It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Weekly Installments during any Reconciliation Month by sending a request for Reconciliation to WCB.

    **b.** Any such request for Reconciliation of the Seller's Initial Weekly Installments for specific Reconciliation Month(s) shall be in writing, shall state the Reconciliation Month(s) for which Reconciliation is requested, and shall include copies of Seller's bank statement(s) and credit card processing statements for each Reconciliation Month at issue, and shall be received by WCB via email to reconciliation@customerinfoportal.com, with the subject line "REQUEST FOR RECONCILIATION" or by other means (to be provided to Seller by WCB upon request) during a calendar month immediately following the latest Reconciliation Month listed in the request for reconciliation (time being of the essence as to the last day of the period during which such demand for Reconciliation shall be received by WCB).

    **c.** WCB has the right to deny any request for Reconciliation if such request is received less than thirty (30) days following the date of WCB's previous request for Reconciliation from the Seller. Furthermore, Reconciliation cannot be made two or more times for the same Reconciliation Month (if requested in more than one requests for Reconciliation).

    **d.** Commencing in the calendar month immediately following the Effective Date of this Agreement, Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and WCB shall comply with each such request, provided that:

        **i.** Each such request is made in accordance with the terms of this Section 11; and

        **ii.** If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by WCB from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

    **e.** Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with WCB's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by WCB in full, or (ii) modify the amount of the Initial Weekly Installment for any calendar month during the term of this Agreement other than during the Reconciliation Month(s) as the result of the Reconciliation.

**12. Adjustment of the Initial Weekly Installment.** Seller and WCB each acknowledge and agree that:

    **a.** If at any time during the term of this Agreement Seller experiences a steady decrease in its Weekly Receipts, as long as Seller is not in default under the terms of this Agreement, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Weekly Installment that Seller is obligated to deliver weekly to WCB in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Weekly Installment (the "Adjusted Weekly Installment") shall replace and supersede the amount of the Initial Weekly Installment set forth in Section 1 above for thirty (30) days from and including the date it is granted. Upon the expiration of such 30-day period the amount of the Adjusted Installment shall automatically revert back to the amount of the Initial Installment, absent an additional request for Adjustment at the expiry of the 30-day period pursuant to this Section 12.

    **b.** The Adjustment of the Initial Weekly Installment shall be performed by WCB within five (5) Workdays following its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Weekly Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full. Notwithstanding anything to the contrary set forth in Sections 12 and 13 hereof, no Adjustment shall take place until and unless Reconciliation for at least one (1) Reconciliation Month takes place resulting in the reduction of the total amount debited from Seller's Approved Bank Account during the Reconciliation Month by at least fifteen percent (15%) in comparison to the amount that would have been debited during that month without Reconciliation.

    **c.** One or more Adjustments performed by WCB may substantially extend the term of this Agreement.

Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

**13. Request for Adjustment Procedure.**

    **a.** It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to WCB.

    **b.** A request for Adjustment (an "<u>Adjustment Request</u>") shall be in writing, and shall include copies of: (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account and credit card processing statements immediately preceding the date of WCB's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to WCB based upon which statements the amount of the Initial Weekly Installment set forth in Section 1 above (or the then current Adjusted Weekly Installment, as the case may be) was determined, and shall be received by WCB by email at adjustment@customerinfoportal.com, with the subject line "REQUEST FOR ADJUSTMENT," within thirty (30) days after the date that is the (i) last day of the latest bank statement enclosed with the Adjustment Request and (ii) the last date of the latest credit card processing statement enclosed with the Adjustment Request (time being of the essence as to the last day of the period during which an Adjustment Request shall be received by WCB).

    **c.** WCB's receipt of a Seller's Adjustment Request after the expiration of the above referenced thirty (30) day period nullifies and makes obsolete such Adjustment Request.

    **d.** Seller shall have the right to request Adjustment of the Initial Weekly Installment, or the Adjusted Weekly Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and WCB shall comply in good faith with such request, provided that:

        **i.** Each such request for Adjustment is made in accordance with the terms of this Section 13; and

        **ii.** A request for Adjustment shall not be made after the Expiration Date.

    **e.** Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with WCB's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by WCB in full or (ii) request Adjustment retroactively for the portion of the term of this Agreement preceding the date of an Adjustment Request.

**14. Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").**

    **a.** Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from WCB of the Purchase Price, and upon obtaining WCB's prior written consent, to accelerate delivery to WCB of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "<u>Outstanding PAFR</u>"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

    **b.** The Outstanding PAFR can only be delivered in full and not partially.

    **c.** Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying WCB to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

    **d.** WCB shall respond to Seller's request within three (3) Workdays from the date of its receipt by WCB.

    **e.** In its response to Seller's request, WCB shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

    **f.** As of the date agreed upon as between WCB and Seller, Seller shall deliver to WCB the full amount of the Outstanding PAFR (such date, the "<u>Accelerated Delivery Date</u>").

    **g.** Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to WCB of the Initial Weekly Installments prior to the delivery of the Outstanding PAFR to WCB.

    **h.** Upon delivery of the Outstanding PAFR to WCB in compliance with the provisions of this Section 14, Seller's obligations to WCB pursuant to this Agreement shall be deemed completed and fulfilled.

**15. Rights and Obligations of WCB Upon Receipt of the Outstanding PAFR.** Upon receipt of the full amount of the Outstanding PAFR:

    **a.** WCB shall notify the Approved Bank Account and request from it to stop transferring Initial Weekly Installments to WCB's bank account.

    **b.** If WCB shall have received one or more Initial Weekly Installment (or Adjusted Weekly Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing WCB's request described in subparagraph (a) above or for any other reason), WCB shall immediately do one of the two following things (but not both):

        **i.** Return to Seller the total sum of the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) received by WCB after the date of delivery of the Outstanding PAFR to WCB; or

        **ii.** Apply the total sum of the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) received by WCB after the Accelerated Delivery Date toward Seller's outstanding financial obligations to WCB existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

➡️ Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

A. By way of example, if as of the Accelerated Delivery Date, Seller and WCB would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "Unrelated Future Agreement"), then and in such event WCB may, in its sole and absolute discretion, apply the sum of the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) received by WCB after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to WCB pursuant to the Unrelated Future Agreement.

c. Seller acknowledges and agrees that WCB shall have the right to apply the total sum of the Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be) received by WCB after the Accelerated Delivery Date toward Seller's outstanding financial obligations to WCB existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, WCB granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

### 16. Risk Sharing Acknowledgments and Arrangements.

a. Seller and WCB each hereby acknowledges and agrees that:

i. The Purchased Future Receipts represent a portion of Seller's Future Receipts.

ii. This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from WCB. WCB does not charge Seller and will not collect from Seller any interest on the monies used by WCB for the purchase of the Purchased Future Receipts. The period of time that it will take WCB to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after WCB's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, WCB may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

iii. The amount of the Initial Weekly Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Weekly Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to WCB.

iv. The amounts of Seller's future Weekly Receipts may increase or decrease over time.

v. If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual weekly amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Weekly Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and WCB may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

b. **WCB's Risk Acknowledgments**. WCB agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and WCB assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give WCB a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, WCB hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "Valid Excuses"):

i. adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

ii. loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;

iii. bankruptcy of Seller; and/or

iv. natural disasters or similar occurrences beyond Seller's control.

c. **Application of Amounts Received by WCB**. WCB reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to WCB from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

d. **Not a Loan**. Seller and WCB agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by WCB is not intended to be, nor shall it be construed as, a loan from WCB to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, WCB's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to WCB in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that WCB has charged or received interest hereunder in

Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

excess of the highest rate allowed by law, then the rate of such interest received by WCB shall automatically be reduced to the maximum rate permitted by applicable law and WCB shall promptly refund to Seller any interest received by WCB in excess of the maximum lawful rate.

**17. Applicable Fees**. Seller acknowledges that the Applicable Fees were agreed upon between Seller and WCB prior to Seller entering into this Agreement, were subject to arm-length negotiation between WCB and Seller, and a detailed list of the Applicable Fees is set forth in Rider 1 of this Agreement, which is attached hereto and made a part hereof.

**18. Prior Balance of Purchased Amounts**. Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance of Purchased Amounts), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless WCB for any and all damages and losses (including without limitation legal fees and expenses) incurred by WCB as the result of such representation being untrue, incorrect or incomplete.

**19. Origination Fee**. To the extent that Seller has agreed to a broker fee with a third-party broker with respect to this Agreement (which is not a party hereto), Seller hereby requests and agrees for WCB to withhold from the Purchase Price, and pay to the third-party broker associated with this Agreement, the Origination Fee contained in Rider 3, which is attached hereto and made a part hereof.

**20. No Reduction of Purchase Price**. Seller hereby: (i) agrees to pay the Applicable Fee, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes WCB to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**21.** Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

    **a. Financial Condition and Financial Information**. Seller's bank and financial statements, copies of which have been furnished to WCB, and future statements which may be furnished hereafter pursuant to this Agreement or upon WCB's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise WCB of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. WCB may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to WCB within five (5) Workdays. Seller's failure to do so, and/or cutting off WCB's online access to the Approved Bank Account, is a material breach of this Agreement.

    **b. Governmental Approvals**. Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

    **c. Good Standing**. Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization, and has full power and authority necessary to carry its business as it is now being conducted.

    **d. Authorization**. Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

    **e. Accounting Records and Tax Returns**. Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that WCB is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

    **f. Taxes; Workers Compensation Insurance**. Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

    **g. Business Insurance**. Seller maintains and will maintain general liability and business-interruption insurance naming WCB as loss payee and additional insured in the amounts and against risks as are satisfactory to WCB and shall provide WCB proof of such insurance upon request.

**h. Electronic Check Processing Agreement**. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede WCB's rights under this Agreement, without WCB's prior written consent.

**i. No Diversion of Future Receipts**. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without WCB's written permission.

**j. Change of Name or Location**. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and WCB, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining WCB's written consent.

**k. Prohibited Business Transactions.** Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining WCB's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**l. No Closing of Business**. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of WCB, and (ii) providing WCB with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to WCB. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until WCB shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide WCB ten (10) business days advance notice.

**m. No Pending Bankruptcy**. As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n. Estoppel Certificate**. Seller will at any time, and from time to time, upon at least one (1) day's prior notice from WCB to Seller, execute, acknowledge and deliver to WCB and/or to any other person or entity specified by WCB, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

**o. Unencumbered Future Receipts**. Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

**p. No Stacking**. Seller shall not further encumber the Future Receipts, without first obtaining written consent of WCB.

**q. Business Purpose**. Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**r. No Default Under Contracts with Third Parties**. Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

**s. Right of Access**. In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants WCB the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's weekly receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants WCB and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide WCB, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow WCB to interview any of those parties.

**t. Phone Recordings and Contact**. Seller agrees that any call between Seller and WCB and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with WCB, its managers, employees and agents (collectively, the "WCB Parties") and that Seller may be contacted by any of the WCB Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the WCB Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

**u. Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

**v. Seller's Due Diligence.** The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by WCB.

**w. Consultation with Counsel.** The person(s) signing this Agreement on behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

**x. WCB's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining WCB's consent, such consent may be withheld, granted or conditioned at WCB's sole and absolute discretion.

**y. No Reliance on Oral Representations.** This Agreement contains the entire agreement between Seller and WCB with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by WCB or any of the WCB Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the WCB Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

**z. No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Closing Costs, if any, set forth in Sections 17-19 herein, WCB is NOT CHARGING ANY ADDITIONAL FEES OR CLOSING COSTS to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in Sections 17-19 hereof, such fee is not charged by WCB. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

## PLEDGE OF SECURITY

**22. Pledge.** As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to WCB (collectively, "Pledge") and grants to WCB a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

    **a.** all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

    **b.** all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23. Termination of Pledge.** Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, WCB will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24. Representations with Respect to Collateral.** Seller hereby represents and warrants to WCB that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

**25. Further Assurances.** Upon the request of WCB, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as WCB may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**26. Attorney-in-Fact.** Seller hereby authorizes WCB at any time to take any action and to execute any instrument, including

without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints WCB as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in WCB's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse and collect all instruments made payable to Seller.

**EVENTS OF DEFAULT AND REMEDIES**

**27. Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

    **a.** Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of timely delivery and in full of Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be) to WCB, and timely and in full payment to WCB of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

    **b.** Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

    **c.** Seller shall default under any of the terms, covenants and conditions of any other agreement with WCB(if any) which is related to the instant Agreement.

    **d.** Seller uses multiple depository accounts without obtaining prior written consent of WCB in each instance.

    **e.** Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

    **f.** Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of WCB in each instance.

    **g.** Seller interferes with WCB collection of Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be).

    **h.** Two (2) or more ACH transactions attempted by WCB are rejected by Seller's bank.

    **i.** The Guaranty shall for any reason cease to be in full force and effect.

**28. Default under the Agreement.** In case any Event of Default occurs and is not waived by WCB, in writing, WCB may declare Seller in default under this Agreement without notice. Without limiting the foregoing, upon Seller's default it shall have no right to request Reconciliation or Adjustment provided in Sections 10-13 of this Agreement.

**29. Seller's Obligations Upon Default.** Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to WCB the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to WCB, as additional damages, any reasonable expenses incurred by WCB in connection with recovering the monies due to WCB from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that WCB shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as twenty-five percent (25%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or twenty-five hundred dollars ($2,500.00), whichever is greater. The entire sum due to WCB pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 9.00% per annum (and such interest shall accrue weekly).

**30. Remedies Upon Default.** Upon Seller's default, WCB may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

    **a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller as the term is defined below, of WCB's security interest;

    **b.** Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

    **c.** Notifying Seller's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to WCB of all or any portion of the amounts received by such credit card processor on behalf of Seller.

    **d.** Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation WCB's rights of a secured party under the UCC.

**31. Remedies are not Exclusive.** All rights, powers and remedies of WCB in connection with this Agreement set forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to WCB by law or equity.

**32. Power of Attorney.** Seller irrevocably appoints WCB and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to WCB from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by

obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code ("Account Debtors"), to make payment directly to WCB (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which WCB may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount.

## ADDITIONAL TERMS

**33. Seller Deposit Agreement**. Seller shall execute an agreement with WCB that shall authorize WCB to arrange for electronic fund transfer services and/or "ACH" payments of Initial Weekly Installments (or Adjusted Weekly Installments, as the case may be) from the Approved Bank Account. Seller shall provide WCB and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) WCB and/or it's agent to deduct weekly the amounts of the Initial Weekly Installment (or the Adjusted Weekly Installment, as the case may be) to WCB from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to WCB by permitting WCB to withdraw the Initial Weekly Installments (or the Adjusted Weekly Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34. Financial Condition**. Seller and its Guarantor(s) authorize WCB and its agents to investigate their financial status and history, and will provide to WCB any bank or financial statements, tax returns, etc., as WCB deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. WCB Seller hereby authorizes WCB to receive from time to time updates on such information and financial status.

**35. Transactional History**. Seller shall execute written authorization(s) to their bank(s) to provide WCB with Seller's banking and/or credit-card processing history.

**36. Indemnification**. Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by WCB for monies owed to WCB from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by WCB.

**37. No Liability**. In no event shall WCB be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

**38. Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39. Assignment**. WCB may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining WCB's written consent.

**40. Notices**. Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

**41. Waiver Remedies**. No failure on the part of WCB to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**42. Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

**43. Governing Law, Venue and Jurisdiction**. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or

proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State, (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to WCB in New York, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this transaction.

**44. Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

**45. Severability.** In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

**46. Entire Agreement.** This Agreement embodies the entire agreement between Seller and WCB and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s) and Riders to this Agreement are part of this Agreement.

**47. JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.**

**48. CLASS ACTION WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**49. ARBITRATION. THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH WCB, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND WCB SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.**

**50. SERVICE OF PROCESS. IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON SELLER'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN SELLER'S ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.**

Guarantor #1 Initials: _____ Guarantor #2 Initials:_____

**51. <u>Counterparts and Facsimile Signatures</u>.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes. Furthermore, this Agreement may be signed electronically and a copy this Agreement with e-signatures of the parties shall have the same force and effect as the original.

**52. <u>Further Acknowledgments</u>.** Seller hereby acknowledges and agrees that any and all electronic communication (e-mails) from funding@customerinfoportal.com received by Seller after this Agreement is signed but prior to Seller's receipt of any amount due to it pursuant to this Agreement, shall be deemed to be part of this Agreement and shall be deemed to be incorporated herein by reference.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR THE SELLER**                                         **FOR THE SELLER**

By: _Michael Fitzgerald_____                 By: _____

**Name:** MICHAEL S FITZGERALD                   **Name:** N/A
**Title:** Owner/Agent/Manager                        **Title:** N/A
**EIN:** 84-2623424                                          **EIN:** N/A

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR**

**OWNER/GUARANTOR #1**                              **OWNER/GUARANTOR #2**

By: _Michael Fitzgerald_____                 By: _____

**Name:** MICHAEL S FITZGERALD                   **Name:** N/A
**SSN:** 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                                       **SSN:** N/A

**West Coast Business Capital, LLC**

**By:** _____
**Name:**
**Title:**

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of 5/6/2021, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit of **West Coast Business Capital, LLC** ("Buyer").

**WHEREAS:**

    A. Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of 5/6/2021, between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

    **THE SELLER:**
    **Legal Business Name:** CALIFORNIA SCUBA CENTER LLC
    **D/B/A:** CALIFORNIA SCUBA CENTER

    B. Each Guarantor is an owner, officer, or manager of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

    C. Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    a. any amendment, modification or extension of the Agreement or any Obligation;

    b. any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    c. any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    d. any other guaranty now or hereafter executed by Guarantor or anyone else;

    e. any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    f. any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    g. the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    h. the failure to give Guarantor any notice whatsoever;

    i. any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents

that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty. Guarantor additionally consents to the ordering of a credit report for Guarantor (a) as a condition precedent to Buyer entering into this Agreement, (b) from time to time during the entire Term of the Agreement, and (c) in the event of default pursuant to the Agreement.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a waiver, nor constitute valid and lawful accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law. Except as provided in Section 10 of this Guaranty, Guarantor submits to the nonexclusive jurisdiction and venue of any state or federal court sitting in New York State or otherwise having jurisdiction over this Guaranty and Guarantor, for resolution of any claim or action arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions. Guarantor acknowledges and agrees that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in this Guaranty was negotiated, and is being carried out, in New York. Guarantor acknowledges and agrees that it is guaranteeing a New York agreement and transaction. Guarantor acknowledges and agrees that New York has a reasonable relationship to this transaction.

**8. JURY WAIVER.** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**9. CLASS ACTION WAIVER.** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**10. ARBITRATION.** THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING (INCLUDING WITHOUT LIMITATION FILING OF AN AFFIDAVIT OF CONFESSION OF JUDGMENT) HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY AND/OR THE TRANSACTION CONTEMPLATED BY THE AGREEMENT, EACH BUYER, SELLER AND GUARANTOR SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND/OR INTERPRETATION OF THIS GUARANTY ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL. UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

Guarantor #1 Initials: _____  Guarantor #2 Initials:_____

**11. SERVICE OF PROCESS.** IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), GUARANTOR HEREBY CONSENTS, IN THE EVENT OF DEFAULT HEREUNDER, TO SERVICE OF PROCESS UPON HIM/HER/THEM BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED. SERVICE HEREUNDER SHALL BE DEEMED COMPLETED UPON GUARANTOR'S ACTUAL RECEIPT OF THE SERVICE OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR SHALL PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS SHALL BE MADE. SERVICE OF PROCESS BY BUYER TO THE LAST KNOWN GUARANTOR'S ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE DATE OF DELIVERY (OR ATTEMPTED DELIVERY) OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

**12. Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**13. Opportunity for Attorney Review.** The Guarantor represents that he/she has carefully read this Guaranty and has had had a reasonable opportunity to, - and to the extent he or she wishes did, - consult with his or her attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as his or her free act and deed.

**14. Counterparts and Facsimile Signatures.** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes. Furthermore, this Guaranty may be signed electronically and a copy this Guaranty with e-signature of the Guarantor shall have the same force and effect as the original.

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1:**                                    **OWNER/GUARANTOR #2:**

By: *Michael Fitzgerald*                                    By: _____

**Name: MICHAEL S FITZGERALD**                              **Name: N/A**
**SSN: 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**                                        **SSN: N/A**


**OWNER/GUARANTOR #3:**



By: _____



**Name: N/A**
**SSN: N/A**



**West Coast Business Capital, LLC**

By: _____
**Name:**
**Title:**

# RIDER 1

## TO THE 5/6/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")

### Between West Coast Business Capital, LLC ("WCB")

### and CALIFORNIA SCUBA CENTER LLC d/b/a CALIFORNIA SCUBA CENTER ("Seller")

### **APPLICABLE FEES**

1. **Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the 5/6/2021 Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

3. **Applicable Fees**. The parties agree that the Applicable Fees which Seller shall pay to WCB, pursuant to Section 17 of the Agreement shall be as follows:

   a. **Due Diligence Fee:** $ 1,200.00 (the cost of the due diligence of Seller' business performed by WCB. As a general rule, the Due Diligence Fee varies and depends on the complexity of underwriting required on a business including without limitation, sophistication of Seller's principals, difficulty in ascertaining Seller's receivables and account debtors, sources of Seller's revenue flow, etc.).

   b. **ACH Program Fee:** $ 395.00 (to cover expense of ACH processing program).

   c. **UCC Fee:** WAIVED (part of filing UCC financing statements and their terminations).

   d. **Wire Fee:** $ 35.00 (to cover cost of remitting the Purchase Price).

4. **Authorization**. Seller hereby authorizes WCB to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to Section 17 of the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivering it to Seller.

5. **No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed to reduce the Purchase Price.

Seller and WCB agree that this Rider shall be attached to the Agreement and shall be made a part thereof.

FOR THE SELLER

By: _Michael Fitzgerald_

Name: MICHAEL S FITZGERALD

FOR THE SELLER

By: _____

Name: N/A

**TO THE 5/6/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")**

**Between West Coast Business Capital, LLC ("WCB")**

**and CALIFORNIA SCUBA CENTER LLC d/b/a CALIFORNIA SCUBA CENTER  ("Seller")**

**PRIOR BALANCE**

**1. Possible Conflicts.**  If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions.**  All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Prior Balance.**  Seller represents and warrants that the following are the amounts that Seller owes to WCB and/or its affiliates (collectively, the "Affiliates") as of the Effective Date of the Agreement under agreements similar in nature to this Agreement (the sum of all such amounts, the "Prior Balance of Purchased Amounts"):

**TOTAL PRIOR BALANCE: $0.00**

**4. Buyback Right.**  By choosing to enter into this Rider 2, Seller hereby exercises its right to buyback from the Affiliates the Prior Balance of Purchased Amounts.  In furtherance of the foregoing, Seller hereby authorizes and directs WCB to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance of Purchased Amounts pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance of Purchased Amounts from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to WCB and/or the creditors listed in this Rider.

**5. No Right for Reconciliation or Adjustment.**  Seller acknowledges and agrees that in the event WCB will indeed forward the Prior Balance of Purchased Amounts to the Affiliates, Seller shall have no right to request any Reconciliation or Adjustments set forth in Sections 10 through 13 of the Agreement.

**6. No Reduction of Purchase Price.**  Seller hereby agrees that deduction of the Prior Balance of Purchased Amounts from the Purchase Price shall not be deemed to reduce the Purchase Price.

**7. Indemnification.** Seller hereby indemnifies and holds harmless WCB for any and all damages and losses (including without limitation legal fees and expenses) incurred by WCB as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and WCB agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**                                        **FOR THE SELLER**

By: _Michael Fitzgerald_                              By: _____

**Name:** MICHAEL S FITZGERALD                    **Name:** N/A

**RIDER 3**

**TO THE 5/6/2021 FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")**

**Between West Coast Business Capital, LLC ("WCB")**

**and CALIFORNIA SCUBA CENTER LLC d/b/a CALIFORNIA SCUBA CENTER ("Seller")**

**ORIGINATION FEE**

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

**3. Applicable Fees**. The parties agree that the Origination Fee that Seller shall pay to WCB pursuant to Section 19 of the Agreement shall be:

    **$900.00**

**4. Authorization**. Seller hereby authorizes WCB to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Origination Fee pursuant to Section 19 of the Agreement by deducting the amount of the Origination Fee from the Purchase Price prior to delivering it to Seller.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Origination Fee from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and WCB agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**FOR THE SELLER**                **FOR THE SELLER**

By: *Michael Fitzgerald*        By: _____

**Name:** MICHAEL S FITZGERALD    **Name:** N/A

# APPENDIX A

# ACH Authorization Form
All information on this form is required unless otherwise noted.

| Business Authorized to Debit/Credit Account (the "Buyer") |
|---|

Authorized Business Name: West Coast Business Capital, LLC

Authorized Business Phone Number: 1-800-955-2411

Authorized Business Address: 116 Nassau Street, Suite 804, New York, NY 10038

| Business Information (the "Seller"): |
|---|

Business Name: CALIFORNIA SCUBA CENTER LLC

Business DBA: CALIFORNIA SCUBA CENTER

Business Phone: (559) 908-1444

Account Holder Address: 510 SHAW AVE, CLOVIS, CA 93612

| Account Holder's Bank Information: |
|---|

Name of Bank: JPMORGAN CHASE

Bank Routing Number: 322271627

Bank Account Number: 667259920

**\*Please verify and complete any missing information.**

| Transaction Information: |
|---|

Amount of Transaction: $1,850.00

Effective Date: 5/6/2021

Rate of collection: Weekly

| Authorization: |
|---|

Pursuant to that certain Future Receivables Sale and Purchase Agreement dated 5/6/2021 between Buyer and Seller (the "Agreement"), Seller authorizes Buyer to electronically draft via the Automated Clearing House system up to the amount(s) indicated above from the account(s) identified above (the "Approved Bank Account"), and Seller agrees to be bound by the ACH Rules as set forth by NACHA" (The Electronic Payments Association). The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder and acknowledges that Seller is subject to a $35 reject fee if items are returned for insufficient funds.

NOTE that this authorization is to remain in full force and effect until Buyer receives written notification from Seller of its termination in such time and in such manner to afford Buyer a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement may constitute a breach of the Agreement.

FOR THE SELLER

By: *Michael Fitzgerald*

Date: May 6, 2021
Name of Account Holder: MICHAEL S FITZGERALD
Title of Account Holder: OWNER

Dear: MICHAEL S FITZGERALD of CALIFORNIA SCUBA CENTER LLC,

Thank you for your interest in financing with West Coast Business Capital, LLC. We look forward to working with your business(es) for all your financing needs.

As part of the underwriting process, RTR Funding, the approved vendor of your proposed agreement with West Coast Business Capital, LLC, needs viewing access to the business' bank account(s) prior to funding, and during the term of the Future Receivables Sale and Purchase Agreement. Please be assured that we take steps to carefully safeguard confidential information, and limit access to only relevant parties to the underwriting process.

Please fill out the form below with the information necessary to access your account.
* Be sure to indicate capital or lower-case letters.

**Name of bank:** Chase
If not applicable please write NA.

**Bank portal website:** https://www.chase.com/digital/online-banking
If not applicable please write NA.

**Username:** cascuba2019
If not applicable please write NA.

**Password:** 510@ShawAve
If not applicable please write NA.**For your security, please change your password immediately after funding call.**

**Security Question/Answer 1:** Please be ready to answer this verbally on the funding call.

**Security Question/Answer 2:** Please be ready to answer this verbally on the funding call.

**Security Question/Answer 3:** Please be ready to answer this verbally on the funding call.

**Any other information necessary to access your account:**
If not applicable please write NA.: N/A

2092682-750

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 3



## REVENUE BASED FINANCING AGREEMENT

This Revenue Based Financing Agreement ("Agreement") dated <u>06/09/2021</u>, is made by and between EBF Holdings, LLC d/b/a Everest Business Funding ("Purchaser"), the business identified below ("Seller"), and the owners of the Seller identified below (each a "Performance Guarantor").

### SELLER'S INFORMATION

| Legal Business Name | CALIFORNIA SCUBA CENTER LLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| D/B/A | California Scuba Center | | | | | | | |
| Type of Business Entity | Corp. | | Limited Liability Company | ✔ | Partnership | | Limited Partnership | |
| | Limited Liability Partnership | | | Sole Proprietorship | | Other | | |
| Physical Address | 510 SHAW AVE | | | | | | | |
| City | CLOVIS | | State | CA | | Zip | | 93612 |
| Mailing Address | 510 SHAW AVE | | | | | | | |
| City | CLOVIS | | State | CA | | Zip | | 93612 |
| Contact Name | MICHAEL SCOTT FITZGERALD | | | | | Position | | |
| Business Phone | | | | Cell Phone | | | | |
| Email | mike@cascubacenter.com | | | Website | | | | |
| Date Business Started | 06/2019 | | | Federal Tax Id | | 84-2623424 | | |
| Monthly Avg Sales | $51,213.96 | | | Annual Sales | | $614,567.48 | | |

### GUARANTOR'S INFORMATION

| Name: michael scott fitzgerald | Address: 2904 E FREMONT AVE, FRESNO, California 93710 |
|---|---|
| Name: | Address: |

### OFFER TO SELL AND PURCHASE PAYMENT RIGHTS

Seller hereby sells, assigns and transfers to Purchaser, without recourse, upon payment of the Purchase Price, the Purchased Amount of Future Receipts by delivering to Purchaser the Specified Percentage of the proceeds of each future sale by Seller. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Credit Card") or other form of monetary payment in the ordinary course of Seller's business. BASED UPON SELLER'S CALCULATIONS AND EXPERIENCE IN OPERATING ITS BUSINESS, SELLER IS CONFIDENT THAT THE PURCHASE PRICE PAID BY PURCHASER IN EXCHANGE FOR THE PURCHASED AMOUNT OF FUTURE RECEIPTS WILL BE USED IN A MANNER THAT WILL BENEFIT SELLER'S CURRENT AND FUTURE BUSINESS OPERATIONS.

| Purchase Price | $20,000.00 | Purchased Amount | $29,000.00 | Daily Payment | $241.67 | Specified Percentage | 15% |
|---|---|---|---|---|---|---|---|
| Daily Payment = (Monthly Average Sales X Specified Percentage ) / Average Weekdays in a Calendar Month | | | | | | | |

| Itemization of Fees Deducted from Purchase Price | | Amount Remitted to Seller: |
|---|---|---|
| | | **$19,275.00** |
| Origination Fee: | $400.00 | The Amount Remitted to Seller may include payments made on Seller's behalf to satisfy prior obligations of Seller to EBF Holdings, LLC d/b/a Everest Business Funding or third parties. |
| Funding Fee: | $50.00 | |
| ACH/Lockbox/CC Split Processing Fee: | $275.00 | |
| Payoff Existing Balance | $0.00 | |
| Total: | ($725.00) | |

Initial Here    *mSf*    1

Seller shall (1) deposit all Future Receipts into only one bank account, which must be acceptable to and pre-approved by Purchaser (the "Account") and (2) instruct Seller's Credit Card processor, which processor must be acceptable to and pre-approved by Purchaser (the "Processor") who shall serve as Seller's sole Credit Card processor, to deposit all Credit Card receipts of Seller into the Account. Purchaser will debit the Daily Payment from the Account each Weekday (Monday – Friday). Seller authorizes Purchaser to initiate electronic checks or ACH debits from the Account equal to the Daily Payment each business day and will provide Purchaser with all required account information. Seller will be responsible for any fees incurred by Purchaser resulting from a rejected electronic check or ACH debit attempt. Purchaser is not responsible for any overdrafts or rejected transactions that may result from Purchaser's debiting any amount authorized under the terms of this Agreement.

**Purchaser Acknowledgement.** There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Purchaser. Seller going bankrupt or going out of business, in and of itself, does not constitute a breach of this Agreement. Purchaser is entering into this Agreement knowing the risks that Seller's business may slow down or fail, and Purchaser assumes these risks based on Seller's representations warranties and covenants in this Agreement, which are designed to give Purchaser a reasonable and fair opportunity to receive the benefit of its bargain.

**Changes to the Daily Payment.** The Daily Payment is intended to represent the Specified Percentage of Seller's daily Future Receipts. Once each calendar month, Seller or Purchaser may request a reconciliation to the Daily Payment to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Any reconciliation request by Seller must be: (1) in writing; (2) include a copy of Seller 's bank statement for the most recent calendar month; and (3) be sent to Everest Business Funding at 5 West 37th Street, Suite 1100, New York NY 10018. It is solely the Seller's responsibility to send a complete bank statement. Seller agrees to provide Purchaser any information requested by Purchaser to assist in this reconciliation. Within four business days of Purchaser's reasonable verification of such information, Purchaser shall adjust the Daily Payment on a going-forward basis to more closely reflect Seller's actual Future Receipts times the Specified Percentage. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Payment until any subsequent adjustment.

**Fees.** A list of all fees applicable under this Agreement is contained in Appendix A.

**THE "REVENUE BASED FINANCING AGREEMENT TERMS AND CONDITIONS" AND THE "PERFORMANCE GUARANTY" ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS REVENUE BASED FINANCING AGREEMENT.**

**Agreement to Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**SELLER:**     CALIFORNIA SCUBA CENTER LLC

| BY: | (PRINT NAME & TITLE BELOW) | SIGNATURE | (SIGN BELOW) | MUST SIGN AS SELLER |
|---|---|---|---|---|
| Michael Scott Fitzgerald | | *MICHAEL SCOTT FITZGERALD* | | ⬅ |
| BY: | (PRINT NAME & TITLE BELOW) | SIGNATURE | (SIGN BELOW) | MUST SIGN AS SELLER |
| | | | | ⬅ |

**Agreement of Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.
**Notice:** This Agreement contains a personal guaranty of performance, and by signing below, you agree that you will be personally liable for the performance of certain obligations of the Seller under this Agreement as provided in the Performance Guaranty.

**OWNER/GUARANTOR:**

| FOR THE OWNER/GUARANTOR #1 | (PRINT NAME BELOW) | SIGNATURE | (SIGN BELOW) | MUST SIGN AS OWNER/GUARANTOR |
|---|---|---|---|---|
| Michael Scott Fitzgerald | | *MICHAEL SCOTT FITZGERALD* | | ⬅ |
| FOR THE OWNER/GUARANTOR #2 | (PRINT NAME BELOW) | SIGNATURE | (SIGN BELOW) | MUST SIGN AS OWNER/GUARANTOR |
| | | | | ⬅ |

*Purchaser's payment of the Purchase Price shall be deemed Purchaser's acceptance and performance of this Agreement, notwithstanding Purchaser not executing this agreement.*

Each of above-signed Seller(s) and Owner(s) represent that he or she is authorized to sign this Agreement individually and on behalf of Seller and that the information provided herein and in all documents, forms and recorded interviews provided to or with Purchaser is true, accurate and complete in all respects. Seller and each of the above-signed Owners authorize Purchaser, its agents and representatives and any credit reporting agency engaged by Purchaser, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, and (ii) obtain credit reports, including consumer credit reports at any time now or for so long as Seller and/or Owners(s) continue to have any obligation owed to Purchaser as a consequence of this Agreement or for Purchaser's ability to determine Seller's eligibility to enter into any future agreement with Purchaser.

## REVENUE BASED FINANCING AGREEMENT TERMS AND CONDITIONS

### I. TERMS OF ENROLLMENT IN PROGRAM

**1.1**     **(a) ACH Authorization.**  Seller shall execute an agreement (the "ACH Authorization") acceptable to Purchaser to authorize the use of the Automated Clearinghouse System (ACH) to retrieve the Daily Payment from the Account. Seller shall provide Purchaser and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Seller's receivables, receipts, deposits and withdrawals into and from the Account. Seller hereby authorizes Purchaser and/or its agent(s) to deduct from the Account the Purchased Amount and any other amounts owed by Seller to Purchaser as specified herein and to pay such amounts to Purchaser. If an ACH transaction is rejected by Seller's financial institution for any reason other than a stop payment order placed by Seller with its financial institution, including without limitation insufficient funds, Seller agrees that Purchaser may resubmit any ACH transaction that is dishonored as permitted under the NACHA rules. In the event Purchaser makes an error in processing any payment or credit, Seller authorizes Purchaser to initiate ACH entries to or from the Account to correct the error. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Seller for these deposits, whether preapproved by Purchaser or not. This additional authorization is not a waiver of Purchaser's right to declare Seller in default if Seller uses an account that Purchaser did not first preapprove in writing. This authorization shall be irrevocable without the prior written consent of Purchaser.

**(b) Bank Holidays and Other Exceptions.**  Purchaser will debit the Daily Payment each Weekday on which the Bank is open and able to process ACH transactions. On the Weekday immediately following any Weekday or Weekdays on which the Bank was not open to process ACH transactions, Purchaser will debit the designated account for an amount equal to the sum of: (i) the Daily Payment amount due on that Weekday, plus (ii) the Daily Payment amount due on the preceding Weekday when the Bank was not open or could not process ACH transactions.

**1.2**     **Financial Condition.**  Seller and Guarantor(s) authorize Purchaser and its agents to investigate their financial responsibility and history, and will provide to Purchaser any authorizations, bank or financial statements, tax returns, etc., as Purchaser deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Purchaser is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.3**     **Transactional History.**  Seller authorizes all of its banks and brokers and Credit Card processors to provide Purchaser with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program.

**1.4**     **Indemnification.**  Seller and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by Purchaser for monies owed to Purchaser from Seller and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Purchaser.

**1.5**     **No Liability.**  In no event will Purchaser be liable for any claims asserted by Seller or Guarantor(s) under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Seller and Guarantor(s). In the event these claims are nonetheless raised, Seller and Guarantor(s) will be jointly liable for all of Purchaser's legal fees and expenses resulting therefrom. Seller and each Owner and each Guarantor hereby waives to the maximum extent permitted by law any claim for damages against Purchaser or any of its affiliates relating to any (i)investigation undertaken by or on behalf of Purchaser as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.6**  **Reliance on Terms.**  Sections 1.1, 1.3, 1.4, 1.6 and 1.8 of this Agreement are agreed to for the benefit of Seller, Purchaser and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.7**  **Accounting Records, and Place of Business.**  Purchaser or its designated representatives and agents shall have the right during Seller's normal business hours and at any other reasonable time to examine the interior and exterior of any of Seller's places of business. Purchaser may examine, among other things, whether Seller (a) has a place of business that is separate from any personal residence, (b) is open for business, and (c) has sufficient inventory to conduct Seller's business. When performing an examination, Purchaser may photograph the interior and exterior of any of Seller's places of business, including any signage, and may photograph any Owner. Purchaser or any of its agents shall have the right to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Seller's accounts or other transactions between the parties thereto and the general financial condition of Seller and Purchaser may remove any of such records temporarily for the purpose of having copies made thereof. Purchaser shall have the right to hire a Certified Public Accountant, licensed in the state where the business is located to perform analysis of the accounting records for the purpose of determining if the Specified Percentage of receipts has been made available for remittance to Purchaser. Seller hereby agrees to fully cooperate with such analysis upon the request of Purchaser.

**1.8**  **Collection from Third Parties.**  Seller hereby grants Purchaser full authority to take any action or execute any instrument or document to settle all obligations due to Seller from any bank or Processor, or in the case of an occurrence of an Event of Default under Section 3 hereof, to Purchaser under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Purchased Amount; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iii) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; (iv) to file any claims or take any action or institute any proceeding that Purchaser may deem necessary for the collection of any of the unpaid Purchased Amount, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Seller and Purchaser is authorized to use Seller's funds to pay for same; and (v) Purchaser shall have the right, without waiving any of its rights and remedies and without notice to Seller or any Guarantor, to notify any Credit Card processor of the sale of Future Receipts and re-direct the remittance of daily settlements to an account of Purchaser's choosing in order to settle all obligations due to Purchaser under this Agreement.

**1.9**  **Confidentiality.**  Seller understands and agrees that the terms and conditions of the products and services offered by Purchaser, including this Agreement and any other Purchaser documentations (collectively, "Confidential Information") are proprietary and confidential information of Purchaser. Accordingly, unless disclosure is required by law or court order, Seller shall not disclose Confidential Information of Purchaser to any person other than an attorney, accountant, financial advisor or employee of Seller who needs to know such information for the purpose of advising Seller ("Advisor"), provided such Advisor uses Confidential Information solely for the purpose of advising Seller and first agrees in writing to be bound by the terms of this section. A breach hereof entitles Purchaser to not only damages and legal fees but also to both a temporary restraining order and a preliminary injunction without bond or security.

**1.10**  **D/B/As.**  Seller hereby acknowledges and agrees that Purchaser may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between Purchaser and Seller, including the filing of UCC-1 financing statements and any other notices or filings.

**1.11**  **Application of Amounts Received.**  Subject to applicable law, Purchaser reserves the right to apply any amounts received from Seller to any fees or other charges due to Purchaser from Seller prior to applying such amounts to reduce the undelivered balance of Purchased Amount.

**1.12**  **Acknowledgment of Security Interest and Security Agreement.**  The Future Receipts sold by Seller to Purchaser pursuant to this Agreement are "accounts", "general intangibles", or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located (the "UCC") and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Purchaser. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the

Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Purchaser has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without an Event of Default, Purchaser may notify account debtors, or other persons obligated on the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Purchaser.

**1.13    Financing Statements.** Seller hereby authorizes Purchaser to file one or more financing statements in order to give notice that the Purchased Amount of Future Receipts is the sole property of Purchaser. Each such filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Purchaser's right to collect same. Seller authorizes Purchaser to apply amounts received from Seller to costs incurred by Purchaser associated with the filing, amendment or termination of any such filings.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

**2.1    Good Faith, Best Efforts and Due Diligence.** Seller will conduct its business in good faith and will use its best efforts to maintain and grow its business. Furthermore, Seller agrees, warrants and represents hereby that Seller will constantly perform all appropriate due diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations as may be commercially reasonable to ensure any and all products and/or services provided, sold or delivered by Seller to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. This is not a guaranty of payment by Seller 's customers but is an obligation of commercially reasonable due diligence investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due. Seller will communicate with Purchaser including providing timely notice to Purchaser if the Account will have insufficient funds for any Daily Payment amount so that Purchaser can reschedule any pending ACH debit from the Account.

**2.2    Nonrecourse Sale of Payment Rights.** Seller represents and warrants that it is selling the Purchased Amount of Future Receipts to Purchaser in the ordinary course of Seller's business and the Purchase Price paid by Purchaser is good and valuable consideration for the sale. Seller is selling a portion of a future revenue stream to Purchaser at a discount, not borrowing money from Purchaser. Purchaser assumes the risk that Future Receipts will be remitted more slowly than Purchaser may have anticipated or projected because Seller 's business has slowed down, or the full Purchased Amount may never be remitted because Seller 's business went bankrupt or otherwise ceased operations in the ordinary course of business. By this Agreement, Seller transfers to Purchaser full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein.

**2.3    Financial Condition and Financial Information.** Seller and Owner represent and warrant that Seller 's bank and financial statements, copies of which have been furnished to Purchaser, and future statements and other financial information that will be furnished hereafter at the request of Purchaser, fairly represent the financial condition of Seller at such dates. Purchaser may request bank statements and other financial information at any time during the performance of this Agreement and the Seller shall provide them to Purchaser within 5 business days. Seller 's failure to do so is a material breach of this Agreement.

**2.4    Governmental Approvals.** Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.5    Authorization.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.6    Insurance.** Seller will maintain business-interruption insurance naming Purchaser as loss payee and additional insured in amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

**2.7    Processor and Bank Account.** Seller will not change its Credit Card processor, add terminals, change its financial institution or bank account(s), use multiple bank accounts, or take any similar action that could interfere with Purchaser's ability to collect the Specified Percentage of the Future Receipts purchased under this Agreement, without Purchaser's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.8** **Change of Name, Type, Location or Sale of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Processor and Purchaser, nor will Seller change any of its places of business or the type of business without prior written consent by Purchaser. Seller will not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Purchaser, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Purchaser.

**2.9** **Daily Batch Out.** Seller will ensure that all Credit Card transactions are communicated daily to the Processor and not later than the day on which such transactions occurred.

**2.10** **Estoppel Certificate.** Seller will at all times, and from time to time, upon at least 1 day's prior notice from Purchaser to Seller, execute, acknowledge and deliver to Purchaser and/or to any other person, firm or corporation specified by Purchaser, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been delivered to Purchaser or the amount of the Purchased Amount that has not been delivered to Purchaser.

**2.11** **No Bankruptcy.** As of the date of this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within 6 months prior to the date of this Agreement, and that it has no present intention of closing its business or ceasing to operate its business, either permanently or temporarily, during the 6 month period after the date of this Agreement. Seller further warrants that as of the date of this Agreement, it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.12** **Sharing of Information.** Seller hereby authorizes Purchaser to share information regarding Seller's performance under this Agreement with affiliates and unaffiliated third parties.

**2.13** **Unencumbered Receipts.** Seller has good, complete, unencumbered and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of Purchaser.

**2.14** **Business Purpose.** Seller is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates. Seller agrees to use the Purchase Price solely for business purposes, and not for personal, family or household purposes. Seller understands that Seller's agreement not to use the Purchase Price for personal, family or household purposes means certain important rights conferred upon consumers pursuant to federal or state law will not apply to this Agreement. Seller agrees that a breach by Seller of the provisions of this section will not affect Purchaser's rights to the Purchased Amount or to use any remedy legally available to Purchaser to obtain delivery of the Purchased Amount.

**2.15** **Defaults under Other Contracts.** Seller's execution of, and/or performance under this Agreement, will not cause or create an Event of Default by Seller under any contract with another person or entity.

**2.16** **Account.** Seller represents and warrants that (i) the Account is Seller's bank account; (ii) the person executing this Authorization on behalf of Seller is an authorized signer on the Account and has the power and authority to authorize Purchaser to initiate ACH transactions to and from the Account; (iii) the Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes.

**2.17** **Specified Percentage Held in Trust.** Seller shall hold the Specified Percentage of the proceeds of each sale of goods and services in trust for the benefit of Purchaser and shall promptly deliver the Specified Percentage to Purchaser as provided herein.

**2.18** **Ordinary Course of Business.** Seller acknowledges that it is entering into this transaction and will deliver Future Receipts to Purchaser in the ordinary course of Seller's business.

DocuSign Envelope ID: AFEFE32C-AB7B-43DB-8D88-C713069E0400

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1**    **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller intentionally interferes with Purchaser's right to collect the Daily Payment in violation of this Agreement; (b) Seller violates any term or covenant in this Agreement; (c) Any representation or warranty by Seller in this Agreement proves to have been incorrect, false or misleading in any material respect when made; (d) Seller defaults under any of the terms, covenants and conditions of any other agreement with Purchaser.

**3.2**    **Remedies.** If any Event of Default occurs, Purchaser may proceed to protect and enforce its rights including, but not limited to, the following:

     **A.**    The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees (including legal fees) due under this Agreement will become due and payable in full immediately.

     **B.**    Purchaser may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which Purchaser shall recover Judgment against Seller, Seller shall be liable for all of Purchaser's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Purchaser under this provision shall be limited as provided in the arbitration provision set forth in Section VIII.

     **C.**    Purchaser may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Purchaser.

     **D.**    Seller shall pay to Purchaser all reasonable costs associated with the Event of Default and the enforcement of Purchaser's remedies set forth above, including but not limited to court costs and attorneys' fees.

Subject to arbitration as provided in Section VIII, all rights, powers and remedies of Purchaser in connection with this Agreement may be exercised at any time by Purchaser after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.3**    **Required Notifications.** Seller is required to give Purchaser written notice within 24 hours of any filing under Title 11 of the United States Code. Seller is required to give Purchaser 7 days' written notice prior to the closing of any sale of all or substantially all of the Seller's assets or stock.

## IV. MISCELLANEOUS

**4.1**    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Purchaser.

**4.2**    **Assignment.** Purchaser may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

**4.3**    **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Purchaser shall become effective only upon receipt by Purchaser. Notices to Seller shall become effective three days after mailing.

**4.4**    **No Waiver of Remedies.** No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5**    **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Purchaser and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole discretion. Except as set forth in Arbitration Section, this Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Purchaser so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the

jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum. ADDITIONALLY, SELLER AND GUARANTOR AGREE THAT ANY SUMMONS AND/OR COMPLAINT OR OTHER PROCESS TO COMMENCE ANY LITIGATION BY PURCHASER WILL BE PROPERLY SERVED IF MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE MAILING ADDRESS(ES) LISTED ON PAGE 1 OF THIS AGREEMENT.

**4.6** **Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7** **Interpretation.** All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against any Party hereto as drafter.

**4.8** **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9** **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Performance Guaranty embody the entire agreement between Seller and Purchaser pertaining to the subject matter thereof and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10** **Facsimile Acceptance.** Facsimile signatures hereon shall be deemed acceptable for all purposes.

**4.11** **Monitoring, Recording, and Solicitations.** In Connection with servicing this Agreement, Seller and each Owner understand and agree to the following:

**A.** **AUTHORIZATION TO CONTACT SELLER AND/OR OWNER BY TELEPHONE USING AN AUTOMATED TELEPHONE DIALING SYSTEM AND/OR ARTIFICIAL VOICES OR PRERECORDED MESSAGES.** Seller and/or each Owner authorize Purchaser, its affiliates, agents and independent contractors to contact Seller and each Owner at any telephone number, including via voice calls and text messages at any mobile telephone number, Seller or any Owner provides to Purchaser or from which Seller or any Owner places a call to Purchaser using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or and Owner incurs charges for receiving such communications. Seller and Owner understand that consent to contact by automated telephone dialing system and/or artificial voices or prerecorded messages may be revoked at any reasonable time and by any reasonable means.

**B.** **AUTHORIZATION TO CONTACT SELLER BY OTHER MEANS.** Seller and each Owner also agree that Purchaser, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to telephone calls to mobile or landline telephones and text messages to mobile telephones via a device that is not an automated telephone dialing system, mail, e-mail and facsimile, to contact Seller and each Owner. Seller and each Owner expressly consent to conduct business by electronic means.

**C.** **CEASE COMMUNICATION REQUESTS.** Seller and each Owner understand that to make a request that Purchaser stop all communications, Seller or Owner must write to Purchaser at the following address: Everest Business Funding at 5 West 37th Street, Suite 1100, New York NY 10018. If Seller and/or Owner makes a cease communication request in writing, Purchaser shall not communicate further with Seller and/or Owner (as the case may be) except: (1) to advise that Purchaser's further efforts are being terminated; (2) to notify Seller and/or Owner (as the case may be) that Purchaser may invoke specified remedies which are ordinarily invoked by Purchaser; or (3) to notify Seller and/or Owner (as the case may be) that Purchaser intends to invoke a specified remedy. Any Owner authorized to act as an agent of Seller may make a cease communication request on behalf of Seller, but Seller may not make a cease communication request on behalf of any Owner. (Continued on Page 9)

A cease communication request made by telephone or some means other than in writing as specified in the paragraph directly above will result in Purchaser ceasing only telephone contact by automated telephone dialing system and/or artificial voices or prerecorded messages.

To discuss changes to communication preferences, such as a change in telephone number, email address, or mailing address, or convenient hours of communication, please call Everest Business Funding at 800-558-0654.

## V. PERFORMANCE GUARANTY.

**5.1** **Personal Guaranty of Performance.** Guarantor (i) will derive direct or indirect economic benefit from this Agreement and (ii) is directly or indirectly involved in the business operations of Seller. As an inducement to Purchaser to purchase the Future Receipts, Guarantor agrees to irrevocably, absolutely and unconditionally guarantee to Purchaser prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

    **5.1.1** Seller's obligation to provide bank statements and other financial information that fairly represent the financial condition of Seller at such dates, within 5 business days after request from Purchaser;

    **5.1.2** Seller's obligation to not change its Credit Card processor, add terminals, change its financial institution or bank account(s), use multiple bank accounts, or take any similar action that could have an adverse effect upon Seller's obligations under this Agreement, without Purchaser's prior written consent;

    **5.1.3** Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Processor and Purchaser;

    **5.1.4** Seller's obligation to not change any of its places of business or the type of business without prior written consent by Purchaser; and

    **5.1.5** Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Purchaser, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Purchaser.

In the event that Seller fails to perform any of the Guaranteed Obligations, Purchaser may recover from Guarantor for all of Purchaser's losses and damages and all remedies specified in Section 3.2 of this Agreement by enforcement of Purchaser's rights under this Performance Guaranty without first seeking to obtain payment from Seller or any other guarantor, or any other guaranty.

**5.2** **Guarantor Waivers.** Purchaser does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Performance Guaranty if it is not notified of: (i) Seller's failure to pay timely perform any obligation under the Agreement; (ii) any adverse change in Seller's financial condition or business; (iii) Purchaser's acceptance of the Agreement; and (iv) any renewal, extension or other modification of the Agreement or Seller's other obligations to Purchaser. In addition, Purchaser may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Performance Guaranty: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Purchaser; and (ii) release Seller from its obligations to Purchaser. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Performance Guaranty. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Performance Guaranty: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Purchaser must return any amount paid by Seller or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under the Agreement and this Performance Guaranty shall include that amount.

**5.3** **Guarantor Acknowledgement.** Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the Jury Trial Waiver and Arbitration sections, and has had a full opportunity to consult with counsel their choice; and have consulted with counsel or have decided not to avail himself / herself / themselves of that opportunity.

## VI. JURY TRIAL WAIVER.

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

## VII. CLASS ACTION WAIVER.

PURCHASER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

## VIII. ARBITRATION.

IF PURCHASER, SELLER OR A GUARANTOR REQUESTS, THE OTHER PARTY(S) AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF A PARTY SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO EACH OTHER PARTY, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF THE PARTIES DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, ANY PARTY MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM. PURCHASER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH THE SELLER AND THE GUARANTOR MUST PAY FILING FEES, PURCHASER WILL ONLY REIMBURSE THE SELLER'S ARBITRATION FILING FEE. EXCEPT AS PROVIDED IN THE NEXT SENTENCE, PURCHASER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR(S) OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR(S) IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN PURCHASER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES. IF THE ARBITRATOR GRANTS RELIEF TO THE SELLER OR THE GUARANTOR(S) THAT IS EQUAL TO OR GREATER THAN THE VALUE OF WHAT THE SELLER OR THE GUARANTOR(S) REQUESTED IN THE ARBITRATION, PURCHASER SHALL REIMBURSE SELLER OR THE GUARANTOR(S) FOR THAT PERSON'S REASONABLE ATTORNEYS' FEES AND EXPENSES INCURRED FOR THE ARBITRATION. SELLER AND THE GUARANTOR(S) AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. EACH PARTY AND THE GUARANTOR(S) MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, THE PARTIES AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

SELLER AND ANY GUARANTOR MAY OPT-OUT OF THIS CLAUSE. TO OPT-OUT OF THIS ARBITRATION CLAUSE, SELLER AND/OR GUARANTOR MAY SEND PURCHASER A NOTICE THAT THE SELLER OR GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT-OUT TO BE EFFECTIVE, SELLER AND/OR GUARANTOR MUST SEND AN OPT-OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT:

Customer Service Department
Everest Business Funding
5 West 37th Street
Suite 1100
New York, NY 10018

| GUARANTOR #1 | (PRINT NAME BELOW) | SIGNATURE | (SIGN BELOW) | MUST SIGN AS OWNER |
|---|---|---|---|---|
| Michael Scott Fitzgerald | | *MICHAEL SCOTT FITZGERALD* | | ⬅ |
| GUARANTOR #2 | (PRINT NAME BELOW) | SIGNATURE | (SIGN BELOW) | MUST SIGN AS OWNER |
| | | | | ⬅ |

## AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS)
## AND DIRECT COLLECTIONS (ACH DEBITS)

**DEFINITIONS:**
**Purchaser: EBF Holdings, LLC d/b/a Everest Business Funding D/B/A EBF**
**Seller: CALIFORNIA SCUBA CENTER LLC**

**Designated Bank Account:**     CALIFORNIA SCUBA CENTER LLC DBA California Scuba Center

(Name of account exactly as it appears on your Bank Statements or Bank Letters)

Bank Name: Chase          Branch: Clovis          Tax ID: 84-2623424

ABA: Routing: 322271627          DDA: Account No: 667259920

**Additional Alternate Bank Account(s), if any, are listed on the attached Appendix "A"**

**Purchase and Sale Agreement:** Revenue Based Financing Agreement between Seller and Purchaser, dated as of 06/09/2021

**NACHA RULES:** The Rules and Operating Guidelines of NACHA – The Electronic Payments Association

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Purchase and Sale Agreement.

**This Agreement for Direct Deposits (ACH Credits) and Direct Collections (ACH Debits) is part of (and incorporated by reference into) the Revenue Based Financing Agreement. Seller should keep a copy of this important legal document for Seller's records.**

**DISBURSEMENT OF PURCHASE PRICE.** By signing below, Seller authorizes Purchaser, after electing to purchase the Purchased Amount, to disburse the Purchase Price (less any applicable fees) set forth in the Revenue Based Financing Agreement, or to disburse other amounts due to Seller under the Revenue Based Financing Agreement, by initiating an ACH credit to the Designated Bank Account.

**COLLECTION OF FUNDS ARISING FROM FUTURE RECEIPTS.** By signing below, Seller authorizes Purchaser to collect amounts Purchaser is entitled to receive under the Revenue Based Financing Agreement by initiating ACH debits to the Designated Bank Account, as follows:

For the amount of $241.67 (or) Percentage of each banking deposit: 15 %

On the following Days: Each business day. On the business day immediately following any business day(s) on which Seller's bank was not open or was not able to process ACH transactions, the Purchaser will debit the Designated Bank Account for an amount equal to the sum of (i) the Daily Payment amount due on that business day, plus (ii) the Daily Payment amount(s) due on the preceding business day(s) when the Bank was not open or could not process ACH transactions.

If an ACH debit from the Designated Bank Account is rejected by Seller's financial institution for any reason other than termination (as further defined in this agreement), Seller authorizes Purchaser to initiate an additional ACH debit to the Alternate Bank Account(s) to collect the amounts due to Purchaser.

**MISCELLANEOUS.** If any ACH transaction date falls on a weekend or holiday, Seller understands and agrees that the transaction may be executed on the next business day. If a transaction is rejected by Seller's financial institution for any reason other than termination of this authorization, including without limitation insufficient funds, Seller understands that Purchaser may, at its discretion, attempt to process the transaction again as permitted under the NACHA Rules. Seller also authorizes Purchaser to initiate ACH entries to correct any erroneous payment transaction. Seller understands that Seller is responsible for ensuring that funds arising from Future Receipts remain in the Designated Bank Account each day until Purchaser debits the amount that the Revenue Based Financing Agreement authorizes Purchaser to debit from the Designated Bank Account for that day. By signing below, Seller attests that both the Designated Bank Account and the Alternate Bank Account(s) were established for business purposes and not primarily for personal, family or household purposes.

Purchaser is not responsible for any overdrafts, rejected transactions, or fees that may result from credits or debits initiated under this Agreement. The origination of ACH transactions to the Designated Bank Account and the Alternate Bank Account(s) must comply with, and both Purchaser and Seller agree to be bound by, the provisions of applicable law and the NACHA Rules.

Seller authorizes Purchaser to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the Designated Bank Account and/or the Alternate Bank Account(s) and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Revenue Based Financing Agreement. In the event that Seller closes the Designated Bank Account and the Alternate Bank Account(s), or the Designated Bank Account t and the Alternate Bank Account(s) have insufficient funds for any ACH transaction under this Authorization, Seller authorizes Purchaser to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Purchaser a limited Power of Attorney to take action in Seller's name to facilitate this authorization.

This authorization is to remain in full force and effect until Purchaser has received written notification from Seller at 5 West 37th Street Suite 1100 New York NY 10018 at least 5 banking days prior to its termination to afford the Purchaser a reasonable opportunity to act on it.

The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designated Bank Account and the Alternate Bank Account(s). Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution(s) that hold(s) the Designated Bank Account and the Alternate Bank Account(s) to honor all ACH entries initiated in accordance with this Authorization Agreement.

Seller: CALIFORNIA SCUBA CENTER LLC

| | |
|---|---|
| First Owner Sign Here: | *MICHAEL SCOTT FITZGERALD* |
| First Owner Print Name: | Michael Scott Fitzgerald |
| First Owner Title: | Date: 6/9/2021 |
| Second Owner Sign Here: | |
| Second Owner Print Name: | |
| Second Owner Title: | Date: |

ISO#6744/AR#1344517/06092021

## AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS)
## AND DIRECT COLLECTIONS (ACH DEBITS)
### Appendix "A"

**Alternate Bank Account:** _____

(Name of account exactly as it appears on your Bank Statements or Bank Letters)

Bank Name: _____ Branch: _____ Tax ID: 84-2623424

ABA: Routing: _____ DDA: Account No: _____

**Alternate Bank Account:** _____

(Name of account exactly as it appears on your Bank Statements or Bank Letters)

Bank Name: _____ Branch: _____ Tax ID: 84-2623424

ABA: Routing: _____ DDA: Account No: _____

**Alternate Bank Account:** _____

(Name of account exactly as it appears on your Bank Statements or Bank Letters)

Bank Name: _____ Branch: _____ Tax ID: 84-2623424

ABA: Routing: _____ DDA: Account No: _____

Seller: CALIFORNIA SCUBA CENTER LLC _____

First Owner Sign Here: *MICHAEL SCOTT FITZGERALD* Date: 6/9/2021

First Owner Print Name: Michael Scott Fitzgerald First Owner Title: _____

Second Owner Sign Here: _____ Date: _____

Second Owner Print Name: _____ Second Owner Title: _____

## Addendum to Revenue Based Financing Agreement

**Origination fee:** This fee is paid by the Seller to EBF Holdings, LLC d/b/a Everest Business Funding to cover the costs of underwriting. These fees include the cost of credit reports, site inspection fees, and other administrative costs.

| Amount of Advance | Origination Fee |
|---|---|
| Up to $7,500 | $ 199.00 |
| $7,501 to $10,000 | $ 275.00 |
| $10,001 to $25,000 | $ 400.00 |
| $25,001 to $50,000 | $ 800.00 |
| $50,001 to $100,000 | $1,295.00 |
| $100,001 to $250,000 | $2,200.00 |
| Over $250,000 | $2,900.00 |

**Funding fee:** **$50.00** – For same day wire transfer

**ACH / Lockbox / CC Split Processing Fee:** The administrative setup and maintenance of these programs is labor intensive, not an automated process, and have fees we pay, requiring us to charge this fee to cover those costs.

| Amount of Advance | Fee |
|---|---|
| Up to $7,500 | $ 99.00 |
| $7,501 to $10,000 | $150.00 |
| $10,001 to $25,000 | $275.00 |
| Over $25,000 | $395.00 |

*The three fees mentioned above will be deducted from the proceeds of your advance. The fee being paid is the amount associated with the dollar amount of your advance.*

**Bank Change Fee:** For each change of account requested, account may only be changed to another commercial checking account. **$75.00**

**NSF Fee:** **$35.00 per NSF**

**Rejected ACH:** If an ACH is rejected based on any action taken by the Seller to our specific ACH debit or All ACH debits without prior notification and authorization by Purchaser. **$100.00 per incident**

**Default Fee:** Charged to Seller in the Event of Default. **$5,000.00**

**UCC Filling Fee:** **$250.00**

Business Name: CALIFORNIA SCUBA CENTER LLC

First Owner Sign Here: *MICHAEL SCOTT FITZGERALD*

First Owner Print Name: Michael Scott Fitzgerald

First Owner Title: _____ Date: 6/9/2021

Second Owner Sign Here: _____

Second Owner Print Name: _____

Second Owner Title: _____ Date: _____ .

ISO#6744/AR#1344517/06092021



## Bank Login Information

Dear Seller,

Thank you for accepting this offer from EBF Holdings, LLC d/b/a Everest Business Funding. We look forward to being your funding partner for as long as you need.

## Daily ACH Program:

EBF Holdings, LLC d/b/a Everest Business Funding will require viewing access to your bank account in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

EBF Holdings, LLC d/b/a Everest Business Funding will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of Bank: _____

Bank portal website: _____

Username: _____

Password: _____

Security Question / Answer 1: _____

Security Question / Answer 2: _____

Security Question / Answer 3: _____

Any other information necessary to access your account:

_____

*MICHAEL SCOTT FITZGERALD*                    6/9/2021
_____          _____
Seller / Owner Signature                         Date

ISO#6744/AR#1344517/06092021

Exhibit 4

- 33 -



# MERCHANT AGREEMENT

Agreement dated _____06/11/2021_____ between White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings ("GFE") and the Merchant listed below ("MERCHANT")
    (Month) (Day) (Year)

## MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | CALIFORNIA SCUBA CENTER, LLC. |
| D/B/A: | CALIFORNIA SCUBA CENTER, LLC. |
| State of Incorporation / Organization: | CA |
| Type of Business Entity: | LLC |
| Federal EIN: | 84-2623424 |
| Physical Address: | 510 SHAW AVENUE, Clovis, CA, 93612 |
| Mailing Address: | 510 SHAW AVENUE, Clovis, CA, 93612 |
| Primary Contact & Number: | MICHAEL SCOTT FITZGERALD (559-908-1444) |

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by GFE as specified below ("Purchase Price"), hereby sells, assigns and transfers to GFE (making GFE the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GFE.

The Purchased Amount shall be paid to GFE by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by GFE (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GFE receives payment in full of the Purchased Amount. Merchant hereby authorizes GFE to ACH Debit the specified remittances from the Merchant's Account on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box and will provide GFE with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by GFE remains in the Account and will be held responsible for any fees incurred by GFE resulting from a rejected ACH attempt or an event of default. (See Appendix A) GFE is not responsible for any overdrafts or rejected transactions that may result from GFE's ACH debiting the specified amounts under the terms of this agreement. GFE will debit the specified remittance amount during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to GFE, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of GFE's receipt of the Merchant's monthly bank statements, GFE shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, GFE shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. GFE may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GFE's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GFE and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

### ORIGINAL OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $84,000.00 | Merchant's Average Monthly Revenue: | $50,213.96 |
| Purchased Amount of Receivables: | $120,960.00 | Specified Percentage of Monthly Revenue: | 25% |
| Total Fees*: | $0.00 | Specified Remittance Amount & Frequency: | $699.00 / Daily |
| Net Funded Amount**: | $84,000.00 | Initial Estimated # of Remittance Payments: | 174 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by GFE and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

Merchant #1 Initials: _____                                           Page 1 of 19

THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGE 2, THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM GFE.

| MERCHANT (#1) | | Signature | *MICHAEL SCOTT FITZGERALD* |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Home Address: | 290 EAST FREMONT AVENUE, Fresno, CA, 93710 |
| Title | Sole Member | Cell Phone Number: | 559-908-1444 |
| Social Security No: | 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 | Home or Secondary Number: | 5599081444 |
| Driver License No: | C5897523 CA | Email: | mike@cascubacenter.com |

| OWNER / GUARANTOR (#1) | | Signature | *MICHAEL SCOTT FITZGERALD* |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Home Address: | 290 EAST FREMONT AVENUE, Fresno, CA, 93710 |
| Title | Sole Member | Cell Phone Number: | 559-908-1444 |
| Social Security No: | 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 | Home or Secondary Number: | |
| Driver License No: | C5897523 CA | Email: | mike@cascubacenter.com |

White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings
By:

_____
(Company Officer)

## MERCHANT AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GFE with a Bank acceptable to GFE to obtain electronic fund transfer services for the Merchant's account at the Bank approved by GFE (the "Account"). Merchant shall provide GFE and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GFE and/or its agent(s) to deduct from the Account the amounts owed to GFE for the receipts as specified herein and to pay such amounts to GFE. Merchant also hereby authorizes GFE to withdraw from the Account the Specified Percentage(s) and/or sums by GFE debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GFE or not. This additional authorization is not a waiver of GFE's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GFE did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GFE.

Merchant understands and agrees that this Agreement, including the authorizations to access Merchant's accounts (including the Account) set forth herein, as well as all other payment processing agreements entered into with respect to the Transactions irrevocably authorize the processor of such payments (the "Processor") and Operator to pay the cash attributable to the Specified Percentage of Receivables to GFE rather than to Merchant until GFE receives the cash attributable to the entire Specified Amount of Future Receivables from Processor and Operator. Merchant and Guarantor(s) authorize GFE and its agents: i) to investigate Merchant's financial status and history, and will provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. and ii) to update such information and financial and credit profiles from time to time as GFE deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide GFE with Merchant's bank statements, brokerage statements, processing history and such other statements and information as GFE may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide GFE with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GFE.

These authorizations and instructions may be revoked only with the prior written consent of GFE. Merchant agrees that Processor and Operator may rely upon the instructions of GFE, without any independent verification, in making the cash payments above. Merchant waives any claim for damages it may have against Processor or Operator in connection with actions taken based on instructions from GFE, unless such damages were due to such Processor's or Operator's failure to follow GFE's instructions. Merchant acknowledges and agrees that (a) Processor and Operator will be acting on behalf of GFE with respect to the specified Percentage of Receivables until cash attributable to the entire Specified Amount of Future Receivables has been remitted by Processor and Operator to GFE, (b) Processor and Operator may or may not be affiliates of GFE, (c) GFE does not have any power or authority to control Processor's or Operator's actions with respect to the processing of Card transactions or remittance of cash to GFE, (d) GFE is not responsible and shall not be liable for, and Merchant agrees to hold GFE harmless for, the actions of Processor and Operator, and (e) funds representing the Specified Percentage of Receivables in the possession of Processing or Operator constitute property owned solely by GFE, and Merchant disclaims any and all interest therein. For purposes of this Agreement, the term "Operator" shall mean GFE or any person or entity designated by GFE to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) any amounts from Merchant's or principal(s) accounts as authorized or permitted by this Agreement.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GFE as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GFE.

**1.3 Future Purchases.** GFE reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize GFE, its agents and representatives, as well as any credit reporting agency engaged by GFE, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to GFE as a consequence of this Merchant Agreement or for GFE's ability to determine Merchant's eligibility to enter into any future agreement with GFE. Merchant and Guarantor(s) will further provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GFE is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon to GFE in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GFE with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant herby (i) authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that GFE deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide GFE with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processor accepted by GFE in accordance with this Agreement.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor and Operator, their respective officers, directors, affiliates, employees, agents, representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable

attorney's fees) suffered or incurred by Processor or Operator resulting from (a) claims asserted by GFE for monies owed to GFE from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by GFE.

**1.7 No Liability.** In no event will Processor, Operator or GFE be liable for any claims asserted by Merchant or Guarantors under any legal theory or law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GFE's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GFE and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GFE to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GFE has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GFE in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GFE has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GFE shall promptly refund to Merchant any interest received by GFE in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GFE not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to GFE as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints GFE as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GFE from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GFE; and (v) to file any claims or take any action or institute any proceeding which GFE may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and GFE is authorized to use Merchant's funds to pay for same. In addition to any other remedies available for violation of the Merchant's Contractual Covenants, in the event that Merchant changes or permits the change of the Processor accepted by GFE or utilizes the services of an additional Processor, GFE shall have the right, without waiving any of its rights or remedies and without notice to Merchant or Principal(s), to notify the new or additional Processor of the sale of the Specified Amount of Future Receivables hereunder and to direct such new or additional Processor to make payment to GFE of all or any portion of the amounts received or held by such Processor for or on behalf of Merchant to pay any amounts GFE is entitled to receive hereunder. Merchant hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to take any and all actions necessary and appropriate to direct such new or additional Processor to make payment to GFE as contemplated by this Section. Merchant further hereby grants GFE an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints GFE and its designees as Merchant's attorney-in-fact, to execute any all documents in the Merchant's name sufficient to provide and perfect any security interest granted by Merchant to GFE hereunder, including but not limited to security interests in motor vehicles and real estate.

**1.11 Protections against Default.** The following Protections 1 through 8 may be invoked by GFE immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GFE electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to GFE; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor or an unauthorized depository account; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God), transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GFE, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GFE; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor or (f) Merchant enters into any agreement with any third person or entity that relates to the Receipts or any portion thereof, whether in the form of a purchase, sale, loan, pledge or the granting of any security interest in the Receipts or any portion thereof These protections are in addition to any other remedies available to GFE at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** GFE may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant agrees to execute affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Merchant also hereby authorizes GFE to execute in the name of the Merchant affidavit(s) of Confession of Judgment in favor of GFE in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, GFE may, without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of any appropriate court based upon the affidavit(s) of judgment by

Merchant #1 Initials: [signature]                                                                                                    Page 4 of 19

confession previously executed by Merchant(s) and Owner(s)/Guarantor(s).

**Protection 4.** GFE may enforce its security interest in the Collateral identified in the Security Agreement hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to GFE from Merchant.

**Protection 6.** GFE may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which GFE shall recover Judgment against Merchant, Merchant shall be liable for all of GFE's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. GFE reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to GFE from Merchant prior to applying such amounts to reduce the amount of any outstanding Purchase Amount.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to GFE. Upon breach of any provision in this Agreement, GFE may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** GFE may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile GFE on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GFE.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GFE, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GFE obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GFE or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GFE as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GFE, including this Agreement and any other GFE documentations (collectively, "Confidential Information") are proprietary and confidential information of GFE. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GFE to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles GFE to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GFE to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that GFE may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GFE and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Purchase of Increments.** In the event that GFE offers to purchase additional Receipts in the "increments' stated on Attachment A of this Agreement, then GFE reserves the unilateral right to delay or rescind such offer in its sole and absolute discretion at any time.

**1.17 Sharing of Information.** Merchant hereby authorizes GFE to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until GFE is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GFE, and future statements which will be furnished hereafter at the discretion of GFE, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GFE of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to GFE. GFE may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GFE within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming GFE as loss payee and additional insured in amounts and against risks as are satisfactory to GFE and shall provide GFE proof of such insurance upon request. Merchant shall also maintain such other insurance in such amounts and against such risks as GFE deems necessary to protect Merchant's business, and Merchant shall provide proof of such insurance to GFE upon demand.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GFE's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GFE, nor shall Merchant change any of its places of business without prior written consent by GFE. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during

the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GFE to Merchant, execute, acknowledge and deliver to GFE and/or to any other person, firm or corporation specified by GFE, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy. As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.**

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts or future check sales, or any portion thereof, whether in the form of a purchase, sale, a loan against, collateral against or the sale or purchase of credits against, such Receipts or future check sales, with any party other than GFE. GFE may share information regarding this Merchant Agreement with any third party in order to determine whether Merchant is in compliance with this provision.

**2.11 Unencumbered Receipts.** Merchant has, and at all times will have, good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GFE. Without limiting the generality of the foregoing, all future Receipts purchased by GFE hereunder shall be free and clear of any and all liens (other than GFE's ownership rights therein) at the time they become Receivables. All amounts received by GFE attributable to the Specified Amount of Future Receivables purchased by GFE hereunder shall arise from bona fide sales by Merchant of its goods and services to Card holders who present their Cards as payment thereof.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GFE obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as GFE has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.15 Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.16 No Violation of Prior Agreements.** Merchant warrants that its execution and performance of this Merchant Agreement will not violate or conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts or the Purchased Amount.

**2.17 Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.18 Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from GFE, it will comply with GFE's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to GFE the requested documentation within twenty-four (24) hours shall be deemed a breach of this Agreement and GFE shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, GFE discovers that Merchant made misrepresentations before receiving funding from GFE, GFE shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GFE (h) Merchant shall change its depositing account without the prior written consent of GFE; (i)

Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) the Specified Percentage of its daily Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with GFE; or (l) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GFE determine that the Purchased Amount cannot be obtained from the Merchant's business, GFE will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GFE for all of GFE's losses and damages, in additional to all costs, fees expenses and legal fees associated with such enforcement. GFE shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GFE may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to GFE. In addition, upon an Event of Default, GFE may: i) enforce the provisions of the Security Agreement and Guaranty against each Merchant and Owner/Guarantor; ii) enforce its security interest in the Collateral and the ; iii) debit Merchant's deposit accounts wherever situated by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account for all or a portion of the balance of the Purchased Amount remaining due, or GFE may instruct the Processor to forward to GFE, without any prior notice to Merchant, all or a portion of the balance of the Purchased Amount remaining due, and iv) without further notice, enter judgment against Merchant(s) and Owner(s)/Guarantor(s) with the judgment clerk of the appropriate court based upon the affidavit(s) of judgment by confession previously executed by Merchant(s) and Owner(s)/Guarantor(s). All rights, powers and remedies of GFE which may be exercised by GFE at any time after the occurrence of an Event of Default are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to GFE all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of GFE 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give GFE written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GFE seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GFE.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), GFE and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of GFE, which consent may be withheld in GFE's sole discretion. Any such assignment or delegation without GFE's prior written consent shall be void. GFE reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. GFE may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to GFE at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to GFE shall become effective only upon receipt by GFE. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GFE to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GFE and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GFE which consent may be withheld in GFE's sole discretion. GFE reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, may, if GFE so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by GFE to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GFE and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that

Merchant #1 Initials: [MSP]                                                                                          Page 7 of 19

he, she or it is not relying on any representations not specifically embodied in this Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that GFE shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by GFE, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow GFE to interview any relevant parties. Furthermore, Merchant agrees to provide GFE, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for GFE to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing GFE with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between GFE and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with GFE, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to GFE by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

| Merchant's Legal Name: | CALIFORNIA SCUBA CENTER, LLC. |
|---|---|
| D/B/A: | CALIFORNIA SCUBA CENTER, LLC. |
| Federal EIN: | 84-2623424 |
| Physical Address: | 510 SHAW AVENUE, Clovis, CA, 93612 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to GFE a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GFE under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GFE upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GFE's entitlements under this Agreement, GFE is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens secure all of GFE's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GFE or an affiliate of GFE. GFE is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GFE without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GFE has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GFE will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GFE written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GFE is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GFE. Merchant agrees to execute and deliver to GFE such instruments and documents GFE may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GFE is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC Financing Statement and to have it filed with any and all appropriate UCC filing offices. GFE shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GFE shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GFE's rights, including without limitation, GFE's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GFE has such rights in such entity's assets. Merchant also agrees that, at the GFE's discretion, GFE may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GFE under any other agreement between Merchant or Guarantor and GFE (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GFE deems necessary to perfect or maintain GFE's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GFE to file any financing statements deemed necessary by GFE to perfect or maintain GFE's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GFE with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with GFE's rights. Merchant and Guarantor shall be liable for, and GFE may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GFE in protecting, preserving and enforcing GFE's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GFE shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GFE may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GFE may enter into an agreement with Merchant's landlord giving GFE the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GFE may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GFE, whether by acceleration or otherwise.

Merchant #1 Initials: [MSF]

# GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GFE, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GFE may seek recovery from Guarantors for all of GFE's losses and damages by enforcement of GFE's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GFE may hold pursuant to this Agreement or any other guaranty.

GFE does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any guaranty of the Guaranteed Obligations; (iv) GFE's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GFE. In addition, GFE may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GFE; (ii) release Merchant from its obligations to GFE; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GFE under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | MICHAEL SCOTT FITZGERALD | **Social Security No:** | 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 |
| **Title** | Sole Member | **Driver License No:** | C5897523 CA |
| **Signature** | *MICHAEL SCOTT FITZGERALD* | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| **Full Name:** | MICHAEL SCOTT FITZGERALD | **Social Security No:** | 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 |
| **Title** | Sole Member | **Driver License No:** | C5897523 CA |
| **Signature** | *MICHAEL SCOTT FITZGERALD* | | |

## APPENDIX A STRUCTURE:

A. **Origination Fee** - % of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - % of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the GFE may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than GFE during any portion of the term of this Agreement, then: i) Merchant shall pay to GFE a "Stacking" fee equal to $5,000.00 per occurrence, and ii) the specified daily remittances that Merchant is obligated to pay to GFE hereunder shall be doubled, and Merchant shall be deemed to have authorized GFE to double the amount of its ACH Debits from the Merchant's Account on a daily basis.

H. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to GFE, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

I. NSF Fee (Standard) - $ 35.00 each until a default is declared.

J. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | MICHAEL SCOTT FITZGERALD | **Social Security No:** | 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 |
| **Title** | Sole Member | **Driver License No:** | C5897523 CA |
| **Signature** | *MICHAEL SCOTT FITZGERALD* | | |

# Merchant Verification Form

| Merchant Name: MICHAEL SCOTT FITZGERALD | |
|---|---|
| 1. Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | NO |
| 2. Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | NO |
| 3. Are you currently in, or contemplating personal bankruptcy? | NO |
| 4. Are you currently in, or contemplating business bankruptcy? | NO |
| 5. Is your business currently for sale? | NO |
| 6. Do you have any existing merchant cash advance balances? | YES |
| 7. Are you involved in any litigation proceedings or are a party to a lawsuit? | NO |
| 8. Is your business currently in default of any agreement with a creditor? | NO |
| 9. Is your business currently in forbearance agreement with a creditor? | NO |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | NO |

| If you have answered YES to any of the above questions, please explain: |
|---|
| |
| |
| |
| |

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Social Security No: | 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 |
| Title | Sole Member | Driver License No: | C5897523 CA |
| Signature | *Michael Scott Fitzgerald* | | |