# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT)
# AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep this important legal document for Merchant's records.

DISBURSEMENT OF ADVANCE PROCEEDS. By signing below, Merchant authorizes GFE to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Merchant later identifies and is acceptable to GFE) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until GFE has received written notification from Merchant of its termination in such time and in such manner as to afford GFE and Merchant's depository bank a reasonable opportunity to act on it.

BUSINESS PURPOSE ACCOUNT. By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

MISCELLANEOUS. GFE is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Merchant's account must comply with the provisions of U.S. law.

I, (We) MICHAEL SCOTT FITZGERALD hereby Authorize, White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings. (Hereinafter known as "GFE") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

| Bank Name: | Bank of America | Tax ID: | | 84-2623424 |
|---|---|---|---|---|
| ABA: Routing: | 121000358 | DDA: Account: | | 325129779489 |
| Bank Name: | JPMORGAN CHASE BANK | Tax ID: | | 84-2623424 |
| ABA: Routing: | 322271627 | DDA: Account: | | 667259920 |
| For the amount of: | $699.00 | (Or) Percentage of each Banking Deposit: | | 25% |
| On the Following Days: | MONDAY–FRIDAY | | | |

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Social Security No: | 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 |
| Title | Sole Member | Driver License No: | C5897523 CA |
| Signature | | | |

Thank you for accepting an offer from White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings ("GFE"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with GFE, GFE requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that GFE may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, GFE will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, GFE shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to GFE, you are required to immediately inform GFE of the changes made and provide GFE with the new bank login information. Please see below for the list of questions that will be by GFE as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | MICHAEL SCOTT FITZGERALD | **Social Security No:** | 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 |
| **Title** | Sole Member | **Driver License No:** | C5897523 CA |
| **Signature** | *michael scott fitzgerald* | | |

# BANK ACCOUNT DISCLOSURE AFFIDAVIT

For the purpose of obtaining the Business Cash Advance evidence by the Merchant Agreement of this same date herewith (the "Business Cash Advance") from White Road Capital LLC, Series: 45306, D/B/A: GFE Holdings., the undersigned Seller/Merchant hereby makes the following statement under penalty of law:

## OPTION 1 – DISCLOSURE AND AUTHORIZATION FOR ADDITIONAL ACCOUNTS:

By selecting this option, the Seller/Merchant hereby declares that in addition to the designated for ACH debit, the Seller/Merchant also has the following additional account(s) which he authorizes us to use in the event we are unable to debit from the designated account. The Seller/Merchant declares and warrents that it currently maintains no other bank account at any financial institution other than those banks and accounts referenced below.

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

| Bank Name | |
|---|---|
| Name on Account | |
| Account Number | |
| Routing Number | |
| Fed ID number associated with this account | |
| Name associated with this account | |
| Phone number of person whose name is associated with this account | |

**OPTION 2** - By selecting this option, the merchant swears, under penalty of law, that Merchant has no accounts in any lending institution in addition to the one provided for ACH debit

## PLEASE SELECT AN OPTION AND SIGN BELOW:

| MERCHANT (#1) | | | |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Social Security No: | 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 |
| Title | Sole Member | Driver License No: | C5897523 CA |
| Signature | *michael scott fitzgerald* | | |

## ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

### THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.

In any litigation commenced by GFE, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against GFE within 1 year of its accrual will be time barred. If GFE prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay GFE's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). GFE, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | *MICHAEL SCOTT FITZGERALD* |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Home Address: | 2904 EAST FREMONT AVENUE, Fresno, CA, 93710 |
| Title | Sole Member | Cell Phone Number: | 559-908-1444 |
| Social Security No: | 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 | Home or Secondary Number: | |
| Driver License No: | CS897523 CA | Email: | mike@cascubacenter.com |

# TRADE REFERENCES

Please provide a list of 3-5 professional references

| TRADE REFERENCE #1: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #2: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #3: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #4: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

| TRADE REFERENCE #5: | |
|---|---|
| Name: | |
| Phone Number: | |
| Email Address: | |

## Attachment A

## Weekly Advance Addendum to the Merchant Agreement

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 06/11/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | CALIFORNIA SCUBA CENTER, LLC. |
| D/B/A: | CALIFORNIA SCUBA CENTER, LLC. |
| Federal EIN: | 84-2623424 |
| Physical Address: | 510 SHAW AVENUE, Clovis, CA, 93612 |

This Weekly Advance Addendum amends the Merchant Agreement and Security Agreement between GFE and the merchant listed below (the "Merchant") dated 06/11/2021, (the "Agreement"). All capitalized terms used in his Addendum shall have the same meaning as defined in the Agreement. Except as modified below, the terms of the Agreement remain in full force and effect.

### AGREEMENT AS TO ADVANCES

1. Weekly Sale and Purchase of Merchant`s Future Receipts: Merchant hereby offers to sell and GFE agrees to purchase, up to the Receipts Purchased Amount, future Receipts on a weekly basis according to the attached schedule. GFE shall have the right to terminate the purchase of any additional future Receipts as set forth in Section 2 of this Addendum.

2. GFE's Obligation to Make Future Purchases: GFE reserves the right to terminate its obligation to make the weekly purchases at its option, if upon: (i) a Event of Default has occurred, as defined in the Agreement; (ii) Merchant fails to provide to GFE a monthly Account statement, access codes to the Account, and full access to merchant's Account prior making any weekly purchase as contemplated herein; (iii) Merchant obtains any additional funding without providing prior written notice to and receiving written approval from GFE; (iv) the Specified Percentage of its weekly Receipts is not available for ACH by GFE on any three (3) business days within any twenty (20) business day period; (v) Merchant has a 20% decline in monthly deposits that is not due to regular seasonal payment fluctuations; (vi) GFE believes in its sole judgment that Merchant's business may not be able to generate future Receipts sufficient to deliver the Purchased Receipts in a timely manner, vii) the Account has a negative balance; viii) Merchant is in arrears with respect to its payment obligations under the Agreement or ix) the Merchant has failed to provide GFE with a complete account receivable report within any thirty (30) day period prior to any weekly purchase contemplated herein In the event that weekly purchases are terminated, the Merchant will remain obligated to deliver the Specified Percentage of its weekly Receipts to GFE until GFE has received the Receipts GFE purchased prior to termination, and to comply with all other provisions of this Agreement.

3. Merchant's Indebtedness When Receipts Purchased Amount Is Sold In Increments: When Merchant sells and GFE purchases the Receipts Purchased Amount, or portions thereof, in increments, the Merchant's indebtedness to GFE under the Agreement (excluding any fees and expenses then then due and owing) shall at any given point in time be equal to the percentage of the total Receipts Purchase Amount that the total of all increments then paid by GFE to the Merchant bears to Total Purchase Price as set forth in the Agreement.

THE TERMS OF THIS ATTACHMENT A ARE HEREBY INCORPORATED INTO AND MADE A PART OF THE MERCHANT AGREEMENT IDENTIFIED ABOVE, AND MERCHANT HEREBY ACKNOWLEDGES THAT THE PERIODIC PURCHASE OF FUTURE RECEIPTS HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE MERCHANT AGREEMENT

| MERCHANT (#1) | | Signature | *MICHAEL SCOTT FITZGERALD* |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Home Address: | 290 EAST FREMONT AVENUE, Fresno, CA, 93710 |
| Title | Sole Member | Cell Phone Number: | 559-908-1444 |
| Social Security No: | 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 | Home or Secondary Number: | |
| Driver License No: | C5897523 CA | Email: | mike@cascubacenter.com |

| OWNER / GUARANTOR (#1) | | Signature | *MICHAEL SCOTT FITZGERALD* |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Home Address: | 290 EAST FREMONT AVENUE, Fresno, CA, 93710 |
| Title | Sole Member | Cell Phone Number: | 559-908-1444 |
| Social Security No: | 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 | Home or Secondary Number: | |
| Driver License No: | C5897523 CA | Email: | mike@cascubacenter.com |

## MERCHANT INFORMATION

| Merchant's Legal Name: | CALIFORNIA SCUBA CENTER, LLC. |
|---|---|
| D/B/A: | CALIFORNIA SCUBA CENTER, LLC. |
| Federal EIN: | 84-2623424 |
| Physical Address: | 510 SHAW AVENUE, Clovis, CA, 93612 |

## GFE Weekly Distribution Grid-Special Agreement

| Increment | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Amount | $5,731.00 | $4,969.00 | $4,794.00 | $4,644.00 | $4,644.00 |
| Increment | 6 | 7 | 8 | 9 | 10 |
| Amount | $4,644.00 | $4,644.00 | $4,644.00 | $4,644.00 | $4,644.00 |
| Increment | 11 | 12 | 13 | 14 | 15 |
| Amount | $4,644.00 | $4,644.00 | $4,644.00 | $4,644.00 | $4,644.00 |
| Increment | 16 | 17 | 18 | 19 | |
| Amount | $4,644.00 | $4,644.00 | $2,750.00 | $740.00 | |

## *Appropriate fee will be deducted from the first increment.

## See APPENDIX A STRUCTURE for fee details.

| MERCHANT (#1) | | Signature | *MICHAEL SCOTT FITZGERALD* |
|---|---|---|---|
| Full Name: | MICHAEL SCOTT FITZGERALD | Home Address: | 2904 EAST FREMONT AVENUE, Fresno, CA, 93710 |
| Title | Sole Member | Cell Phone Number: | 559-908-1444 |
| Social Security No: | 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 | Home or Secondary Number: | |
| Driver License No: | CS897523 CA | Email: | mike@cascubacenter.com |

Exhibit 5

- 34 -



**Tel: (877) 625-1825**

**60 PARK AVE S, LAKEWOOD NJ, 08701**

## MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 07/19/2021 _____ by and between MERCURY FUNDING GROUP INC ("MERCURY") and each merchant listed below (the "Merchant").
Merchant's Legal Name: CALIFORNIA SCUBA CENTER, LLC
D/B/A/: CALIFORNIA SCUBA CENTER

Fed ID #: 84-2623424 _____ / _____

Type of Entity:

☐ Corporation   ☑ Limited Liability Company   ☐ Limited Partnership   ☐ Limited Liability Partnership   ☐ Sole proprietor

Business Address: 510 SHAW AVE CLOVIS CA 93612
Contact Address: 2904 E FREMONT AVE FRESNO CA 93710

Merchant hereby sells, assigns, and transfers to MERCURY (making MERCURY the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of the merchant's business), for the payment of Merchant's sale of goods or services until the amount specified below (the "Receivables Purchased Amount") has been delivered by Merchant to MERCURY. All references in this Agreement to Merchant refer to each Merchant in the collective and the alternative. All references in this Agreement to Guarantor refer to each Guarantor in the collective and the alternative.

The Receivables Purchased Amount shall be paid to MERCURY by Merchant irrevocably authorizing only one depositing account acceptable to MERCURY (the "Account") to remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each transaction, until such time as MERCURY receives full payment of the Receivables Purchased Amount. Merchant hereby authorizes MERCURY to ACH Debit the specified remittances from the merchant's bank account as of the next business day after the date of this Agreement and will provide MERCURY with all required access codes and monthly bank statements. Merchant understands that it is responsible for ensuring that the Specified Percentage to be debited by MERCURY remains in the Account and will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 1). MERCURY is not responsible for any overdrafts or rejected transactions that may result from MERCURY's ACH debiting the Specified Percentage amounts under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between MERCURY and Merchant, upon the violation of any provision contained in Section 12 or the occurrence of an Event of Default under Section 29, the Specified Percentage shall equal 100%. A list of all additional fees applicable under this agreement is contained in the TERMS AND CONDITIONS of this Agreement.

Purchase Price: $ 18,000.00 _____   Specified Percentage: 30 _____ %   Receivables Purchased Amount: $ 26,982.00 _____

The amount that Merchant will remit to MERCURY towards the Receivables Purchased Amount during any specific DAY will be a payment of $ 674.55 _____ (the "Estimated Payment"). The Merchant represents and warrants that the Estimated Payment is a good faith approximation of the Specified Percentage. Merchant represents and warrants that it understands the Specified Percentage is not an interest rate rather it represents the percentage of revenue (not profit) to be remitted to MERCURY until the Receivables Purchased Amount is paid as described in Section 10 herein. The Estimated Payment is subject to the reconciliation provisions contained in Section 9 herein.

**THE PAGES THAT FOLLOW CONTAIN ADDITIONAL TERMS AND CONDITIONS THAT ARE PART OF THIS AGREEMENT. READ THEM BEFORE SIGNING THIS AGREEMENT ON THE NEXT PAGE.**

Approved for MERCURY FUNDING GROUP INC by: _____

I have read and agree to the terms and conditions set forth above:

| | |
|---|---|
| Name: MICHAEL SCOTT FITZGERALD | Name: _____ |
| Title: OWNER | Title: _____ |
| Date: 07/19/2021 | Date: _____ |

## FOR THE MERCHANT/OWNER (#1)

By: MICHAEL SCOTT FITZGERALD      OWNER                        *[signature]*

             Print Name                Title             B02136B9D0834A... Signature

SS#: 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                                Driver License Number: _____

## FOR THE MERCHANT/OWNER (#2)

By: _____      _____      _____

            Print Name                Title                 Signature

SS#: _____             Driver License Number: _____

**I have read and agree to the terms and conditions set forth above:**

**Name:** MICHAEL SCOTT FITZGERALD    *[signature]*      **Name:** _____
**Title:** OWNER           B02136B9D0834A1...      **Title:** _____
**Date:** 07/19/2021                          **Date:** _____

To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each above-signed Merchant and Owner represents that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of MERCURY's Documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and MERCURY, and MERCURY shall be entitled to all remedies available under the law.

Merchant and each above-signed Owner authorizes MERCURY, its agents and representatives, and any credit-reporting agency engaged by MERCURY, to (i) investigate any references given or any other statements obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation to MERCURY under this Agreement or for MERCURY's Ability to determine Merchant's eligibility to enter into any future agreement with MERCURY.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.**

## TERMS AND CONDITIONS

1. **Additional Fees.** In addition to the Receivables Purchased Amount, Merchant will be held responsible to MERCURY for the following fees, where applicable:

A. $1,800.00 _____ to cover underwriting of Receivable worthiness. This will be deducted from payment of the Purchase Price.

B. ACH Debit Program and Related Expenses - $0 each month until the Receivables Purchased Amount has been fully paid to MERCURY.

C. NSF/ Rejected ACH Fee - $50.00 (each). After two (2) NSFs a default may be declared.

D. Blocked Account/Default - $2,500.00 - If a merchant blocks MERCURY's ACH debit of the Account, simultaneously uses multiple bank accounts or credit-card processors to process its Receivables, changes bank accounts or switches to another credit-card processor without MERCURY's consent, or commits another default pursuant to the Agreement.

E. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

F. UCC Fee - $195.00 – to cover MERCURY filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

G. Court costs, collection agency, attorney fees, and expert fees, if required, as explained in other Sections of this Agreement.

2. **Merchant Deposit Agreement.** Merchant shall appoint a bank acceptable to MERCURY, to obtain electronic fund transfer services and/or "ACH" payments. Merchant shall provide MERCURY and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify Merchant's Receivables. Merchant shall authorize MERCURY and/or its agent(s) to deduct the amounts owed to MERCURY for the Receivables as specified herein from settlement amounts which would otherwise be due to Merchant and to pay such amounts to MERCURY by permitting MERCURY to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent MERCURY's written consent.

3. **Term of Agreement.** This Agreement shall continue until MERCURY receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 7, 8, 12, 13, 14, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 40, 41, and 42 shall survive the termination of this Agreement.

4. **Ordinary Course of Business.** Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from Merchant to MERCURY under this Agreement are being made in the ordinary course of Merchant's business.

5. **Financial Condition.** Merchant and Guarantor authorize MERCURY and its agent(s) to investigate their financial responsibility and history, and will provide to MERCURY any bank or financial statements, tax returns, etc., as MERCURY deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. MERCURY is authorized to update such information and financial profiles from time to time as it deems appropriate.

I have read and agree to the terms and conditions set forth above:

Name: MICHAEL SCOTT FITZGERALD

Title: OWNER

Date: 07/19/2021

Name: _____

Title: _____

Date: _____

**6.   Transactional History.** Merchant authorizes its bank or credit card processor to provide MERCURY with Merchant's banking and/or credit card processing history. Should the bank or credit processor fail to comply, Merchant shall provide said transactional history to MERCURY upon MERCURY's request.

**7.   Indemnification.** Merchant and Guarantor jointly and severally indemnify and hold harmless Merchant's credit card and check processors (collectively and alternatively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by MERCURY for monies owed to MERCURY from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by MERCURY.

**8.   No Liability.** In no event will MERCURY be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by Merchant and Guarantor.

**9.   Reconciliations.** Merchant may give written notice to MERCURY requesting that MERCURY conduct a reconciliation in order to ensure that MERCURY has not collected more Receivables than it was entitled to collect under this Agreement. Merchant may give written notice requesting a reconciliation by e-mail to info@mercuryfundingllc.com and such notice will be deemed to have been received if and when MERCURY sends a reply e-mail (but not a read receipt). If such reconciliation determines that MERCURY collected more than to the Specified Percentage, then at Merchant's direction, MERCURY will either credit to Merchant's bank account all amounts to which MERCURY was not entitled or credit the outstanding Receivables Purchase Amount, if applicable. In order to effectuate this reconciliation, Merchant must produce with its request the login and password for Merchant's Account and any and all bank statements, merchant statements, and other documents necessary to ascertain the amounts of the Specified Percentage. MERCURY will complete each such reconciliation within two (2) business days after receipt of a written request by Merchant for said reconciliation accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested. If it is determined at the time of a reconciliation request by either MERCURY or Merchant that the Estimated Payment's collected by MERCURY have been less than the Specified Percentage, MERCURY may collect the corrected reconciled amount from the Account up until the Specified Percentage.

**10.   Sale of Receivables.** Merchant and MERCURY agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from MERCURY to Merchant or that the Specified Percentage is in any way an interest rate. MERCURY is entering into this Agreement knowing the risks that Merchant's business may decline or fail, resulting in MERCURY not receiving the Receivables Purchased Amount. Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. MERCURY has purchased and shall own all the Receivables up to the full Receivables Purchased Amount as the Receivables are created. Payments made to MERCURY in respect to the full amount of the Receivables shall be conditioned upon Merchant's sale of products and services and the payment therefor by Merchant's customers in the manner provided in this Agreement.

**11.   Power of Attorney.** Merchant irrevocably appoints MERCURY as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to MERCURY, or in the case of a violation by Merchant of Section 2 or the occurrence of an Event of Default under Section 29 hereof, to settle all obligations due to MERCURY from Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 28); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to MERCURY; and (v) to file any claims or take any action or institute any proceeding which MERCURY may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**12.   Protections Against Default.** The following Protections 1 through 7 may be invoked by MERCURY, immediately and without notice to Merchant in the event:

(a) Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of Merchant's services and products;

(b)  Merchant changes its arrangements with Processor in any way that is adverse to MERCURY;

(c)  Merchant changes Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any of Merchant's check and/or credit card transactions to another such processor;

(d)      Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers,

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD

Title: OWNER

Date: 07/19/2021

Name: _____

Title: _____

Date: _____

moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of MERCURY and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to MERCURY; or

(e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to MERCURY at law, in equity, or otherwise available pursuant to this Agreement.

(f) Merchant fails to furnish, upon MERCURY's request, Merchant's financial information pursuant to Section 16 of this Agreement.

(g) Merchant refuses to comply with MERCURY's reconciliation request.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement become due and payable in full immediately.

Protection 2. MERCURY may enforce the provisions of the Guarantee against Guarantor.

Protection 3. MERCURY may enforce its security interest in the Collateral identified in Section 28 and the Guarantee herein.

Protection 4. MERCURY may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by MERCURY, Merchant shall, upon execution of this Agreement, deliver to MERCURY an executed assignment of lease of Merchant's premises in favor of MERCURY. Upon breach of any provision in this Section 12, MERCURY may exercise its rights under such assignment of lease.

Protection 6. MERCURY may debit Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. MERCURY will have the right, without waiving any of its rights and remedies and without notice to Merchant and/or Guarantor, to notify Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to MERCURY of all or any portion of the amounts received by such credit card processor on behalf of Merchant. Merchant hereby grants to MERCURY an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints MERCURY and its representatives as Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to MERCURY as contemplated by this Section.

**13. Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorize MERCURY to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against MERCURY or any of its affiliates relating to any (i) investigation undertaken by or on behalf of MERCURY as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**14. Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by MERCURY, including this Agreement and any other MERCURY documents (collectively, "Confidential Information") are proprietary and confidential information of MERCURY. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of MERCURY to any person other than an attorney, accountant, financial advisor, or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Section 14. Breach of confidentiality, not excused by law, shall warrant a penalty of $10,000.00 to be imposed on Merchant and owed to MERCURY.

**15. D/B/As.** Merchant hereby acknowledges and agrees that MERCURY may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between MERCURY and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**16. Financial Condition and Financial Information.** Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to MERCURY, and future statements which will be furnished hereafter at the request of MERCURY, fairly represent the financial condition of Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of Merchant. Merchant has a continuing affirmative obligation to advise MERCURY of any material adverse change in its financial condition, operation, or ownership. MERCURY may request statements at any time during the performance of this Agreement and the Merchant shall provide them to MERCURY within 2 business days. Merchant's failure to do so is a material breach of this Agreement.

**17. Governmental Approvals.** Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

I have read and agree to the terms and conditions set forth above:

Name: MICHAEL SCOTT FITZGERALD

Title: OWNER

Date: 07/19/2021

B02138B9D0834A1...

Name: _____

Title: _____

Date: _____

**18.   Authorization.** Merchant represents, warrants, and covenants that it and the person(s) signing this Agreement on behalf of **Merchant** have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**19.   Insurance.** Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming MERCURY as loss payee and additional insured in amounts and against risks as are satisfactory to MERCURY and shall provide MERCURY proof of such insurance upon request.

**20.   Electronic Check Processing Agreement.** Merchant represents, warrants, and covenants that it will not, without MERCURY's **prior** written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement. Any such change shall be a material breach of this Agreement.

**21.   Change of Name or Location.** Merchant represents, warrants, and covenants that it will not conduct its business under any **name** other than as disclosed to MERCURY or change any of its places of business without prior written consent from MERCURY.

**22.   Estoppel Certificate.** Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least one (1) day's prior notice from MERCURY to Merchant, execute, acknowledge, and deliver to MERCURY and/or to any other person or entity specified by MERCURY, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**23.   No Bankruptcy.** Merchant represents, warrants, and covenants that as of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**24.   Working Capital Funding.** Merchant represents, warrants, and covenants that it will not enter into with any party other than **MERCURY** any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables.

**25.   Unencumbered Receivables.** Merchant represents, warrants, and covenants that it has good, complete, and marketable title to **all** Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of MERCURY, other than any for which MERCURY has actual or constructive knowledge as of the date of this Agreement.

**26.   Business Purpose.** Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**27.   Default Under Other Contracts.** Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

**28.   Security Interest.** To secure Merchant's payment and performance obligations to MERCURY under this Agreement and any future agreement with MERCURY, Merchant hereby grants to MERCURY a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to MERCURY under any other agreement between Merchant or Guarantor and MERCURY (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Merchant agrees to execute any documents or take any action in connection with this Agreement as MERCURY deems necessary to perfect or maintain MERCURY's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Merchant hereby authorizes MERCURY to file any financing statements deemed necessary by MERCURY to perfect or maintain MERCURY's security interest, which financing statements may contain notification that Merchant has granted a negative pledge to MERCURY with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with MERCURY's rights. Merchant shall be liable for and MERCURY may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by MERCURY in protecting, preserving, and enforcing MERCURY's security interest and rights. Merchant further acknowledges that MERCURY may use another legal name and/or D/B/A or an agent when designating the Secured Party when MERCURY files the above-referenced financing statement(s).

**I have read and agree to the terms and conditions set forth above:**

Name:   MICHAEL SCOTT FITZGERALD

Title:  OWNER

Date:   07/19/2021

Name:  _____

Title: _____

Date:  _____

29. **Events of Default.** An "Event of Default" will be considered to have taken place if any of the following occur:

(1) Merchant violates any term or covenant in this Agreement;

(2) Any representation or warranty by Merchant in this Agreement proves to have been incorrect, false, or misleading in any material respect when made;

(3) the sending of notice of termination by Merchant or Guarantor;

(4) Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of MERCURY;

(5) Merchant transfers or sells all or substantially all of its assets without the prior written consent of MERCURY;

(6) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant without the prior written consent of MERCURY;

(7) Merchant uses multiple depository accounts without the prior written consent of MERCURY;

(8) Merchant changes the Account without the prior written consent of MERCURY;

(9) Merchant performs any act that reduces the value of any Collateral granted under this Agreement;

(10) Merchant defaults under any of the terms, covenants, and conditions of any other agreement with MERCURY;

(11) Merchant fails to deposit its Receivables into the Account;

(12) Merchant fails to timely provide requested financial documentation to MERCURY;

(13) The Estimated Payment is found to be lower than the Specified Percentage and Merchant refuses to comply with MERCURY's reconciliation to correctly reflect the Specified Percentage;

(14) Merchant intentionally blocks or prevents the payments obligated under this Agreement to MERCURY; or

(15) The Estimated Payment is not paid after two (2) business days due to insufficient funds in the Account and Merchant fails to respond to MERCURY's requests for reconciliation or documents as described in Sections 9 and 16 of this Agreement.

If Merchant goes out of business in the ordinary course of its business, is not otherwise in default of this Agreement, and provides MERCURY with written notice of the closure within two (2) business days thereafter, then such closure will not be deemed an Event of Default, and Merchant will be permitted to liquidate its assets, provided that the proceeds of any such liquidation will be deemed Receivables, of which Merchant will be obligated to MERCURY for the Specified Percentage.

30. **Remedies.** In case any Event of Default occurs and is not waived, MERCURY may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of MERCURY in connection with this Agreement, including each Protection listed in Section 12, may be exercised at any time by MERCURY after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, MERCURY will be entitled to the issuance of an injunction, restraining order, or other equitable relief in MERCURY's favor, subject to court approval, restraining Merchant's accounts and/or receivables up to the amount due to MERCURY as a result of the Event of Default, and Merchant will be deemed to have consented to the granting of an application for the same to any court of competent jurisdiction without any prior notice to any Merchant or any Guarantor and without MERCURY being required to furnish a bond or other undertaking in connection with the application.

31. **Costs.** Merchant will pay to MERCURY all reasonable costs associated with (a) a breach by Merchant of the covenants in this **Agreement** and the enforcement thereof, and (b) the enforcement of MERCURY's remedies set forth in Section 30 above, including but not limited to collection agency fees, reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest from the date of default at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower).

32. **Required Notifications.** Merchant is required to give MERCURY written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give MERCURY at least 7 days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

33. **Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

34. **Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective **successors** and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of MERCURY, which consent may be withheld in MERCURY's sole discretion. MERCURY may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 28 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD

Title: OWNER

Date: 07/19/2021

Name: _____

Title: _____

Date: _____

date of any such assignment or transfer by MERCURY, whether or not Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of Merchant or MERCURY) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between MERCURY and such assignee (the "Assignment Agreement"), have the rights and obligations of MERCURY under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guarantee regarding the full and prompt performance of every obligation that is a subject of the Guarantee, MERCURY's rights under Section 12 of this Agreement (Protections Against Default), and to receive damages from Merchant following a breach of this Agreement by Merchant. In connection with such assignment, MERCURY may disclose all information that MERCURY has relating to Merchant or its business. Merchant agrees to acknowledge any such assignment in writing upon MERCURY's request.

**35.** **Notices.** Notwithstanding notices, requests, consents, demands and other communication specifically mentioned in a separate Section, all notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addressesset forth in this Agreement and shall become effective only upon receipt. This Section is not applicable to service of process or notices in any legal proceedings.

**36.** **Waiver.** No failure on the part of MERCURY to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**37.** **Litigation and Arbitration.** This Agreement will be governed by and construed in accordance with the laws of the State of New York, **without** regard to any applicable principles of conflict of laws. Any litigation relating to this Agreement must be commenced and maintained in any court located in the Counties of Nassau, New York, Queens, or Kings in the State of New York (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the State of New York and that the New York will have jurisdiction over any litigation relating to this Agreement. The parties agree to waive trial by jury in any dispute between them. In any litigation or arbitration commenced by MERCURY, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against MERCURY within 1 year of its accrual will be time barred. If MERCURY prevails in any litigation or arbitration with Merchant and/or Guarantor, then Merchant and Guarantor must pay MERCURY's reasonable attorney fees, which may include a contingency fee of up to 33.33% of the amount claimed, expert fees, costs of suit, and prejudgment interest from the date of default at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). If MERCURY obtains the entry of a money judgment against Merchant and/or Guarantor, then the judgment will accrue interest at a rate of 16% per annum, which rate will govern over the statutory rate of interest up until actualsatisfaction of the judgment. MERCURY, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings. Any action or dispute relating to this Agreement, including, but not limited to issues of arbitrability, may, at the option of any party to such action or dispute, be determined by arbitration to be administered by Arbitration Services, Inc. before a single arbitrator under its Commercial Arbitration Rules as are in effect at that time, which Rules are available at www.arbitrationservicesinc.com. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of the Commercial Arbitration Rules, any witness in such an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MERCURY. Merchant and Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on Page 1 of this Agreement or any other address(es) provided in writing to MERCURY by Merchant or Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete 3 days after dispatch. Merchant and Guarantor agree that they will be precluded from asserting that they did not receive service of process or any other notice mailed to the Contact Address set forth on Page 1 of this Agreement if they do not furnish a certified mail return receipt signed by MERCURY demonstrating that MERCURY was provided with notice of a change in the Contact Address.

**38.** **Monitoring, Recording, and Electronic Communications.** MERCURY may choose to monitor and/or record telephone calls with **Merchant** and its owners, employees, and agents. By signing this Agreement, Merchant agrees that any call between MERCURY and Merchant or their representatives may be monitored and/or recorded.

**39.** **Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this **I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| **Name:** MICHAEL SCOTT FITZGERALD | **Name:** _____ |
| **Title:** OWNER | **Title:** _____ |
| **Date:** 07/19/2021 | **Date:** _____ |

Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**40.** **Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**41.** **Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. **Should** there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein.

**42.** **Right of Offset.** If Merchant paid to MERCURY more than the Receivables Purchased Amount, MERCURY may use any funds from such **overpayment** to offset any fees or costs owed by Merchant to MERCURY under this Agreement. Further, should MERCURY and Merchant enter into any further agreement where Merchant is obligated to remit funds to MERCURY, any amount Merchant overpaid under this Agreement shall offset Merchant's responsibilities under any future similar agreement and shall be credited towards Merchants outstanding receivables purchased amount.

**Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

I have read and agree to the terms and conditions set forth above:

Name: MICHAEL SCOTT FITZGERALD

Title: OWNER

Date: 07/19/2021

Name: _____

Title: _____

Date: _____

## GUARANTEE

**Personal Guarantee of Performance.** Each undersigned Guarantor hereby guarantees Merchant's performance of all of the representations, warranties, and covenants made by Merchant to MERCURY in this Merchant Cash Advance Agreement, inclusive of all addenda, if any, executed simultaneously herewith (the "Agreement"), as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement. All references herein to Merchant refers to each Merchant in the Agreement in the collective and the alternative. All references herein to Guarantor refer to each Guarantor in the collective and the alternative.

**Litigation and Arbitration.** This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws. Any litigation relating to this Agreement or this Guarantee must be commenced and maintained in any court located in the Counties of Nassau, New York, Queens, or Kings in the State of New York (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that the Agreement and this Guarantee encompass the transaction of business within the State of New York and that New York courts will have jurisdiction over any litigation relating to the Agreement or this Guarantee. The parties agree to waive trial by jury in any dispute between them. In any litigation or arbitration commenced by MERCURY, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against MERCURY within 1 year of its accrual will be time barred. If MERCURY prevails in any litigation or arbitration with Merchant and/or Guarantor, then Merchant and Guarantor must pay MERCURY's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert fees, costs of suit, and prejudgment interest from the date of default at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). If MERCURY obtains the entry of a money judgment against Merchant and/or Guarantor, then the judgment will accrue interest at a rate of 16% per annum, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment. MERCURY, Merchant, and Guarantor agree that they may bring claims against each other relating to the Agreement or this Guarantee only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings. Any action or dispute relating to the Agreement or this Guarantee, including, but not limited to issues of arbitrability, may, at the option of any party to such action or dispute, be determined by arbitration to be administered by Arbitration Services, Inc. before a single arbitrator under its Commercial Arbitration Rules as are in effect at that time, which Rules are available at www.arbitrationservicesinc.com. Notwithstanding any provision of the Commercial Arbitration Rules, any witness in such an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. The arbitration agreement contained herein may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of MERCURY. Guarantor consents to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on Page 1 of the Agreement or any other address(es) provided in writing to MERCURY by Merchant or Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete 3 days after dispatch. Merchant and Guarantor agree that they will be precluded from asserting that they did not receive service of process or any other notice mailed to the Contact Address set forth on Page 1 of the Agreement unless they furnish a certified mail return receipt signed by MERCURY demonstrating that MERCURY was provided with written notice of a change in the Contact Address. In case Guarantor's obligations become due hereunder and are not waived, MERCURY will be entitled to the issuance of an injunction, restraining order, or other equitable relief in MERCURY's favor, subject to court approval, restraining Merchant's and Guarantor's accounts and/or receivables up to the amount due to MERCURY as a result of the Event of Default, and Merchant and Guarantor will be deemed to have consented to the granting of an application for the same to any court of competent jurisdiction without any prior notice to any Merchant or any Guarantor and without MERCURY being required to furnish a bond or other undertaking in connection with the application.

**Guarantor Waivers.** In the event that Merchant fails to make a payment or perform any obligation when due under the Agreement, MERCURY may enforce its rights under this Guarantee without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral MERCURY may hold pursuant to this Guarantee or any other agreement or guarantee. MERCURY does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Guarantee even if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) MERCURY's acceptance of the Agreement with

I have read and agree to the terms and conditions set forth above:

Name: MICHAEL SCOTT FITZGERALD

Title: OWNER

Date: 07/19/2021

Name: _____

Title: _____

Date: _____

Merchant; and (v) any renewal, extension, or other modification of the Agreement or Merchant's other obligations to MERCURY. In addition, MERCURY may take any of the following actions without releasing Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or Merchant's other obligations to MERCURY; (ii) release Merchant from its obligations to MERCURY; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and Merchant's other obligations to MERCURY under the Agreement and this Guarantee are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under the Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of the Agreement and this Guarantee; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Guarantee are joint and several.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

## THE UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS GUARANTEE

By: MICHAEL SCOTT FITZGERALD          OWNER

     Print Name            Title           Signature

SS#: 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           Driver License Number: _____

## FOR THE MERCHANT/OWNER (#2)

By: _____

     Print Name            Title           Signature

SS#: _____           Driver License Number: _____

**I have read and agree to the terms and conditions set forth above:**

**Name:** MICHAEL SCOTT FITZGERALD      **Name:** _____

**Title:** OWNER                    **Title:** _____

**Date:** 07/19/2021                 **Date:** _____

## BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from MERCURY FUNDING GROUP INC. We look forward to being your funding partner.

You authorize MERCURY FUNDING GROUP INC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

MERCURY FUNDING GROUP INC will require viewing access to your bank account, each business day.

MERCURY FUNDING GROUP INC will also require viewing access to your bank account, prior to funding, as part of our underwriting process. Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank: CHASE BANK

Name of account: CALIFORNIA SCUBA CENTER, LLC

Account number: 667259920          Routing number: 322271627

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1: _____

Security Question/Answer 2: _____

Security Question/Answer 3: _____

Any other information necessary to access your account: _____

Please note: In the event that we are unable to access your account, we will take a daily estimated payment. An additional $50 fee will be assessed for each day we don't have access.

If you have any questions, please feel free to contact us directly at (877) 625-1825.

**I have read and agree to the terms and conditions set forth above:**

**Name:** MICHAEL SCOTT FITZGERALD          **Name:** _____

**Title:** OWNER          **Title:** _____

**Date:** 07/19/2021          **Date:** _____

B02136B9D0834A1...

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 6

 IBEX FUNDING GROUP

# IBEX FUNDING GROUP LLC

### FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT

This agreement (this "Agreement"), dated 08/11/2021_____, between IBEX FUNDING GROUP LLC ("Buyer") and the seller(s) listed herein (collectively, the "Seller") (all capitalized terms shall have the meanings ascribed to them below):

**Business Legal Name:** CALIFORNIA SCUBA CENTER LLC
**D/B/A:** CALIFORNIA SCUBA CENTER
**Form of Business Entity:** LLC                                    **EIN #:** 84-2623424
**Physical Address:** 510 SHAW AVE , CLOVIS, CA 93612; 2904 E FREMONT AVE, FRESNO, CA, 93710
**Mailing Address:** 510 SHAW AVE , CLOVIS, CA 93612; 2904 E FREMONT AVE, FRESNO, CA, 93710

| PURCHASE PRICE: | PURCHASED AMOUNT: | NET PURCHASE PRICE REMITTED AFTER FEES | SPECIFIED %: | INITIAL INSTALLMENT: |
|---|---|---|---|---|
| $60,000.00 | $90,000.00 | $55,500.00 | 25% | $1,200.00 |

**FOR SELLER #1**                                    **FOR SELLER # 2 (if any)**

By: MICHAEL SCOTT FITZGERALD                         By: _____

Name: MICHAEL SCOTT FITZGERALD                       Name: _____

Title: Owner/Agent/Manager                           Title: Owner/Agent/Manager
mike@cascubacenter.com
Email: _____                       Email: _____

Business Phone: 5595128727                           Business Phone: _____

Concurrently with the execution of this Agreement by Seller, and as condition to the effectiveness hereof, Seller has caused the **Personal Guarantee of Performance** in the form attached hereto as Exhibit A (the "Guaranty") to be signed and delivered to Buyer.

Furthermore, in the event the Seller and/or Guarantor are comprised of more than one entity and/or individuals, then ALL such entities and/or individuals, respectively, shall sign a standard form addendum of Buyer to this Agreement reflecting said interest of Buyer.

**WHEREAS,** Seller is desirous to sell to Buyer, and Buyer is desirous to purchase from Seller a Specified Percentage of the Seller's Future Receipts, but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the mutual receipts and sufficiency of which is hereby acknowledged by both parties, Buyer and Seller hereby agree to the foregoing and as follows:

1.  **Basic Terms and Definitions.**

    a.  "Effective Date" shall mean the later of: (i) the date set forth in the preamble to this Agreement, and (ii) the date when BUYER paid the Purchase Price to Seller.

    b.  "Specified Percentage" shall mean the percentage set forth in the preamble to this Agreement of each and every sum from sale made by Seller of Future Receipts.

    c.  "Future Receipts" shall mean, collectively, all of Seller's receipts of monies for the sale of its goods and services that monies shall be paid and delivered to Seller by Seller's customers and/or other vendees after the Effective Date of this Agreement; which payments or deliveries of monies can be made in the form of cash, check, credit, charge, or debit card, ACH or other electronic transfer or any other form of monetary payment and/or pecuniary benefit received by Seller. "Daily Receipts" shall mean the amount of Future Receipts received by Seller on a daily basis.

    d.  "Purchased Amount" shall mean the total amount of the Specified Percentage of the Future Receipts that Seller shall be under obligation to deliver and pay over to Buyer pursuant to this Agreement. The Purchased Amount shall be the amount set forth under "Purchased Amount" in the preamble to this Agreement.



**e.** "Purchase Price" shall mean the total amount that Buyer agrees to pay for the Purchased Amount. The Purchase Price shall be the amount set forth under "Purchase Price" in the preamble to this Agreement. However, the amount that Seller will actually receive from Buyer pursuant to this Agreement will be less than the Purchase Price by the total sum of the Applicable Fees, Prior Balance and the Origination Fee, if any, as set forth in subparagraphs h., i., and j. below.

**f.** "Initial Installment" shall mean the fixed amount (whether daily or weekly, as set forth in the preamble) that Seller and Buyer agree to be a good faith approximation of the Specified Percentage of Seller's (daily or weekly) Future Receipts. Seller and Buyer further agree that the Initial Installment set forth in the Preamble to this Agreement is based upon the information provided by Seller to Buyer concerning Seller's most recent accounts receivable and/or revenue, including representations by the Seller to Buyer regarding the Seller's estimated Future Receipts, and subject to Seller's right of adjustment/reconciliation set forth in this Agreement.

**g.** "Workday" shall mean Monday through Friday except on days when banking institutions are closed for the holidays and do not process ACH payments.

**h.** "Applicable Fees" shall mean, collectively, all initial costs and fees that Seller agrees to pay to Buyer as consideration for agreeing to enter into this Agreement and that are described in Section 17 of this Agreement. The total sum of the Applicable Fees will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 1 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

**i.** "Prior Balance" shall mean the sum of all amounts that Seller may owe to Buyer and/or third party(s) as of the Effective Date of this Agreement. The Prior Balance, if any, is described in Section 18 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller pursuant to Seller's authorization set forth in Rider 2 to this Agreement, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchase Price or Purchased Amount.

**j.** "Origination Fee" shall mean the fee set forth in Rider 1 that Buyer charges Seller for the costs of underwriting and processing Seller's application for funding. The Origination Fee, if any, is described in Section 19 of this Agreement and will be deducted from the Purchase Price prior to delivering it to Seller, provided nevertheless that such deduction shall not be deemed to reduce the agreed upon Purchased Price or Purchased Amount.

**k.** In the event "Seller" is comprised of more than one entity, then:

    **i.** The term "Seller" shall mean, individually and collectively, all such entities; and

    **ii.** Each Seller is an "Affiliate" of all other Seller(s). The term "Affiliate" shall mean an entity or an individual that (1) controls, (2) is under the "Control", or (3) is under common Control with the entity or individual in question. The term "Control" shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the management and policy of such corporation or other entity, whether through ownership of voting securities, by stature, or by contract; and

    **iii.** The representations, warranties, covenants, obligations and liabilities of each Seller shall be joint and several under this Agreement;

    **iv.** The liability of each Seller under this Agreement shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity;

    **v.** The terms "Specified Percentage", "Future Receipts", and "Initial Installment" shall mean the Specified Percentage and the Future Receipts of each Seller individually; and

    **vi.** Buyer may pursue its rights and remedies under this Agreement against any one or any number of entities that constitute Seller without obligation to assert, prosecute or exhaust any remedy or claim against any other Seller or any Guarantor.

**l.** In the event "Guarantor" is comprised of more than one individual, then:

    **i.** The term "Guarantor" shall mean, individually and collectively, all such individuals;

    **ii.** Each Guarantor is an Affiliate of all other Guarantor(s);

    **iii.** The representations, warranties, covenants, obligations and liabilities of each Guarantor shall be joint and several under this Agreement and the Guaranty;



      **iv.**    The liability of each Guarantor under this Agreement and the Guaranty shall be direct and immediate and shall not be conditional or contingent upon the pursuance of any remedies against any other person or entity; and

      **v.**    Buyer may pursue its rights and remedies under this Agreement and/or Guaranty against any one or any number of individuals that constitute Guarantor without obligation to assert, prosecute or exhaust any remedy or claim against any other Guarantor or any Seller.

**2.**    **The Term.** This Agreement for the purchase and sale of Future Receipts does not have a fixed duration or term, and therefore it is potentially infinite. Subject to the provisions of Sections 10-13 hereof, the term of this Agreement shall commence on the Effective Date and expire on the date (the "<u>Expiration Date</u>") when the Purchased Amount and all other sums due to Buyer pursuant to this Agreement are received by Buyer in full.

**3.**    **Sale of Purchased Future Receipts.** Seller hereby sells, assigns, transfers and conveys (hereinafter, the "<u>Sale</u>") unto Buyer all of Seller's right, title and interest in to the Specified Percentage of the Future Receipts until the Purchased Amount shall have been delivered by Seller to Buyer (hereinafter, the portion of the Future Receipts sold by Seller to Buyer pursuant to this Agreement, the "<u>Purchased Future Receipts</u>"); to have and hold the same unto Buyer, its successors and assigns, forever. This Sale of the Purchased Future Receipts is made without express or implied warranty to Buyer of collectability of the Purchased Future Receipts by Buyer and without recourse against Seller and/or Guarantor(s), except as specifically set forth in this Agreement. By virtue of this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Future Receipts and Seller retains no legal or equitable interest therein.

**4.**    **Payment of Purchase Price.** In consideration of the sale by Seller to Buyer of the Purchased Future Receipts pursuant to this Agreement, Buyer agrees to pay to Seller the Purchase Price. The amount of the Purchase Price (reduced by the Applicable Fees, Prior Balance, and Origination Fee, if any) shall be delivered to Seller after execution of this Agreement.

**5.**    **Use of Purchase Price.** Seller hereby acknowledges that it fully understands that: (i) Buyer's ability to collect the Purchased Amount (or any portion thereof) is contingent upon Seller's continued operation of its business and successful generation of the Future Receipts until the Purchased Amount is delivered to Buyer in full; and (ii) that in the event of decreased efficiency or total failure of Seller's business Buyer's receipt of the full or any portion of the Purchased Amount may be delayed indefinitely. Based upon the foregoing, Seller agrees to use the Purchase Price exclusively for the benefit and advancement of Seller's business operations and for no other purpose.

**6.**    **Initial Installments of Purchased Amount.** The Purchased Amount shall be delivered by Seller to Buyer in the amount of the Initial Installment on each and every Workday or Workweek (depending on whether the Initial Installment are daily or weekly) commencing on the Effective Date and ending on the Expiration Date.

**7.**    **Approved Bank Account and Credit Card Processor.** During the term of this Agreement, Seller shall: (i) deposit all Future Receipts into one (and only one) bank account which bank account shall be acceptable and preapproved by Buyer (the "Approved Bank Account"), (ii) use one (and only one) credit card processor which processor shall be acceptable and preapproved by Buyer (the "Approved Processor") and (iii) deposit all credit card receipts into the Approved Bank Account. In the event the Approved Bank Account or Approved Processor shall become unavailable or shall cease providing services to Seller during the term of this Agreement, prior to the first date of such unavailability or cessation of services, Seller shall arrange for another Approved Bank Account or Approved Processor, as the case may be.

**8.**    **Authorization to Debit Approved Bank Account.** Seller hereby authorizes Buyer to initiate electronic checks or ACH debits from the Approved Bank Account (which as of the Effective Date of this Agreement shall be the account listed below) in the amount of the Initial Installment commencing on the Effective Date until Buyer receives the full Purchased Amount;

\*Seller shall provide Buyer with all access code(s) for the Approved Bank Account during the Term of this Agreement.

The Initial Installment is to be drawn via ACH payment, from the following bank account:

    **i.** Account Number: <u>667259920</u>

    **ii.** Routing Number: <u>322271627</u>

    **iii.** Account Name: <u>CALIFORNIA SCUBA CENTER</u>

    **iv.** Bank Name: <u>CHASE</u>

\*Note that this authorization is to remain in full force and effect until Buyer receives written notification from



Seller of its termination in such time and in such manner to afford Buyer a reasonable opportunity to act on it; provided, however, that revocation of this authorization prior to remittance of the balance under the Agreement shall constitute a breach thereunder, subject to Sections 10-13 herein.

**9.     Fees Associated with Debiting Approved Bank Account**. It shall be Seller's exclusive responsibility to pay to its banking institution and/or Buyer's banking institution directly (or to compensate Buyer, in case it is charged) all fees, charges and expenses incurred by either Seller or Buyer due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Seller's banking institution of the transactions contemplated by this Agreement, including without limitation a $35.00 charge per bounced or rejected ACH debit.

**10.    Seller's Right for Reconciliation**. Seller and Buyer each acknowledges and agrees that:

      **a.**     If at any time during the term of this Agreement Seller will experience unforeseen decrease or increase in its Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 11 below, to request retroactive reconciliation of the Initial Installments to accurately reflect the Specified Percentage of the Purchased Future Receipts during that period.

      **b.**     Such reconciliation (the "Reconciliation") of the Seller's Initial Installment shall be performed by Buyer within five (5) Workdays following its receipt of the Seller's request for Reconciliation by either crediting or debiting the difference back to, or from, the Approved Bank Account so that the total amount debited by Buyer from the Approved Bank Account during the period at issue is equal to the Specific Percentage of the Future Receipts that Seller collected during that time.

      **c.**     One or more Reconciliation procedures performed by Buyer may reduce or increase the effective Initial Installment amount during that time in comparison to the one set forth in Section 1 of this Agreement, and, as the result of such reduction, the term of this Agreement during which Buyer will be debiting the Approved Bank Account may get shortened or extended indefinitely.

**11.    Request for Reconciliation Procedure.**

      **a.**     It shall be Seller's sole responsibility and the right hereunder to initiate Reconciliation of Seller's actual Initial Installments during by sending a request for Reconciliation to Buyer.

      **b.**     Any such request for Reconciliation of the Seller's Initial Installments shall be in writing, shall include a copy of (as applicable) Seller's bank statement(s), credit card processing statements, and pertinent aging report(s) for the period at issue, and shall be received by Buyer via email to submissions@ibexfundinggroup.com, with the subject line "REQUEST FOR RECONCILIATION".

      **c.**     Seller shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Buyer shall comply with each such request, provided that:

           **i.**     Each such request is made in accordance with the terms of this Section 11; and

           **ii.**     If a request for Reconciliation is made after the expiration of the term of this Agreement and, as the result of such Reconciliation, the total amount actually debited by Buyer from the Approved Bank Account will become less than the Purchased Amount, then and in such event the term of this Agreement shall automatically be extended until the time when the total amount actually debited from Approved Bank Account pursuant to this Agreement shall become equal to the Purchased Amount.

      **d.**     Nothing set forth in Sections 10 or 11 of this Agreement shall be deemed to: (i) provide Seller with the right to interfere with Buyer's right and ability to debit the Approved Bank Account while the request for Reconciliation of Seller's receipts is pending or until the Purchased Amount is collected by Buyer in full, or (ii) modify the amount of the Initial Installment for any period during the term of this Agreement other than during the Reconciliation period as the result of the Reconciliation.

**12.    Adjustment of the Initial Installment**. Seller and Buyer each acknowledge and agree that:

      **a.**     If at any time during the term of this Agreement Seller experiences a steady decrease in its Receipts, Seller shall have the right, at its sole and absolute discretion, but subject to the provisions of Section 13 below, to request modification ("Adjustment") of the amount of the Initial Installment that Seller is obligated to deliver to Buyer in accordance with the provisions of Section 6 above. Such Adjustment shall become effective as of the date it is granted and the new adjusted amount of the Initial Installment (the "Adjusted Installment") shall replace and supersede the amount of the Initial Installment set forth in Section 1 above.

      **b.**     The Adjustment of the Initial Installment shall be performed by Buyer within five (5) Workdays following



its receipt of the Seller's request for Adjustment by modifying the amount of the Initial Installment that shall be debited from the Approved Bank Account until the Purchased Amount is paid in full.

    **c.**     One or more Adjustments performed by Buyer may substantially extend the term of this Agreement.

## 13.   Request for Adjustment Procedure.

    **a.**     It shall be Seller's sole responsibility and the right to initiate the Adjustment by sending a request for Adjustment to Buyer.

    **b.**     A request for Adjustment (an "Adjustment Request") shall be in writing, and shall include copies of (as applicable): (i) Seller's last three (3) consecutive bank statements of the Approved Bank Account, the last three (3) credit card processing statements and the last three (3) aging reports immediately preceding the date of Buyer's receipt of the Adjustment Request, and (ii) Seller's bank statements and credit card processing statements previously provided by Seller to Buyer based upon which statements the amount of the Initial Installment set forth in Section 1 above (or the then current Adjusted Installment as the case may be) was determined, and shall be received by Buyer by email at submissions@ibexfundinggroup.com, with the subject line "REQUEST FOR ADJUSTMENT".

    **c.**     Seller shall have the right to request Adjustment of the Initial Installment, or the Adjusted Installment (as the case may be), as many times during the term of this Agreement as it deems proper, and Buyer shall comply in good faith with such request, provided that <u>each such request for Adjustment is made in accordance with the terms of this Section 13.</u>

    **d.**     Nothing set forth in Sections 12 or 13 of this Agreement shall be deemed to provide Seller with the right to (i) interfere with Buyer's right and ability to debit the Approved Bank Account while the request for Adjustment is pending or until the Purchased Amount is collected by Buyer in full.

## 14.   Seller's Right to Accelerate Remittance of the Outstanding Portion of the Purchased Amount of Future Receipts ("Outstanding PAFR").

    **a.**     Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, at any time after receipt from Buyer of the Purchase Price, and upon obtaining Buyer's prior written consent, to accelerate delivery to Buyer of the then undelivered portion of the Purchased Amount of Future Receipts (such amount, the "Outstanding PAFR"). The delivery of the Outstanding PAFR shall be governed by the following subparagraphs.

    **b.**     The Outstanding PAFR can only be delivered in full and not partially.

    **c.**     Seller shall request the right to accelerate the delivery of the Outstanding PAFR by notifying Buyer to that effect; provided that such notice shall be in writing (an email delivery shall be deemed acceptable) and shall contain the information on the source(s) of the funds to be used for delivery of the Outstanding PAFR and on the approximate date of such delivery.

    **d.**     Buyer shall respond to Seller's request within three (3) Workdays from the date of its receipt by Buyer.

    **e.**     In its response to Seller's request, Buyer shall indicate the exact amount of the Outstanding PAFR as of the date of its delivery by Seller.

    **f.**     As of the date agreed upon as between Buyer and Seller, Seller shall deliver to Buyer the full amount of the Outstanding PAFR (such date, the "<u>Accelerated Delivery Date</u>").

    **g.**     Under no circumstances shall Seller suspend or modify, or cause to be suspended or modified, the delivery to Buyer of the Initial Installments prior to the delivery of the Outstanding PAFR to Buyer.

    **h.**     Upon delivery of the Outstanding PAFR to Buyer in compliance with the provisions of this Section 14, Seller's obligations to Buyer pursuant to this Agreement shall be deemed completed and fulfilled.

## 15.   Rights and Obligations of Buyer Upon Receipt of the Outstanding PAFR. Upon receipt of the full amount of the Outstanding PAFR:

    **a.**     Buyer shall notify the Approved Bank Account and request from it to stop transferring Initial Installments to Buyer's bank account.

    **b.**     If Buyer shall have received one or more Initial Installment (or Adjusted Installment, as the case may be) after the Accelerated Delivery Date (due to the Approved Bank's delay in processing Buyer's request described in subparagraph (a) above or for any other reason), Buyer shall immediately do one of the two following things (but not both):



   **i.** Return to Seller the total sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by Buyer after the date of delivery of the Outstanding PAFR to Buyer; or

   **ii.** Apply the total sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by Buyer after the Accelerated Delivery Date toward Seller's outstanding financial obligations to Buyer existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any).

     **A.** By way of example, if as of the Accelerated Delivery Date, Seller and Buyer would be parties to a another future receivables sale and purchase agreement in connection with a portion of Seller's Future Receipts that is not subject to this Agreement (such agreement, an "<u>Unrelated Future Agreement</u>"), then and in such event Buyer may, in its sole and absolute discretion, apply the sum of the Initial Installments (or the Adjusted Installments, as the case may be) received by Buyer after the Accelerated Delivery Date pursuant to this Agreement toward fulfilling Seller's obligations to Buyer pursuant to the Unrelated Future Agreement.

  **c.** Seller acknowledges and agrees that Buyer shall have the right to apply the total sum of the Initial Installments (or Adjusted Installments, as the case may be) received by Buyer after the Accelerated Delivery Date toward Seller's outstanding financial obligations to Buyer existing as of the Accelerated Delivery Date for reasons unrelated to this Agreement (if any) in exchange for, and as an adequate and sufficient consideration for, Buyer granting Seller the right to accelerate the payment of the Purchased Amount of Future Receipts.

**16.** <u>**Risk Sharing Acknowledgments and Arrangements.**</u>

  **a.** Seller and Buyer each hereby acknowledges and agrees that:

   **i.** The Purchased Future Receipts represent a portion of Seller's Future Receipts.

   **ii.** This Agreement consummates the sale of the Purchased Future Receipts at a discount, not the borrowing of funds by Seller from Buyer. Buyer does not charge Seller and will not collect from Seller any interest on the monies paid by Buyer for the purchase of the Purchased Future Receipts. The period of time that it will take Buyer to collect the Purchased Amount is not fixed, is unknown to both parties as of the Effective Date of this Agreement and will depend on how well or not well Seller's business will be performing following the Effective Date. As an extreme example, in the event Seller's business ceases to exist after Buyer's purchase of the Purchased Future Receipts as a result of a drying up of revenues for reasons outside Seller's control, Buyer may never collect all or a substantial portion of the Purchased Future Receipts and will never recover the moneys it spent on such purchase.

   **iii.** The amount of the Initial Installment set forth in Section 1 of this Agreement is calculated based upon the information concerning an average amount of Receipts collected by Seller's business immediately prior to the Effective Date of this Agreement, as well as representations regarding the Seller's estimated Future Receipts, which information was provided by the Seller to Buyer.

   **iv.** The amounts of Seller's Future Receipts may increase or decrease over time.

   **v.** If, based upon the Reconciliation and/or the Adjustment procedures described above, it will be determined that the actual amounts of the Specified Percentage of the Future Receipts get reduced in comparison to the amount of the Initial Installment as of the Effective Date set forth in Section 1 of this Agreement, and in comparison to the amount that both Seller and Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is not remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business (but not due to Seller's willful or negligent mishandling of its business or due to Seller's failure to comply with its obligations under this Agreement), Seller would not be in breach of or in default under this Agreement.

  **b.** <u>**Buyer's Risk Acknowledgments**</u>. Buyer agrees to purchase the Purchased Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes this risk based exclusively upon the information provided to it by Seller and related to the business operations of Seller's business prior to the date hereof, and upon Seller's representations, warranties and covenants contained in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. Furthermore, Buyer hereby acknowledges and agrees that Seller shall be excused from performing its obligations under this Agreement in the event Seller's business ceases its operations exclusively due to the following reasons (collectively, the "<u>Valid Excuses</u>"):

   **i.** adverse business conditions that occurred for reasons outside Seller's control and not due to Seller's willful or negligent mishandling of its business;

   **ii.** loss of the premises where the business operates (but not due to Seller's breach of its obligations to its landlord), provided however that Seller does not continue and/or resume business operations at another location;



    **iii.**   bankruptcy of Seller; and/or

    **iv.**   natural disasters or similar occurrences beyond Seller's control.

    **c.**   **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the outstanding amount of the Purchased Amount. Any ACH payments and/or payments which clear after the Effective Date of this Agreement shall be applied to the balance hereunder.

    **d.**   **Not a Loan.** Seller and Buyer agree that the Purchase Price is paid to Seller in consideration for the acquisition of the Purchased Future Receipts and that payment of the Purchase Price by BUYER is not intended to be, nor shall it be construed as, a loan from Buyer to Seller that requires absolute and unconditional repayment on a maturity date. To the contrary, Buyer's ability to receive the Purchased Amount pursuant to this Agreement, and the date when the Purchased Amount is delivered to Buyer in full (if ever) are subject to and conditioned upon performance of Seller's business. If, nevertheless, a court having jurisdiction over this Agreement and the parties hereto shall have determined that Buyer has charged or received interest hereunder in excess of the highest rate allowed by law, then the rate of such interest received by Buyer shall automatically be reduced to the maximum rate permitted by applicable law and Buyer shall promptly refund to Seller any interest received by Buyer in excess of the maximum lawful rate.

**17.**    **Applicable Fees.** Seller acknowledges that the Applicable Fees were agreed upon between Seller and Buyer prior to Seller entering into this Agreement, were subject to arm-length negotiation between Buyer and Seller, and a detailed list of the Applicable Fees is set forth in Rider 1 of this Agreement, which is attached hereto and made a part hereof.

**18.**    **Prior Balance.** Seller represents and warrants that Rider 2, which is attached hereto and made a part hereof, contains true and correct information as to the name(s) of Seller's creditors and the amounts that Seller owes each of those creditors as of the Effective Date (and these amounts being a portion of the Prior Balance), and that as of the date hereof there are no creditors of Seller which may otherwise encumber the Purchased Future Receipts other than those listed in Rider 2. Seller indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of such representation being untrue, incorrect or incomplete.

**19.**    **Origination Fee.** Seller hereby agrees for Buyer to withhold from the Purchase Price the Origination Fee contained in Rider 1, which is attached hereto and made a part hereof.

**20.**    **No Reduction of Purchase Price.** Seller hereby: (i) agrees to pay the Applicable Fees, the Prior Balance and the Origination Fee (the sum of those, hereinafter, the "Closing Costs") in full; (ii) hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to this Agreement toward satisfaction of Seller's obligation to pay the Closing Costs by deducting the amount of the Closing Costs from the Purchase Price prior to delivering it to Seller; and (iii) agrees that deduction of the Closing Costs from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**21.**    Seller represents, warrants and covenants that as of this date and during the term of this Agreement:

    **a.**   **Financial Condition and Financial Information.** Seller's bank and financial statements, copies of which have been furnished to Buyer, and future statements which may be furnished hereafter pursuant to this Agreement or upon Buyer's request, fairly represent the financial condition of Seller as of the dates such statements were issued, and prior to execution of the Agreement there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller has a continuing, affirmative obligation to advise Buyer of any material adverse change in its financial condition, operation or ownership, and/or online banking log-in credentials. Buyer may request Seller's bank statements at any time during the term of this Agreement and Seller shall provide them to Buyer within two (2) Workdays of such request. Seller's failure to do so, and/or cutting off Buyer's online access to the Approved Bank Account, is a material breach of this Agreement.

    **b.**   **Governmental Approvals.** Seller is in compliance and, during the term of this Agreement, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

    **c.**   **Good Standing.** Seller is a corporation/limited liability company/limited partnership/other type of entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now



being conducted.

**d.   Authorization.** Seller has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Seller is bound or any statute, rule, regulation, order or other law to which Seller is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Seller. All organizational and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Seller has full power and authority to bind Seller to perform its obligations under this Agreement.

**e.   Accounting Records and Tax Returns.** Seller will treat receipt of the Purchase Price and payment of the Purchased Amount in a manner evidencing sale of its future receipts in its accounting records and tax returns and further agrees that Buyer is entitled to audit Seller's accounting records upon reasonable notice in order to verify compliance. Seller hereby waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Seller asserts that this transaction is anything other than a sale of future receipts.

**f.   Taxes; Workers Compensation Insurance.** Seller has paid and will promptly pay, when due, all taxes, including without limitation, income, employment, sales and use taxes, imposed upon Seller's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

**g.   Business Insurance**. Seller maintains and will maintain general liability and business-interruption insurance naming Buyer as loss payee and additional insured in the amounts and against risks as are satisfactory to Buyer and shall provide Buyer proof of such insurance upon request.

**h.   Electronic Check Processing Agreement**. Seller shall not change its Approved Processor, add terminals, change its Approved Bank Account(s) or take any other action that could have any adverse effect upon Seller's obligations or impede Buyer's rights under this Agreement, without Buyer's prior written consent.

**i.   No Diversion of Future Receipts**. Seller shall not allow any event to occur that would cause a diversion of any portion of Seller's Future Receipts from the Approved Bank Account or Approved Processor without Buyer's written permission.

**j.   Change of Name or Location**. Seller, any successor-in-interest of Seller, and Guarantor shall not conduct Seller's businesses under any name other than as disclosed to the Approved Processor and Buyer, shall not change and/or transfer ownership in/of the Seller and will not change any of its places of business without first obtaining Buyer's written consent.

**k.   Prohibited Business Transactions.** Seller shall not: (i) transfer or sell all or substantially all of its assets (including without limitation the Collateral (as such term is defined in Section 22) or any portion thereof) without first obtaining Buyer's consent; or (ii) make or send notice of its intended bulk sale or transfer.

**l.   No Closing of Business**. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without first: (i) obtaining the express written consent of Buyer, and (ii) providing Buyer with a written agreement of a purchaser or transferee of Seller's business or assets to assume all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Seller represents that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Seller agrees that until Buyer shall have received the Purchased Amount in full, Seller will not voluntarily close its business on a permanent or temporarily basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Seller shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Seller's business by legal authorities having jurisdiction over Seller's business (such as from a health department or fire department), or if such closing is necessitated by circumstances outside Seller's reasonable control. Prior to any such temporary closure of its business, Seller shall provide Buyer ten (10) business days advance notice.

**m.   No Pending Bankruptcy.** As of the date of Seller's execution of this Agreement, Seller is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under any title of the United States Code and there has been no involuntary bankruptcy petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy or some other insolvency proceeding within six months immediately preceding the date of this Agreement.

**n.   Estoppel Certificate**. Seller will at any time, and from time to time, upon at least one (1) day's prior notice from Buyer to Seller, execute, acknowledge and deliver to Buyer and/or to any other person or entity specified by Buyer, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications,

DocuSign Envelope ID: 012CB7CB-AE26-4E93-8C98-7249F04148B6



that the same is in full force and effect as modified and stating the modification(s) and stating the date(s) on which the Purchased Amount or any portion thereof has been repaid.

   **o.**   **Unencumbered Future Receipts**. Seller has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Seller specifically warrants and represents that it is not currently bound by the terms of any future receivables and/or factoring agreement which may encumber in any way the Future Receipts.

   **p.**   **No Stacking**. Seller shall not further encumber the Future Receipts, without first obtaining written consent of Buyer. Any further encumbrance by seller of the Future Receipts is a material breach of this Agreement.

   **q.**   **Business Purpose**. Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

   **r.**   **No Default Under Contracts with Third Parties**. Seller's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Seller under any contract, which Seller is or may become a party to.

   **s.**   **Right of Access.** In order to ensure Seller's compliance with the terms of this Agreement, Seller hereby grants Buyer the right to enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Approved Processor and to ensure that Seller has not violated any other provision of this Agreement. Furthermore, Seller hereby grants Buyer and its employees and consultants access to Seller's employees and records and all other items of property located at the Seller's place of business during the term of this Agreement. Seller hereby agrees to provide Buyer, upon request, all and any information concerning Seller's business operations, banking relationships, names and contact information of Seller's suppliers, vendors and landlord(s), to allow Buyer to interview any of those parties.

   **t.**   **Phone Recordings and Contact.** Seller agrees that any call between Seller and Buyer and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, Seller acknowledges and agrees that: (i) it has an established business relationship with Buyer, its managers, employees and agents (collectively, the "Buyer Parties") and that Seller may be contacted by any of the Buyer Parties from time-to-time regarding Seller's performance of its obligations under this Agreement or regarding other business transactions; (ii) it will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the Buyer Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to Seller's office, or its owners, managers, officers, or employees.

   **u.**   **Knowledge and Experience of Decision Makers**. The persons authorized to make management and financial decisions on behalf Seller with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Seller entering into this Agreement.

   **v.**   **Seller's Due Diligence**. The person authorized to sign this Agreement on behalf of Seller: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Buyer.

   **w.**   **Consultation with Counsel**. The person(s) signing this Agreement of behalf of Seller: (a) has read and fully understands the content of this Agreement; (b) has consulted to the extent he/she wished with Seller's own counsel in connection with the entering into this Agreement; (c) has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Seller, and whether this Agreement adequately reflects his or her understanding of its terms.

   **x.**   **Buyer's Consent.** Seller agrees that in every instance Seller's rights under this Agreement are contingent upon first obtaining Buyer's consent, such consent may be withheld, granted or conditioned at Buyer's sole and absolute discretion.

   **y.**   **No Reliance on Oral Representations**. This Agreement contains the entire agreement between Seller and Buyer with respect to the subject matter of this Agreement and supersedes each course of conduct previously



pursued or acquiesced in, and each oral agreement and representation previously made, by Buyer or any of the Buyer Parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Buyer Parties, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect Seller's obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

 **z.**   **No Additional Fees Charged.** Seller hereby acknowledges and agrees that: (i) other than the Closing Costs, if any, Buyer is not charging any additional fees to Seller; and (ii) if Seller is charged with any fee and/or cost not listed in this Agreement or the Riders hereto, such fee is not charged by Buyer. Moreover, as all working capital received under this Agreement is required to ensure Seller's continued success, Seller warrants and covenants not to pay any fee and/or commission with regard to this transaction other than as provided for herein.

## PLEDGE OF SECURITY

**22.**   **Pledge.** As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of Seller under this Agreement (and any future amendments of this Agreement, if any) (hereinafter referred to collectively as the "Obligations"), Seller hereby pledges, assigns and hypothecates to Buyer (collectively, "Pledge") and grants to Buyer a continuing, perfected and first priority lien upon and security interest in, to and under all of Seller's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

 **a.**   all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Seller; and

 **b.**   all Seller's proceeds, as such term is defined by Article 9 of the UCC.

**23.**   **Termination of Pledge.** Upon the payment and performance by Seller in full of the Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Seller. Upon any such termination, Buyer will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Seller shall reasonably request.

**24.**   **Representations with Respect to Collateral.** Seller hereby represents and warrants to Buyer that the execution, delivery and performance by Seller of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC -1s); and (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, and/or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Seller is a party or by which any of Seller's assets (including, without limitation, the Collateral) are bound.

**25.**   **Further Assurances.** Upon the request of Buyer, Seller, at Seller's sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Buyer may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

**26.**   **Attorney-in-Fact.** Seller hereby authorizes Buyer at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Buyer as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time, in Buyer's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Seller, and thereafter filing any such financing and/or continuation statements, and (b) to receive, endorse and collect all instruments made payable to Seller.

## EVENTS OF DEFAULT AND REMEDIES

**27.**   **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" by Seller:

 **a.**   Seller shall violate any term, condition or covenant in this Agreement governing Seller's obligations of



timely delivery and in full of Initial Installments (or Adjusted Installments, as the case may be) to Buyer, and timely and in full payment to Buyer of any other sums due for any reason whatsoever other than as the result of Seller's business ceasing its operations exclusively due to any of the Valid Excuses.

     **b.** Any representation or warranty by Seller made in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made.

     **c.** Seller shall default under any of the terms, covenants and conditions of any other agreement with Buyer (if any) which is related to the instant Agreement.

     **d.** Seller uses multiple depository accounts without obtaining prior written consent of Buyer in each instance.

     **e.** Seller fails to deposit any portion of its Future Receipts into the Approved Bank Account;

     **f.** Seller changes the Approved Bank Account or Approved Processor without obtaining prior written consent of BUYER in each instance.

     **g.** Seller interferes with Buyer's collection of Initial Installments (or Adjusted Installments, as the case may be).

     **h.** Two (2) or more ACH transactions attempted by Buyer are rejected by Seller's bank due to lack of sufficient funds in the Approved Bank Account, without Seller giving Buyer prior notice and a valid reason for said lack of funds.

     **i.** Buyer receives an "R02", "R07", "R08", "R16", "R29" or any other similar ACH response code indicating that Buyer's ACH transactions have been stopped, not authorized, or the account has been frozen or closed, without Seller giving Buyer prior notice.

     **j.** The Guaranty shall for any reason cease to be in full force and effect.

**28.** **Default under the Agreement**. In case any Event of Default occurs and is not waived by Buyer, in writing, Buyer may declare Seller in default under this Agreement without notice.

**29.** **Seller's Obligations Upon Default**. Upon occurrence of an Event of Default due to Seller's breach of its obligations under this Agreement, Seller shall immediately deliver to Buyer the entire unpaid portion of the Purchased Amount. In addition, Seller shall also pay to Buyer, as additional damages, any reasonable expenses incurred by Buyer in connection with recovering the monies due to Buyer from Seller pursuant to this Agreement, including without limitation the costs of retaining collection firms and reasonable attorneys' fees and disbursements (collectively, "Reasonable Damages"). The parties agree that Buyer shall not be required to itemize or prove its Reasonable Damages and that the fair value of the Reasonable Damages shall be calculated as thirty-three percent (33%) of the undelivered portion of the Purchased Amount of Future Receipts upon the occurrence of an event of default, or seventy-five hundred dollars ($7,500.00), whichever is greater. The entire sum due to Buyer pursuant to this Section 29 shall bear simple interest from the Default Payment Date until is paid in full, at the rate of 9.00% per annum (and such interest shall accrue daily).

**30.** **Remedies Upon Default**. Upon Seller's default, Buyer may immediately proceed to protect and enforce its rights under this Agreement and/or Guaranty by:

     **a.** Enforcing its rights as a secured creditor under the Uniform Commercial Code including, without limitation, notifying any account debtor(s) of Seller and/or Guarantor(s) as the terms are defined below, of Buyer's security interest (Buyer understands that in the course of notifying said account debtor of Seller's security interest, Seller shall have the right to share any and all information regarding this Agreement and the Personal Guarantee of Performance);

     **b.** Enforcing the provisions of the Personal Guarantee of Performance against the Guarantor(s) without first seeking recourse from Seller;

     **c.** Notifying Seller's and/or Guarantor's credit card processor of the sale of Future Purchase Receipts hereunder and to direct such credit card processor to make payment to Buyer of all or any portion of the amounts received by such credit card processor on behalf of Seller; and

     **d.** Commencing a suit in law and/or equity, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy including without limitation Buyer's rights of a secured party under the UCC.

**31.** **Remedies are not Exclusive**. All rights, powers and remedies of Buyer in connection with this Agreement set



forth herein may be exercised at any time after the occurrence of any Event of Default, are cumulative and not exclusive and shall be in addition to any other rights, powers or remedies provided to Buyer by law or equity.

**32.** **Power of Attorney.** Seller irrevocably appoints Buyer and its representatives as its agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Buyer from any credit card processor and/or account debtor(s) of Seller; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement, including without limitation (i) to protect the value of the Collateral by obtaining the required insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors, as that term is defined by Article 9 of the Uniform Commercial Code (" Account Debtors"), to make payment directly to Buyer (including providing information necessary to identify Seller); and (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to collection of the Purchased Amount.

## ADDITIONAL TERMS

**33.** **Seller Deposit Agreement.** Seller shall execute an agreement with Buyer that shall authorize Buyer to arrange for electronic fund transfer services and/or "ACH" payments of Initial Installments (or Adjusted Installments, as the case may be) from the Approved Bank Account. Seller shall provide Buyer and/or its authorized agent with all information, authorizations and passwords necessary to verify Seller's receivables, receipts and deposits into the Approved Bank Account. Seller shall authorize (by executing written authorizations, if required) Buyer and/or it's agent to deduct daily the amounts of the Initial Installment (or the Adjusted Installment, as the case may be) to Buyer from settlement amounts which would otherwise be due to Seller from electronic check transactions and to pay such amounts to Buyer by permitting Buyer to withdraw the Initial Installments (or the Adjusted Installments, as the case may be) from such an account. The authorization shall be irrevocable until such time when Seller shall have performed its obligations under this Agreement in full.

**34.** **Financial Condition.** Seller and its Guarantor(s) authorize Buyer and its agents to investigate their financial status and history and will provide to Buyer any bank or financial statements, tax returns, etc., as Buyer deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. Buyer Seller hereby authorizes Buyer to receive from time to time updates on such information and financial status.

**35.** **Transactional History.** Seller shall execute written authorization(s) to their bank(s) to provide Buyer with Seller's banking and/or credit-card processing history.

**36.** **Indemnification.** Seller and its Guarantor(s) jointly and severally, indemnify and hold harmless to the fullest extent permitted by law Approved Processor, any ACH processor, customer and/or Account Debtors of the Seller, its/their officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any ACH processor, customer and/or Account Debtors of the Seller resulting from (a) claims asserted by Buyer for monies owed to Buyer from Seller and (b) actions taken by any ACH processor, customer and/or Account Debtor of the Seller in reliance upon information or instructions provided by Buyer.

**37.** **No Liability.** In no event shall Buyer be liable for any claims asserted by Seller or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby knowingly and voluntarily waived by Seller and Guarantor(s).

## MISCELLANEOUS

**38.** **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

**39.** **Assignment.** Buyer may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Seller. Seller shall not assign its rights or obligations under this Agreement without first obtaining Buyer's written consent.

**40.** **Notices.** Unless different means of delivering notices are set forth elsewhere in this Agreement, all notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.



41.     **Waiver Remedies**. No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

42.     **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

43.     **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forum"). The parties agree that the Acceptable Forum is convenient and submit to the jurisdiction of the Acceptable Forum and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to the Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in this Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this transaction. Seller and its Guarantor(s) consent to service of process and legal notices made by First Class Mail, Priority Mail or certified mail, return receipt requested, delivered by the United States Postal Service and addressed to the mailing address set forth on Page 1 of this Agreement or any other address(es) provided in writing to Buyer by Seller or Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete 5 days after dispatch. Seller and its Guarantor(s) agree that they will be precluded from asserting that they did not receive service of process or any other notice mailed to the mailing address set forth on Page 1 of this Agreement if they do not furnish a certified mail return receipt signed by Buyer demonstrating that Buyer was provided with notice of a change in the contact address.

44.     **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have expired.

45.     **Severability**. In case any of the provisions in this Agreement are found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision of this Agreement that may be found by a court having jurisdiction to be prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

46.     **Entire Agreement**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. The Exhibit(s), Riders and Addendums, if any, to this Agreement are part of this Agreement.

47.     **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION AND DISCUSSIONS OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

48.     **CLASS ACTION WAIVER.** EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY, AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR IS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT TO THE CONTRARY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

49.     **ARBITRATION.** THE PARTIES ACKNOWLEDGE AND AGREE THAT, PROVIDED THAT NO SUIT, ACTION OR PROCEEDING HAS BEEN ALREADY COMMENCED IN CONNECTION WITH ANY MATTER ARISING OUT OF



OR RELATED TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, EACH BUYER, SELLER, AND ANY GUARANTOR OF SELLER SHALL HAVE THE RIGHT TO REQUEST THAT ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THE CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT, ARE SUBMITTED TO ARBITRATION. THE PARTY SEEKING ARBITRATION SHALL FIRST SEND A WRITTEN NOTICE OF INTENT TO ARBITRATE TO ALL OTHER PARTIES, BY CERTIFIED MAIL UPON SENDING OF SUCH NOTICE, A PARTY REQUESTING ARBITRATION MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). EACH SELLER, GUARANTOR AND BUYER SHALL PAY THEIR OWN ATTORNEYS' FEES INCURRED DURING THE ARBITRATION PROCEEDING. THE PARTY INITIATING THE ARBITRATION SHALL PAY ANY ARBITRATION FILING FEE, ADMINISTRATION FEE AND ARBITRATOR'S FEE.

**50.** **Counterparts and Facsimile Signatures**. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together, shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

### [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]



**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**FOR SELLER # 1**

By: MICHAEL SCOTT FITZGERALD
**Name:** MICHAEL SCOTT FITZGERALD
**Title: Owner/Agent/Manager**
**EIN:** 84-2623424

**FOR THE SELLER # 2 (if any)**

By:_____
**Name:**
**Title: Owner/Agent/Manager**
**EIN:** 84-2623424

**AGREE TO BE BOUND BY THE PROVIONS OF THIS AGREEMENT APPLICABLE TO AND CONCERNING GUARANTOR.**

**OWNER/GUARANTOR # 1**

By: MICHAEL SCOTT FITZGERALD
**Name:** MICHAEL SCOTT FITZGERALD
**SSN:**

**OWNER/GUARANTOR # 2 (if any)**

By:_____
**Name:**
**SSN:**

**IBEX FUNDING GROUP LLC**

By:_____
**Name:** IBEX FUNDING GROUP LLC
**Title:**

 **IBEX FUNDING GROUP**

# EXHIBIT A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>08/11/2021</u>, by the undersigned individual(s) whose name(s) and signature(s) appear in the signature box of this Guaranty (individually and collectively, jointly and severally, "Guarantor") for the benefit of **IBEX FUNDING GROUP LLC** ("Buyer").

**WHEREAS:**

**A.** Pursuant to that Future Receivables Sale and Purchase Agreement (the "Agreement"), dated as of <u>08/11/2021</u>, between Buyer and the Seller(s) listed below (collectively and individually, "Seller"), Buyer has purchased a portion of Future Receipts of Seller.

**B.** Each Guarantor is an owner, officer, manager or affiliate of Seller and will directly benefit from Buyer and Seller entering into the Agreement.

**C.** Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of the obligations of Seller under the Agreement (each such obligation, individually, an "Obligation" and all such obligations, collectively, the "Obligations").

**NOW, THEREFORE,** as an inducement for Buyer to enter into the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms.** All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

**2. Guaranty of Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt, full, faithful and complete performance and observance of all of Seller's Obligations; and Guarantor unconditionally covenants to Buyer that if default or breach shall at any time be made by Seller in the Obligations, Guarantor shall well and truly pay or perform (or cause to be paid or performed) the Obligations and pay all damages and other amounts stipulated in the Agreement with respect to the non-performance of the Obligations, or any of them.

**3. Guarantor's Additional Covenants.** The liability of Guarantor hereunder shall not be impaired, abated, deferred, diminished, modified, released, terminated or discharged, in whole or in part, or otherwise affected, by any event, condition, occurrence, circumstance, proceeding, action or failure to act, with or without notice to, or the knowledge or consent of, Guarantor, including, without limitation:

    **a.** any amendment, modification or extension of the Agreement or any Obligation;

    **b.** any extension of time for performance, whether in whole or in part, of any Obligation given prior to or after default thereunder;

    **c.** any exchange, surrender or release, in whole or in part, of any security that may be held by Buyer at any time under the Agreement;

    **d.** any other guaranty now or hereafter executed by Guarantor or anyone else;

    **e.** any waiver of or assertion or enforcement or failure or refusal to assert or enforce, in whole or in part, any Obligation, claim, cause of action, right or remedy which Buyer may, at any time, have under the Agreement or with respect to any guaranty or any security which may be held by Buyer at any time for or under the Agreement or with respect to the Seller;

    **f.** any act or omission or delay to do any act by Buyer which may in any manner or to any extent vary the risk of Guarantor or which would otherwise operate as a discharge of Guarantor as a matter of law;

    **g.** the release of any other guarantor from liability for the performance or observance of any Obligation, whether by operation of law or otherwise;

    **h.** the failure to give Guarantor any notice whatsoever;



i. any right, power or privilege that Buyer may now or hereafter have against any person, entity or collateral.

**4. Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller outside of the ordinary course of Seller's business without the prior written consent of Buyer, which consent may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor shall pay to Buyer upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) of, or incidental to, or relating to the enforcement or protection of Buyer's rights hereunder or Buyer's rights under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors and assigns of Buyer. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim, which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified and consents that a negative credit report reflecting on his/her credit record may be submitted to a credit-reporting agency if the Guarantor does not honor the terms of this Guaranty.

**5. Waiver; Remedies.** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**6. Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount of Future Receipt is a payment for an adequate consideration and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges that Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges that the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount.

**7. Governing Law and Jurisdiction.** This Guaranty shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Guaranty shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forum"). The parties agree that the Acceptable Forum is convenient and submit to the jurisdiction of the Acceptable Forum and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Guaranty irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. Seller and its Guarantor(s) acknowledge and agree that the Purchase Price is being paid and received by Seller in New York, that the Specified Percentage of the Future Receipts are being delivered to Buyer in New York, and that the transaction contemplated in the Agreement was negotiated, and is being carried out, in New York. Seller and its Guarantor(s) acknowledge and agree that New York has a reasonable relationship to this Guaranty. Seller and its Guarantor(s) consent to service of process and legal notices made by First Class Mail, Priority Mail or certified mail, return receipt requested, delivered by the United States Postal Service and addressed to the mailing address set forth on Page 1 of this Agreement or any other address(es) provided in writing to Buyer by Seller or Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete 5 days after dispatch. Seller and its Guarantor(s) agree that they will be precluded from asserting that they did not receive service of process or any other notice mailed to the mailing address set forth on Page 1 of this Agreement if they do not furnish a certified mail return receipt signed by Buyer demonstrating that Buyer was provided with notice of a change in the contact address.

**8. <u>JURY WAIVER.</u> THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

## RIDER 1

## TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT ("Agreement")
### Between IBEX FUNDING GROUP LLC ("BUYER")

And _____CALIFORNIA SCUBA CENTER LLC_____ ("Seller"),

dated ___08/11/2021___.

## APPLICABLE FEES

1. **Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

2. **Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise indicated herein.

3. **Applicable Fees**. The parties agree that the Applicable Fees which Seller shall pay to Buyer, pursuant to Section 17 of the Agreement shall be as follows:

   a. **Origination Fee:** $ 4,500.00_____ , or up to ten percent (10%) of the Purchase Price (the cost of the due diligence and underwriting of Seller's business performed by Buyer. As a general rule, the Origination Fee varies and depends on the complexity of underwriting required on a business including without limitation, sophistication of Seller's principals, difficulty in ascertaining Seller's receivables and account debtors, sources of Seller's revenue flow, etc.).

   b. **UCC Fee:** $250.00

   c. **NSF Fee:** $35.00 per NSF

   d. **ACH Rejection Fee:** $35.00 per rejection

   e. **Default Fee:** See Section 29 of the Agreement

4. **Authorization**. Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Applicable Fees pursuant to Section 17 of the Agreement by deducting the amount of the Applicable Fees from the Purchase Price prior to delivering it to Seller.

5. **No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Applicable Fees from the Purchase Price shall not be deemed to reduce the Purchase Price.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

FOR THE SELLER                                    FOR THE SELLER #2 (If any)

**By:** _MICHAEL SCOTT FITZGERALD_____        **By:** _____

**Name:** MICHAEL SCOTT FITZGERALD                **Name:**



# RIDER 2

## TO THE FUTURE RECEIVABLES SALE AND PURCHASE AGREEMENT
### ("Agreement")

### Between IBEX FUNDING GROUP LLC ("BUYER")

and ___CALIFORNIA SCUBA CENTER LLC_____ ("Seller")

dated ___08/11/2021_____.

## PRIOR BALANCE

**1. Possible Conflicts**. If there is any conflict or inconsistency between any of the provisions of this Rider and any of the provisions of the Future Receivables Sale and Purchase Agreement (the "Agreement") to which this Rider is attached, all such conflicts and inconsistencies shall be resolved in favor of the provisions of this Rider.

**2. Definitions**. All capitalized terms used in this Rider shall have the meaning set forth in the Agreement unless otherwise

indicated herein.

**3. Prior Balance**. Seller represents and warrants that the following list of its creditors and the amounts that Seller owes its creditors as of the Effective Date of the Agreement is true, correct and complete:

**TOTAL PRIOR BALANCE:**

**4. Authorization**. Seller hereby authorizes Buyer to apply a portion of the Purchase Price due to Seller pursuant to the Agreement toward satisfaction of Seller's obligation to pay the Prior Balance pursuant to Section 18 of the Agreement by deducting the amount of the Prior Balance from the Purchase Price prior to delivering it to Seller, and to forward the specific amounts owed by Seller to Buyer and/or the creditors listed in this Rider.

**5. No Reduction of Purchase Price**. Seller hereby agrees that deduction of the Prior Balance from the Purchase Price shall not be deemed to reduce the Purchase Price.

**6. Indemnification.** Seller hereby indemnifies and holds harmless Buyer for any and all damages and losses (including without limitation legal fees and expenses) incurred by Buyer as the result of the information set forth in this Rider being untrue or incorrect or incomplete.

**Seller and Buyer agree that this Rider shall be attached to the Agreement and shall be made a part thereof.**

**AGREED AND ACCEPTED:**

**OWNER/GUARANTOR #1**
By: _MICHAEL SCOTT FITZGERALD_____
**Name:** MICHAEL SCOTT FITZGERALD
**SSN:**

**OWNER/GUARANTOR #2 (if any)**
By: _____
**Name:**
**SSN:**

**IBEX FUNDING GROUP LLC**
By: _____
**Name:**
**Title:**



Dear Seller,

Thank you for your interest to work with IBEX FUNDING GROUP LLC. We look forward to working with you for as long as you need.

As part of the underwriting process, IBEX FUNDING GROUP LLC will require viewing access to your bank account prior to and during the Future Receivables Sale and Purchase Agreement. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Please fill out the form below with the information necessary to access your account.
* Be sure to indicate capital or lower-case letters.

Name of bank: _____CHASE_____

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Any other information necessary to access your account: _____

_____

## **AUTHORIZATION TO INITIATE ACH DEBIT ENTRIES**

Name of Company      **IBEX FUNDING GROUP LLC**

## **CUSTOMER INFORMATION**

I (We) hereby authorize Company as shown above, hereinafter called COMPANY, to initiate debit entries to my (our) bank account as detailed below, and to debit the same to such account. Should a transaction be returned, I (we) further authorize debiting this account for non-sufficient fund fees according to applicable State Law. I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. Law.

Full Name on Account:   CALIFORNIA SCUBA CENTER LLC

Account #:   667259920      Routing #:   322271627

Account Type (select one):   ☒Checking      ☐Savings

Account Class (select one):   ☐Consumer Account      ☐Business Account

Debit Payment Details:

Payment Amount:   $1,200.00      Number of payments:   75

Date of next payment: 08/11/2021      Frequency of payments:   DAILY
(example: one-time, monthly, etc.)

I agree to be bound by the ACH Rules as defined by the National ACH Association (NACHA). I understand that this authorization is to remain in full force and effect until Company has received written notification from me of its termination at least five (5) business days prior to the payment due date. I further understand that canceling my ACH authorization does not relieve me of the responsibility of paying my account in full, and that if I cancel or revoke this authorization before any remaining debt is paid in full, the Company may take additional actions including legal actions to secure the debt.

Customer Signature:   X _MICHAEL SCOTT FITZGERALD_      Date:   08/11/2021
(Authorized Signer for Account)

Customer Printed Name:   MICHAEL SCOTT FITZGERALD

Customer Contact Telephone #:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 7



## Amsterdam Capital Solutions

### REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated **August 11, 2021** between Amsterdam Capital Solutions ("ACS") the Merchant(s) listed below ("**Merchant**") and the Individual(s) listed below ("**Guarantor**")

### MERCHANT INFORMATION

Merchant's Legal Name: CALIFORNIA SCUBA CENTER LLC

ASSET RECORDS MANAGEMENT / BACKYARD CREATIONS, INC.

D/B/A: CALIFORNIA SCUBA CENTER    State of Incorporation / Organization: CA    Type of Entity: Corp. ○    LLC ●

Physical Address: 510 SHAW AVE    Other: _____ ○    Sole Prop ○

City: CLOVIS    State: CA    Zip: 93612    Business Phone: 559-512-8727

Guarantor(s) Name: MICHAEL SCOTT FITZGERALD    Cellphone Number: 559908144    Email Address: MIKE@CASCUBACENTER.COM

Mailing Address: SAME AS ABOVE    City: _____    State: _____    Zip: _____

Purchase Price: $ 70,000.00    Purchased Percent 15 %    Purchased Amount: $ 104,930.00    Payment Frequency: WEEKLY    Remittance $ 5,247.00

In consideration of payment by ACS to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to ACS (making ACS the absolute owner) the Purchased Percentage of all of the Merchant's receipts, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to ACS.

Merchant is selling a portion of a future revenue stream to ACS at a discount, and is not borrowing money from ACS, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by ACS. The Remittance is a good faith estimate of ACS's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. ACS is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and ACS assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give ACS a reasonable and fair opportunity to receive the benefit of its bargain. ACS acknowledges that it may never receive the Purchased Amount in the event that the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

ACS will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, ACS (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as ACS receives payment in full of the Purchased Amount. Merchant hereby authorizes ACS to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of ACS) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide ACS with all required access codes and monthly bank statements regarding the Account so that ACS may monitor the Account. ACS payment of the Purchase Price shall be deemed the acceptance and performance by ACS of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by ACS remains in the Account and will be held responsible for any fees incurred by ACS resulting from a rejected ACH attempt or an Event of Default. ACS is not responsible for any overdrafts or rejected transactions that may result from ACS's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between ACS and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT (#1)** By: MICHAEL SCOTT FITZGERALD

(Print Name and Title)

DocuSigned by:

*MICHAEL SCOTT FITZGERALD*

B02136B9D0834A1...

(Signature)

**FOR THE MERCHANT (#2)** By: _____

(Print Name and Title)

(Signature)

**BY GUARANTOR(S) (#1)** By: MICHAEL SCOTT FITZGERALD

(Print Name and Title)

DocuSigned by:

*MICHAEL SCOTT FITZGERALD*

B02136B9D0834A1...

(Signature)

**BY GUARANTOR(S) (#2)** By: _____

(Print Name and Title)

(Signature)

1

Initial: DS *MSF*



## Amsterdam Capital Solutions

<u>MERCHANT AGREEMENT TERMS AND CONDITIONS</u>

**1    TERMS OF ENROLLMENT IN PROGRAM**

1.1    <u>Merchant Deposit Agreement and Processor.</u> Merchant shall (A) execute an agreement acceptable to ACS with a Bank acceptable to ACS to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to ACS with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide ACS and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes ACS and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to ACS for the receipts as specified herein and to pay such amounts to ACS. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by ACS or not. This additional authorization is not a waiver of ACS's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which ACS did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of ACS.

1.2 <u>Term of Agreement.</u> This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by ACS as he terms of this Agreement.

1.3 <u>Reconciliation.</u> As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to info@mcaservicingcompany.com Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. ACS retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and ACS shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by ACS within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by ACS shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with ACS's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4 <u>Adjustments to the Remittance.</u> As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to ACS to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to info@mcaservicingcompany.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. ACS retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and ACS shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide ACS with viewing access to their bank account as well as all information reasonably requested by ACS to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.5 <u>Financial Condition.</u> Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize ACS and its agents to investigate their financial responsibility and history, and will provide to ACS any authorizations, bank or financial statements, tax returns, etc., as ACS requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. ACS is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.6 <u>Transactional History.</u> Merchant authorizes all of its banks, brokers and processor to provide ACS with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide ACS with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from ACS.

1.7 <u>Indemnification.</u> Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless ACS and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnity as a direct or indirect result of (a) claims asserted by ACS for monies owed to ACS from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by ACS.

1.8 <u>No Liability.</u> In no event will ACS be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of ACS's attorney's fees and expenses resulting therefrom.

1.9 <u>Reliance on Terms.</u> Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, ACS, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

1.10 <u>Sale of Receipts.</u> Merchant and ACS agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from ACS to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. ACS has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that ACS's share of Receipts collected are being held by Merchant in trust and are the sole property of ACS until they are remitted to ACS. Payments made to ACS in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to ACS full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. ACS hereby appoints Merchant, and Merchant accepts appointment, as service for and on behalf of ACS for the purpose of collecting and delivering Receipts to ACS as required by this Agreement until ACS has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to ACS under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that ACS is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that ACS has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and ACS shall promptly refund to Merchant any interest received by ACS in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that ACS not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11 <u>Power of Attorney.</u> Merchant irrevocably appoints ACS and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to ACS from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to ACS; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which ACS may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by   merchant.

1.12 <u>Protections against Default.</u> The following Protections 1 through 8 may be invoked by ACS immediately and without notice to Merchant in the event:  (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the ACS electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to ACS; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check

Initial *MSF*

DocuSign Envelope ID: B08EB028-5531-400F-A345-5D50A689D416



## Amsterdam Capital Solutions

processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of ACS, and (ii) the written agreement of any ACS or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to ACS; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide ACS with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from ACS, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections arein addition to any other remedies available to ACS at law, in equity or otherwise pursuant to this Agreement.
**Protection 1.** The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.
**Protection 2.** ACS may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
**Protection 3.** Merchant hereby authorizes ACS to execute in the name of the Merchant a Confession of Judgment in favor of ACS pursuant to the terms of the Confession of Judgment. Upon an Event of Default, ACS may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
**Protection 4.** ACS may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.
**Protection 5.** ACS may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9
**Protection 6.** ACS may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if ACS recovers a Judgment against Merchant, Merchant shall be liable for all of ACS's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.
**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to ACS. Upon breach of any provision in this Agreement, ACS may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. ACS may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to ACS.
**Protection 8.** ACS may debit Merchant's depository accounts wherever situated in such amounts as determined by ACS in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to ACS by means of ACH debit or facsimile signature on a computer generated check drawn on Merchant's bank account or otherwise for all sums due to ACS.
**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes ACS to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that ACS obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against ACS or any of its affiliates relating to any (i)investigation undertaken by or on behalf of ACS as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.
**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by ACS, including this Agreement and any other ACS documents (collectively, "Confidential Information") are proprietary and confidential information of ACS. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of ACS to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles ACS to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.
**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantor(s)s hereto all hereby authorizes ACS to use its, his or her name in listings of clients and in advertising and marketing materials.
**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that ACS may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between ACS and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## 2 REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:
**2.1 Financial Condition and Financial Information.** Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to ACS, and future statements which will be furnished hereafter at the discretion of ACS, fairly represent the financial condition of Merchant at such dates, and since those dates
there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise ACS of any material adverse change in their financial condition, operation or ownership. ACS may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to ACS within five business days after request from ACS. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.
**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.
**2.3 Authorization,** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.
**2.4 Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.
**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without ACS's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and ACS, nor shall Merchant change any of its places of business without prior written consent by ACS.
**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.
**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from ACS to Merchant, execute, acknowledge and deliver to ACS and/or to any other person, firm or corporation specified by ACS, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has beenrepaid.
**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.
**2.10 Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which ACS has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of ACS or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of ACS.
**2.11 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.
**2.12 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith.** Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling ACS the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

3

Initial 



## Amsterdam Capital Solutions

### 3  EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor(s) shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant or verbally notifying ACS of its intent to breach this Agreement; (d) the Merchant fails to give ACS 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account; (e) Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by ACS, (f) Merchant shall voluntarily transfer or sell all or substantially all of its assets; (g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (h) Merchant shall use multiple depository accounts without the prior written consent of ACS or takes any other action that intentionally interferes with or prevents ACS from receiving the Purchased Amount in accordance with the terms of this Agreement; (i) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party. (j) Merchant shall change its depositing account without the prior written consent of ACS; or (k) Merchant shall close its depositing account used for ACH debits without the prior written consent of ACS (I) Merchant's bank returns a code other than NSF cutting ACS from its collections (m) Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant; (n) Merchant shall default under any of the terms, covenants and conditions of any other agreement with ACS.

**3.2 Limited Personal Guaranty** Upon the occurrence of an Event of Default, ACS will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will be jointly and severally liable to ACS for all of ACS's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement

**3.3 Remedies.** Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, ACS may proceed to protect and enforce its rights and enforce its rights in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of ACS in connection with this Agreement may be exercised at any time by ACS after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Attorney's Fees.** Upon the occurrence of an Event of Default, and ACS retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

**3.5 Costs.** Merchant shall pay to ACS all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of ACS's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.6 Required Notifications.** Merchant is required to give ACS written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give ACS seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

### 4  MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by ACS.

**4.2 Assignment.** ACS may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to ACS shall become effective only upon receipt by ACS. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of ACS to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and ACS and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of ACS which consent may be withheld in ACS's sole discretion. ACS reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if ACS so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by ACS to transfer such proceeding to an Acceptable Forum. Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by ACS by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and ACS and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

4

Initial 

## SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: CALIFORNIA SCUBA CENTER LLC

D/B/A: CALIFORNIA SCUBA CENTER          Federal ID#: 84-2623424

Physical Address: 510 SHAW AVE          City: CLOVIS          State: CA          Zip: 93612

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to ACS and ACS's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to ACS a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to ACS under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to ACS upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover ACS's entitlements under this Agreement, ACS is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of ACS's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, ACS or an affiliate of ACS is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to ACS for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due ACS under the Revenue Purchase Agreement. With respect to any such entity, ACS shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. ACS shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. ACS shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of ACS's rights, including without limitation, ACS's right to collect all accounts, and to notify any payment card processor or creditor of such entity that ACS has such rights in such entity's assets. Merchant also agrees that, at the ACS's discretion, ACS may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by ACS without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. ACS shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, ACS has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, ACS will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from ACS written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and ACS is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by ACS. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to ACS such instruments and documents ACS may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. ACS is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to ACS under any other agreement between Merchant or Guarantor(s)(s) and ACS (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as ACS deems necessary to perfect or maintain ACS's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes ACS to file any financing statements deemed necessary by ACS to perfect or maintain ACS's security interest. Merchant and Guarantor(s)(s) shall be liable for, and ACS may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by ACS in protecting, preserving and enforcing ACS's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** ACS shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, ACS may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that ACS may enter into an agreement with Merchant's landlord giving ACS the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, ACS may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to ACS, whether by acceleration or otherwise.

5

Initial 

DocuSign Envelope ID: B08EB028-5531-400F-A345-5D50A689D416



## Amsterdam Capital Solutions

### GUARANTY OF PERFORMANCE

As an additional inducement for ACS to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides ACS with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to ACS in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers.** In the event of a breach of the above, ACS may seek recovery from Guarantor(s)s for all of ACS's losses and damages by enforcement of ACS's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral ACS may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. ACS is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) ACS's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to ACS. In addition, ACS may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to ACS; (ii) release Merchant from its obligations to ACS; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to ACS under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that ACS must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

**Guarantor(s) Acknowledgement.** Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if ACS so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by ACS to transfer such proceeding to an Acceptable Forum.

The Merchant and Guarantor Acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their rights to Service of Porcess by traditional manners and will accept process of any Summons and Complaint or other legal process by certifies mail return receipt requested to the Mailing Address on Page 1 of the Agreement.

---

**FOR ALL MERCHANT(S) (#1)** By: MICHAEL SCOTT FITZGERALD

DocuSigned by:

*MICHAEL SCOTT FITZGERALD*

_____ (Print Name and Title)  B02136B9D0834A1...  (Signature)

SSN# 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

---

**FOR ALL MERCHANT(S) (#2)** By: _____

_____ (Print Name and Title)  _____ (Signature)

SSN# _____

---

**GUARANTOR(S) (#1)** By: MICHAEL SCOTT FITZGERALD

DocuSigned by:

*MICHAEL SCOTT FITZGERALD*

_____ (Print Name and Title)  B02136B9D0834A1...  (Signature)

SSN# 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

---

**GUARANTOR(S) (#2)** By: _____

_____ (Print Name and Title)  _____ (Signature)

SSN# _____

6

Initial: 



## Amsterdam Capital Solutions

### APPENDIX A - THE FEE STRUCTURE:

A. Underwriting Fee  $ 2,800.00  to cover the underwriting and related expenses.

B. Origination Fee  $ 2,800.00  to cover the cost of Origination and ACH Setup.

C. NSF Fee (standard) $35.00 (each)

D. Rejected ACH / Blocked ACH / Default Fee $2,500.00 when Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E. Bank Change Fee $50.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system

F. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

**FOR THE MERCHANT (#1)** By: MICHAEL SCOTT FITZGERALD

(Print Name and Title)

*MICHAEL SCOTT FITZGERALD*

B02136B9D0834A (Signature)

**FOR THE MERCHANT (#2)** By: _____

(Print Name and Title)

_____

(Signature)

7

Initial: MSF



**Amsterdam Capital Solutions**

## <u>AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS</u>

Merchant: <u>CALIFORNIA SCUBA CENTER LLC</u>
(Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between ACS and Merchant, dated as of <u>August 11, 2021</u>
(Month) (Day) (Year)

Designated Checking Account:

| | | | |
|---|---|---|---|
| Bank Name: | <u>CHASE BANK</u> | Branch: | |
| Tax ID: | <u>84-2623424</u> | | |
| ABA: Routing: | <u>322271627</u> | DDA: Account: | <u>667259920</u> |

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes ACS to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. By signing below, Merchant also authorizes ACS to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:

In the amount of: $ <u>5,247.00</u>   (Or) Percentage of each Banking Deposit: <u>15</u> %   On the Following Day(s): ☐ Monday ☐ Tuesday ☐ Wednesday ☐ Thursday ☑ Friday

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that ACS may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes ACS to initiate ACH entries to correct any erroneous payment transaction. Merchant also authorizes ACS or its affiliates and servicers to collect amounts due.

**MISCELLANEOUS.** ACS is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until ACS has received written notification from Merchant at the address set forth below at least 5 banking days prior to its termination to afford ACS a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant: <u>CALIFORNIA SCUBA CENTER LLC</u>
(Merchant's Legal Name)

Date: <u>August 11, 2021</u>
(Month) (Day) (Year)

Title: <u>Owner</u>

X: *MICHAEL SCOTT FITZGERALD*
DocuSigned by:
B02136990089A4E...
(Signature)

Print Name: <u>MICHAEL SCOTT FITZGERALD</u>

Initial:  DS mSF

DocuSign Envelope ID: B08EB028-5531-400F-A345-5D50A689D416



# Amsterdam Capital Solutions

### Bank Login Information

Dear Merchant,

Thank you for accepting this offer from Amsterdam Capital Solutions. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

Funder will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of Bank:

_____

Bank portal website: _____
Username: Password: _____

Security Question / Answer 1: _____
Security Question / Answer 2: _____
Security Question / Answer 3: _____

Any other information necessary to access your account:

_____

_____

| | |
|---|---|
| DocuSigned by: | |
| *MICHAEL SCOTT FITZGERALD* | August 11, 2021 |
| B0213680b6834A1... | Date |
| Merchant / Owner Signature | |

9

Initial: *MSF*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 8



ver. 5/20/21 FL

ALVA ADVANCE LLC
300 Arthur Godfrey Rd Suite 201A, Miami Beach, FL 33140

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated _____09/01/2021_____ by and between ALVA ADVANCE LLC ("ALVA") and each merchant listed below ("Merchant").

Merchant's Legal Name: CALIFORNIA SCUBA CENTER LLC, and all entities listed on "Exhibit A"

D/B/A/: CALIFORNIA SCUBA CENTER _____ Fed ID #: 84-2623424 _____

Type of Entity:

☐ Corporation ☑ Limited Liability Company ☐ Limited Partnership ☐ Limited Liability Partnership ☐ Sole Proprietor

Business Address: 510 SHAW AVE _____ City: CLOVIS _____ State: CA _____ Zip: 93612 ____

Contact Address: 510 SHAW AVE _____ City: CLOVIS _____ State: CA _____ Zip: 93612 ____

E-mail Address: mike@cascubacenter.com _____ Phone Number: (559) 908-1444 _____

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 78,468.00 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 117,702.00 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 40 % |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 71,335.00 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 1,816.02<br>**per** _____ **day** |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to ALVA (making ALVA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to ALVA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by ALVA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount,

I have read and agree to the terms and conditions set forth above:

_____
MSF

Name: MICHAEL SCOTT FITZGERALD Title: OWNER _____ Date: 09/01/2021 _____

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

are the property of ALVA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for ALVA and that each Merchant will hold Receivables in trust for ALVA in its capacity as a fiduciary for ALVA.

The Receivables Purchased Amount shall be paid to ALVA by each Merchant irrevocably authorizing only one depositing account acceptable to ALVA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as ALVA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes ALVA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide ALVA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). ALVA is not responsible for any overdrafts or rejected transactions that may result from ALVA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to ALVA for the following fees, where applicable:

A. $ 7,133.00   - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If ALVA considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover ALVA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of ALVA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that ALVA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific _day_____ will be capped at $ 1,816.02_____ (the "Cap"). If the Specified Percentage of all Receivables for a specific _day_____ is less than the Cap, then in addition to the Specified Percentage of Receivables for that _day_____, ALVA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that _day_____ does not exceed the Cap. The Cap is not applicable to make up for a business day on which ALVA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by ALVA to have taken place.

**4. Reconciliations**. Any Merchant may give written notice to ALVA requesting that ALVA conduct a reconciliation in order to ensure that the amount that ALVA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to accountant@alvaadvance.com and such notice will be deemed to have been received if and when ALVA sends a reply e-mail (but not a read receipt). If such reconciliation determines that ALVA collected more than it was entitled to, then ALVA will credit to the Account all amounts to which ALVA was not entitled within seven days thereafter. If such reconciliation determines that ALVA collected less than it was entitled to, then ALVA will debit from the Account all additional amounts to which ALVA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. ALVA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying ALVA the amount of the balance of the Receivables Purchased Amount at

**I have read and agree to the terms and conditions set forth above:**

_____
~~~~~~~~~~ msf ~~~~~~~~~~

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER _____ Date: 09/01/2021 _____

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to ALVA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide ALVA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize ALVA and/or its agent(s) to deduct the amounts owed to ALVA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to ALVA by permitting ALVA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent ALVA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until ALVA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, and 57 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to ALVA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes ALVA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to ALVA any bank or financial statements, tax returns, and other documents and records, as ALVA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. ALVA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** ALVA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between ALVA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for ALVA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

ALVA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives ALVA permission to call or send a text message to any telephone number given to ALVA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives ALVA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that ALVA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that ALVA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of ALVA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. ALVA may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to ALVA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement

**I have read and agree to the terms and conditions set forth above:**

Name: <u>MICHAEL SCOTT FITZGERALD</u>  Title: <u>OWNER</u>  Date: <u>09/01/2021</u>

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

authorize ALVA, its agents and representatives, and any credit-reporting agency engaged by ALVA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to ALVA under this Agreement or for ALVA's ability to determine any Merchant's eligibility to enter into any future agreement with ALVA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to ALVA under the Fair Credit Reporting Act, authorizing ALVA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes ALVA to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to ALVA under the Fair Credit Reporting Act, authorizing ALVA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes ALVA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide ALVA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by ALVA for monies owed to ALVA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by ALVA.

**14. No Liability.** In no event will ALVA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and ALVA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from ALVA to any Merchant. ALVA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in ALVA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. ALVA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to ALVA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints ALVA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to ALVA, or, if ALVA considers an Event of Default to have taken place under Section 34, to settle all obligations due to ALVA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to ALVA; and (v) to file any claims or take any action or institute any proceeding which ALVA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by ALVA, immediately

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD   Title: OWNER              Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to ALVA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of ALVA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to ALVA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to ALVA at law, in equity, or otherwise available pursuant to this Agreement.

(f) ALVA considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. ALVA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. ALVA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. ALVA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by ALVA, Merchant shall deliver to ALVA an executed assignment of lease of each Merchant's premises in favor of ALVA. Upon breach of any provision in this Section 17, ALVA may exercise its rights under such assignment of lease.

Protection 6. ALVA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. ALVA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to ALVA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to ALVA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints ALVA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to ALVA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes ALVA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against ALVA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of ALVA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by ALVA, including this Agreement and any other ALVA documents (collectively, "Confidential Information") are proprietary and confidential information of ALVA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of ALVA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that ALVA may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between ALVA and each Merchant, including

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER          Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to ALVA, and future statements which will be furnished hereafter at the request of ALVA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise ALVA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that within ten days after written notice of a request by ALVA, Merchant(s) will maintain business-interruption insurance naming ALVA as loss payee and additional insured in amounts and against risks as are satisfactory to ALVA and shall provide ALVA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without ALVA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to ALVA or change any place(s) of its business without prior written consent from ALVA.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from ALVA to that Merchant, execute, acknowledge, and deliver to ALVA and/or to any other person or entity specified by ALVA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of ALVA, other than any for which ALVA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than ALVA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER  Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

written consent of ALVA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to ALVA under this Agreement and any future obligations with ALVA, each Merchant hereby grants to ALVA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to ALVA under any other agreement between any Merchant or Guarantor and ALVA (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as ALVA deems necessary to perfect or maintain ALVA's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes ALVA to file any financing statements deemed necessary by ALVA to perfect or maintain ALVA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to ALVA with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with ALVA's rights. Each Merchant shall be liable for and ALVA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by ALVA in protecting, preserving, and enforcing ALVA's security interest and rights. Each Merchant further acknowledges that ALVA may use another legal name and/or D/B/A or an agent when designating the Secured Party when ALVA files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with ALVA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide ALVA with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of ALVA other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of ALVA;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of ALVA;
(8) Any Merchant uses multiple depository accounts without the prior written consent of ALVA;
(9) Any Merchant changes the Account without the prior written consent of ALVA;
(10) ALVA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by ALVA;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD   Title: OWNER               Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

(14) Any Merchant causes any ACH debit to the Account by ALVA to be blocked or stopped without providing any advance written notice to ALVA, which notice may be given by e-mail to accountant@alvaadvance.com; or

(15) Any Merchant prevents ALVA from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide ALVA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to accountant@alvaadvance.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with ALVA:

**35. Remedies.** In case any Event of Default occurs and is not waived, ALVA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of ALVA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by ALVA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, ALVA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in ALVA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to ALVA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without ALVA being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give ALVA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give ALVA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of ALVA, which consent may be withheld in ALVA's sole discretion. ALVA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by ALVA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or ALVA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between ALVA and such assignee (the "Assignment Agreement"), have the rights and obligations of ALVA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, ALVA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, ALVA may disclose all information that ALVA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon ALVA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by accountant@alvaadvance.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of Florida,

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD   Title: OWNER     Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

that the Purchase Price is being paid by ALVA in the State of Florida, that the Receivables Purchased Amount is being delivered to ALVA in the State of Florida, and that the State of Florida has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between ALVA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of Florida, without regard to any applicable principles of conflict of laws.

**40. Venue and Forum Selection.** Any litigation relating to this Agreement or involving ALVA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Broward or Miami-Dade in the State of Florida (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to ALVA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by ALVA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Costs.** Each Merchant and each Guarantor must pay all of ALVA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee, expert witness fees, and costs of suit.

**44. Prejudgment and Postjudgment Interest.** If ALVA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then ALVA will be entitled to the recovery of prejudgment interest at a rate of 18% per annum, or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 18% per annum, or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**45. Legal Fees.** If ALVA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay ALVA's reasonable attorney fees, which may include a contingency fee.

**46. Class Action Waiver.** ALVA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**47. Arbitration.** Any action or dispute relating to this Agreement or involving ALVA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Notwithstanding any provision of any applicable arbitration rules, an arbitration must be conducted remotely if so requested by any party to the arbitration. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to ALVA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in ALVA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to ALVA as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER  Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under the arbitration laws of the State in which the arbitration is being conducted or the laws of the State of Florida. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of ALVA.

**48. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to ALVA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by ALVA demonstrating that ALVA was provided with notice of a change in the Contact Address.

**49. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**50. Waiver.** No failure on the part of ALVA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**51. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to ALVA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of ALVA. Each Merchant and each Guarantor acknowledge that ALVA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify ALVA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that ALVA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**52. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**53. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**I have read and agree to the terms and conditions set forth above:**

*MSF*

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER  Date: 09/01/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

     **54. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

     **55. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

     **56. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. ALVA will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

     **57. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: MICHAEL SCOTT FITZGERALD      OWNER      *michael scott fitzger*
       (Print Name)          (Print Title)          (Signature)

SS# 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           Driver License Number C5897523

**FOR THE MERCHANT/OWNER (#2)**

By: _____     _____     _____
       (Print Name)          (Print Title)          (Signature)

SS# _____           Driver License Number _____

Approved for ALVA ADVANCE LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated _____09/01/2021_____, of the Standard Merchant Cash Advance Agreement, dated _____09/01/2021_____ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between ALVA ADVANCE LLC ("ALVA") and CALIFORNIA SCUBA CENTER LLC, and all entities listed on "Exhibit A" ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to ALVA in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** ALVA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives ALVA permission to call or send a text message to any telephone number given to ALVA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives ALVA permission to communicate such information to them by e-mail. Each Guarantor agrees that ALVA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that ALVA has no liability for any such charges.

**G3. Guarantor Waivers.** If ALVA considers any Event of Default to have taken place under the Agreement, then ALVA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral ALVA may hold pursuant to this Guarantee or any other agreement or guarantee. ALVA does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) ALVA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to ALVA. In addition, ALVA may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to ALVA; (ii) if there is more than one Merchant, release a Merchant from its obligations to ALVA such that at least one Merchant remains obligated to ALVA; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to ALVA under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, ALVA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in ALVA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to ALVA as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER  Date: 09/01/2021

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

of competent jurisdiction without any prior notice to any Merchant or Guarantor and without ALVA being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of Florida, that the Purchase Price is being paid by ALVA in the State of Florida, that the Receivables Purchased Amount is being delivered to ALVA in the State of Florida, and that the State of Florida has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between ALVA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of Florida, without regard to any applicable principles of conflict of laws.

**G7. Venue and Forum Selection.** Any litigation relating to this Agreement or this Guarantee or involving ALVA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Broward or Miami-Dade in the State of Florida (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to ALVA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with ALVA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by ALVA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Costs.** Each Merchant and each Guarantor must pay all of ALVA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G11. Prejudgment and Postjudgment Interest.** If ALVA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then ALVA will be entitled to the recovery of prejudgment interest at a rate of 18% per annum, or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 18% per annum, or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G12. Legal Fees.** If ALVA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay ALVA's reasonable attorney fees, which may include a contingency fee.

**G13. Class Action Waiver.** ALVA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G14. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving ALVA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Notwithstanding any provision of any applicable arbitration rules, an arbitration must be conducted remotely if so requested by any party to the arbitration. In case any Event of Default occurs and is not waived, each Guarantor consents to ALVA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in ALVA's favor, subject to court or arbitrator

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD   Title: OWNER   Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

approval, restraining each Guarantor's accounts and/or receivables up to the amount due to ALVA as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under the arbitration laws of the State in which the arbitration is being conducted or the laws of the State of Florida. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of ALVA.

**G15. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to ALVA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by ALVA demonstrating that ALVA was provided with notice of a change in the Contact Address.

**G16. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G17. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, and G21 shall survive any termination of this Guarantee.

**G18. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G19. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD  Title: OWNER  Date: 09/01/2021

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from ALVA ADVANCE LLC. We look forward to being your funding partner.

You authorize ALVA ADVANCE LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

ALVA ADVANCE LLC will require viewing access to your bank account each business day.

ALVA ADVANCE LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank: CHASE BANK

Name of account: CALIFORNIA SCUBA CENTER LLC

Account number: 667259920          Routing number: 322271627

Bank portal website:          chase.com

Username:          cascuba2019

Password:          510@ShawAve

Security Question/Answer 1:          Reba

Security Question/Answer 2:          Fresno

Security Question/Answer 3:          Craig

Any other information necessary to access your account:          None

If you have any questions please feel free to contact us directly.

**I have read and agree to the terms and conditions set forth above:**

Name: MICHAEL SCOTT FITZGERALD   Title: OWNER          Date: 09/01/2021



## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ESTIMATED PAYMENTS

This is an Addendum, dated _____09/01/2021_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____09/01/2021_____, between Alva Advance LLC ("ALVA") and _____CALIFORNIA SCUBA CENTER LLC, and all entities listed on "Exhibit A"_____ ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the _40_ % Specified Percentage of Merchant's Receivables, ALVA may instead debit $ _1,816.02_ ("Estimated Payment") from the Account every _____day_____. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Any Merchant may give written notice to ALVA requesting that ALVA conduct a reconciliation in order to ensure that the amount that ALVA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to accountant@alvaadvance.com and such notice will be deemed to have been received if and when ALVA sends a reply e-mail (but not a read receipt). If such reconciliation determines that ALVA collected more than it was entitled to, then within seven days thereafter, ALVA will credit to the Account all amounts to which ALVA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that ALVA collected less than it was entitled to, then within seven days thereafter, ALVA will debit from the Account all additional amounts to which ALVA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. ALVA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

## FOR THE MERCHANT/OWNER (#1)

By: MICHAEL SCOTT FITZGERALD      OWNER      *MICHAEL SCOTT FITZGERAL*

    (Print Name)                    (Print Title)                    (Signature)

## FOR THE MERCHANT/OWNER (#2)

By:_____     _____     _____

    (Print Name)                     (Print Title)                    (Signature)

DocuSign Envelope ID: BEAE04BB-2943-4A0E-AEE7-22E73FDD7138

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1.     I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____09/01/2021_____, between Alva Advance LLC ("Alva")       and       CALIFORNIA SCUBA CENTER LLC, and all entities listed on "Exhibit A" ("Merchant") on behalf of Merchant.

2.     This Declaration incorporates by reference the Agreement and every addendum to it.

3.     I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4.     I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5.     I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6.     I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7.     I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8.     I acknowledge that the payments to be made from any Merchant to Alva under the Agreement are being made in the ordinary course of each Merchant's business.

9.     I am aware of each Merchant's right to request a reconciliation of the payments made under the Agreement at any time.

10.    **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on 09/01/2021 _____
                     (Date)


**FOR THE MERCHANT/OWNER (#1)**


By: MICHAEL SCOTT FITZGERALD     OWNER     *MICHAEL SCOTT FITZGERALD*
        (Print Name)                  (Print Title)              B0213089D0834A1
                                                               (Signature)


**FOR THE MERCHANT/OWNER (#2)**


By: _____  _____  _____
        (Print Name)                  (Print Title)                  (Signature)